**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | |
|---|---|
| MSP RECOVERY CLAIMS, SERIES LLC, a Delaware series limited liability company; MSPA CLAIMS I, LLC, a Florida limited liability company; MSP Recovery Claims Series 44, LLC, a Delaware series limited liability company; MSP Recovery Claims PROV, Series LLC, a Delaware series limited liability company; and MSP Recovery Claims CAID, Series LLC, a Delaware series limited liability company; on behalf of themselves and all others similarly situated, | Case No. 3:22-cv-422<br><br>CLASS ACTION COMPLAINT<br><br>DEMAND FOR JURY TRIAL |
|        Plaintiffs, | |
| v. | |
| LUNDBECK LLC, a Delaware corporation; CARING VOICE COALITION, INC., an Idaho non-profit corporation; THERACOM, LLC, an Ohio corporation; and ADIRA FOUNDATION, a Virginia non-profit corporation, | |
|        Defendants. | |

**<u>CLASS ACTION COMPLAINT</u>**

**TABLE OF CONTENTS**

NATURE OF ACTION ............................................................................................. 1

   I.    PARTIES, JURISDICTION, AND VENUE ..................................................... 5

   II.   STANDING .................................................................................................. 14

   III.   REGULATORY BACKGROUND.................................................................. 15

   IV.   FACTUAL ALLEGATIONS......................................................................... 16

      A.   OIG Guidance for Co-Payment Charities ..................................... 21

      B.   CVC's Growth and OIG's Communications.................................. 23

      C.   The Scheme Permitted Lundbeck to Charge Supra-Competitive Prices For and Artificially Inflate the Quantity of Xenazine ....................................................... 28

      D.   The DOJ Settlement ...................................................................... 30

      E.   CVC's Fraudulent Transfers to Adira ........................................... 39

   V.   CLASS ACTION ALLEGATIONS ............................................................... 42

TOLLING OF THE STATUTE OF LIMITATIONS.................................................. 45

   VI.   CLAIMS FOR RELIEF ............................................................................... 46

      FIRST CLAIM FOR RELIEF ................................................................. 46

      SECOND CLAIM FOR RELIEF ............................................................ 54

      THIRD CLAIM FOR RELIEF ................................................................ 57

      FOURTH CLAIM FOR RELIEF ............................................................ 71

      FIFTH CLAIM FOR RELIEF ................................................................. 74

      SIXTH CLAIM FOR RELIEF................................................................. 78

      SEVENTH CLAIM FOR RELIEF .......................................................... 80

DEMAND FOR JUDGMENT.................................................................................... 81

JURY DEMAND ...................................................................................................... 82

APPENDIX .............................................................................................................. 83

Plaintiffs, MSP Recovery Claims, Series LLC ("MSPRC"); MSPA Claims 1, LLC ("MSPA"); MSP Recovery Claims Series 44, LLC ("Series 44"); MSP Recovery Claims PROV, Series LLC ("Claims PROV" ) MSP Recovery Claims CAID, Series LLC ("Claims CAID" and collectively, "Plaintiffs"), on behalf of themselves and other Medicare Advantage health plans[1] and Medicaid health plans[2] (collectively, "Class Members"),[3] sue Lundbeck LLC ("Lundbeck"), Caring Voice Coalition, Inc. ("CVC"), Theracom, L.L.C. ("Theracom") (collectively, "RICO Defendants"), and Adira Foundation f/k/a Facilitating Patient Health ("Adira" and collectively "Defendants") allege:

## NATURE OF ACTION

1. This case arises out of Lundbeck's conspiratorial schemes to increase the unit price and quantity dispensed of Xenazine, which is used to treat chorea associated with Huntington's disease. As a result of these schemes, Plaintiffs' assignors ("Assignors")[4] and the Class Members paid supra-competitive prices for Xenazine and for artificially inflated quantities of dispensed Xenazine on behalf of beneficiaries enrolled in their health plans ("Enrollees").

2. RICO Defendants created a scheme to circumvent Congressionally mandated co-

---

[1] "Medicare Advantage health plans" is defined as Medicare Advantage entities such as Medicare Advantage organizations ("MAOs"), Independent Practice Associations ("IPAs"), Management Service organizations ("MSOs"), Health Maintenance organizations ("HMOs"), and other Medicare first tier, downstream, and related entities. Throughout the Complaint, "MA Plan" is used as a shorthand for all such Medicare Advantage health plan entities.

[2] "Medicaid health plans" is defined to include Medicaid Managed Care Organizations ("MCO") and other Medicaid first tier, downstream, and related entities. Throughout the Complaint, "Medicaid Plans" is used as a shorthand for all such Medicaid health plan entities.

[3] The full class is defined infra, Section V.

[4] Plaintiffs hold assigned rights through assignments from several entities including MAOs, MCOs, full-risk organizations such as MSOs, IPAs, and other Medicare and Medicaid first-tier, downstream, and related entities, all of which act as third-party payers, providing prescription drug benefits, *inter alia*, to their enrolled beneficiaries ("Enrollees").

payment requirements (referred to as "Co-Payment Circumvention Enterprise" or simply, "Scheme") designed to reduce sensitivity to the ever-increasing drug prices and increased dispensing of Xenazine.[5]

3.      RICO Defendants executed their Scheme, engaging in numerous overt acts that both effectively eliminated price sensitivity allowing Lundbeck to raise their prices to supra-competitive levels and caused Xenazine to be over-dispensed rather than equivalent alternative options. This resulted in cognizable economic damages as Assignors and Class Members paid substantially more than they otherwise would have but for the Co-Payment Circumvention Enterprise.

4.      Lundbeck and CVC colluded and agreed that CVC would act as an illegal conduit, disguised as an independent charity, by which Lundbeck could funnel kickbacks to MA Plan patients and Medicaid Plan patients through CVC's disease funds. Lundbeck and CVC agreed that CVC would create a Huntington's Disease Fund ("HD Fund") that would exclusively, or nearly so, help Xenazine patients and that Lundbeck would be the sole donor to CVC's HD Fund.

5.      As part of this Scheme, Lundbeck used Theracom—acting as the Xenazine Information Center ("XIC")—to facilitate the transmission of information between Lundbeck and CVC. This information was used to ensure that CVC used the purported "donations" exclusively to pay for Xenazine co-payments and allowed Lundbeck to perform return on investment calculations.

---

[5] When Medicare beneficiaries, including those covered by Medicare Advantage health plans, obtain a prescription drug, the beneficiaries need to make a co-payment. Congress included co-payment requirements in the Medicare structure, in part, to encourage market forces to serve as a check on health care costs, specifically including the prices that pharmaceutical companies can demand for their drugs. Austin Frerick, A., *The Cloak of Social Responsibility: Pharmaceutical Corporate Charity*, TAX NOTES, Vol. 153, No. 9, Nov. 28, 2016. [hereinafter *Cloak of Social Responsibility*].

6.      RICO Defendants also funneled MA Plan and Medicaid Plan patients away from Lundbeck's free drug program. Lundbeck and Theracom ensured that the large sums of money that Lundbeck continuously paid to CVC improperly influenced CVC's practices. Likewise, RICO Defendants ensured that the co-payment assistance grants—paid for by Lundbeck, facilitated by Theracom, and distributed by CVC—improperly influenced the practices of patients receiving, and pharmacies dispensing Xenazine.

7.      In doing so, RICO Defendants eliminated the effects of price sensitivity—because the patients (i.e., consumers) were no longer incurring any cost—thereby artificially increasing the quantity dispensed by pharmacies and the amount of claims paid by Assignors and Class Members for Xenazine. Likewise, with price sensitivity eliminated, the Co-Payment Circumvention Enterprise allowed Lundbeck to artificially increase the price of Xenazine for all prescriptions to supra-competitive levels.

8.      As a result, the Assignors and Class Members were forced to pay artificially increased prices for all Xenazine prescriptions and for an increased quantity of Xenazine claims. This resulted in cognizable economic damages as the Assignors and Class Members paid substantially more than they otherwise would have—but for the Co-Payment Circumvention Enterprise.

9.      Lundbeck, a sophisticated pharmaceutical manufacturer, knew that the intended victims of the Scheme were the health plans Plaintiffs seek to represent. Indeed, after a patient's cost sharing obligation is paid, health plans such as the Assignors and Class Members must then pay for Xenazine. To be clear, if a patient does not provide their cost sharing obligations (e.g., co-pay), a prescription will not be dispensed from a pharmacy.

10.     On April 2, 2019, Lundbeck paid $52.6 million to settle the United States' claims

that Lundbeck violated the Anti-Kickback Statute ("AKS") and False Claims Act ("FCA"). Lundbeck entered into a Settlement Agreement with the United States of America ("Lundbeck Settlement"), with the United States Department of Justice ("DOJ") and on behalf of the Office of Inspector General ("OIG") of the Department of Health and Human Services related to the general conduct at issue in this lawsuit. *See* Lundbeck Settlement Agreement, attached as **Exhibit A**; *See also* DOJ Settlement Agreement Press Release, attached as **Exhibit B**.

11.    The Lundbeck Settlement did not address or settle damages sustained by the Assignors and Class Members. The terms of the Lundbeck Settlement did not address the claims Plaintiffs set forth in the action.

12.    CVC made several transfers to Adira considered to be fraudulent and voidable pursuant to Va. Code Ann. § 55.1-400 *et seq*.

13.    Additionally, Adira is the de facto successor of CVC. Adira was created by and has always been operated by the very same people who operated CVC—including, but not limited to Greg Smiley, James Rock, and Bruce Packett. Adira received the remainder of CVC's unrestricted and unobligated assets, including cash, investments, and valuable personal property. Adira received and continues to maintain all of CVC's data—often on the same computer equipment that CVC utilized—including taking ownership and control of what CVC described as its "home-grown patient portal for monitoring patient and grant data—known in shorthand by previous leadership as PAMS [which] was [CVC's] largest and most significant of assets." As CVC's successor, Adira is liable for CVC's debts and liabilities.

14.    Plaintiffs bring this lawsuit to redress the damages sustained by Assignors and Class Members as a result of RICO Defendants' unlawful Scheme to increase the price and dispensed quantity of Xenazine.

15.    The improper actions alleged here have allowed Lundbeck to maintain supra-competitive prices by eliminating price sensitivity that would have directly benefited consumers and the public at large. Price sensitivity counterbalances Lundbeck's desire to inflate prices for medically necessary drugs–which is why Congress relies on price sensitivity as a vital mechanism for combating supra-competitive pricing. CVC's co-payment assistance program allowed Lundbeck to increase the price of Xenazine regardless of the relevant market conditions by insulating Lundbeck from the realities of patients' inability to afford their co-payment obligations. Not only did this allow Lundbeck to charge supra-competitive prices, but also resulted in the induced over-dispensing of Xenazine.

16.    RICO Defendants used mail and wires in furtherance of their racketeering Scheme. Lundbeck used the wires to transmit their "donations" to CVC, which, in reality, were bribes to CVC. CVC would then transmit data using the mail and wires, allowing Lundbeck to perform what amounted to return on investments ("ROI") calculations on their "donations."

17.    RICO Defendants' conduct violated the AKS, 42 U.S.C. § 1320a-7b, the Travel Act, 18 U.S.C. § 1952 ("Travel Act"), Mail Fraud, 18 U.S.C. § 1341, and Wire Fraud, 18 U.S.C. § 1343.

## I.    PARTIES, JURISDICTION, AND VENUE
### *Plaintiffs*

18.    Plaintiffs are companies that obtained assignments from their Assignors to recover reimbursement or payment from RICO Defendants. The Assignors provide health insurance coverage, pursuant to Medicare Part C and Part D and Medicaid on behalf of their Enrollees. Specifically, the Assignors made payments on behalf of, or otherwise became financially responsible for the cost of the illegally inflated and overly dispensed Xenazine as a result of the Scheme.

*MSPRC*

19.     MSPRC is a Delaware series limited liability company with its principal place of business located in Coral Gables, Florida. MSPRC's limited liability company agreement provides for the establishment of one or more designated Series.

20.     MSPRC has enumerated rights relating to its designated series pursuant to its limited liability agreement and consistent with Delaware law. Del. Code Ann. Tit. 6, §§ 18-215(a)-(c). Specifically, all rights and benefits arising from assignments to its series shall belong to MSPRC. MSPRC may receive assignments in the name of MSPRC and further associate such assignments with a particular series or may have claims assigned directly to a particular series. In either event, MSPRC and the designated series are authorized to pursue or assert any claim or suit capable of being asserted by any designated series arising from, or by virtue of, an assignment to a designated series. MSPRC retains the legal right to sue on behalf of each designated series and pursue all rights, benefits, and causes of action arising from assignments to a series in its own name or in the name of the designated series. One or more Health Plans irrevocably assigned to certain series of this Plaintiff the right to assert the causes of action alleged in this Complaint. As a result of said assignments, MSPRC, through its operating agreement, is authorized and empowered to obtain the relief sought herein.

21.     MSPRC has established various designated series pursuant to Delaware law to maintain various claims recovery assignments separate from other Company assets, and to account for and associate certain assets with certain particular series. Pursuant to MSPRC's limited liability agreement, all designated series form a part of MSPRC. MSPRC may receive assignments in the name of MSPRC and further associate such assignments with a particular series or may have claims assigned directly to a particular series. In either event, MSPRC will maintain the right to

sue on behalf of each series and pursue any and all rights, benefits, and causes of action arising from assignments to a series. Any claim or suit may be brought by MSPRC in its own name or it may elect to bring suit in the name of its designated series. MSPRC's limited liability agreement provides that any rights and benefits arising from assignments to its series shall belong to MSPRC. MSPRC's assignments, samples of which are alleged in detail in the Appendix to this Complaint, are valid and binding contracts.

*MSPA*

22.    MSPA is a limited liability company that is duly organized, validly existing, and in good standing under the laws of Florida, with its principal place of business in Coral Gables, Florida. One or more health plans irrevocably assigned to MSPA the right to assert the causes of action alleged in this Complaint. As a result of said assignments, MSPA is authorized and empowered to obtain the relief sought herein. MSPA's assignments, samples of which are alleged in detail in the Appendix to this Complaint, are valid and binding contracts.

*Series 44*

23.    Series 44 is a duly organized and existing Delaware series limited liability company with its principal place of business located in Coral Gables, Florida. Series 44's limited liability company operating agreement provides for the establishment of one or more designated series as permitted by Delaware law. Del. Code Ann. Tit. 6, § 18-215(a). Accordingly, Series 44 established various designated series to serve as units of the company for the purpose of maintaining various claims recovery assignments separate from other company assets, and to account for and associate certain assets with certain particular series.

24.    Series 44 has enumerated rights relating to its designated series pursuant to its limited liability agreement and consistent with Delaware law. Del. Code Ann. Tit. 6, §§ 18-215(a)-

(c). Specifically, all rights and benefits arising from assignments to its series shall belong to Series 44. Series 44 may receive assignments in the name of Series 44 and further associate such assignments with a particular series or may have claims assigned directly to a particular series. In either event, Series 44 and the designated series are authorized to pursue or assert any claim or suit capable of being asserted by any designated series arising from, or by virtue of, an assignment to a designated series. Series 44 retains the legal right to sue on behalf of each designated series and pursue all rights, benefits, and causes of action arising from assignments to a series in its own name or in the name of the designated series. Series 44's assignments, samples of which are alleged in detail in the Appendix to this Complaint, are valid and binding contracts.

### *Claims Prov*

25.    Claims PROV is a duly organized and existing Delaware series limited liability company with its principal place of business located in Coral Gables, Florida. Claims PROV's limited liability company operating agreement provides for the establishment of one or more designated series as permitted by Delaware Law. Del. Code Ann. Tit. 6, § 18-215(a). Accordingly, Claims PROV established various designated series to serve as units of the company for the purpose of maintaining various claims recovery assignments separate from other company assets, and in order to account for and associate certain assets with certain particular series.

26.    Claims PROV has enumerated rights relating to its designated series pursuant to its limited liability agreement and consistent with Delaware law. Del. Code Ann. Tit. 6, §§ 18-215(a)-(c). Specifically, all rights and benefits arising from assignments to its series shall belong to Claims PROV. Claims PROV may receive assignments in the name of Claims PROV and further associate such assignments with a particular series or may have claims assigned directly to a particular series. In either event, Claims PROV and the designated series are authorized to pursue or assert any

claim or suit capable of being asserted by any designated series arising from, or by virtue of, an assignment to a designated series. Claims PROV retains the legal right to sue on behalf of each designated series and pursue all rights, benefits, and causes of action arising from assignments to a series in its own name or in the name of the designated series. One or more Health Plans irrevocably assigned to certain series of Claims PROV the right to assert the causes of action alleged in this Complaint. As a result of said assignments, Claims PROV, through its operating agreement, is authorized and empowered to obtain the relief sought herein. Claims PROV's assignments, samples of which are alleged in detail in the Appendix to this Complaint, are valid and binding contracts.

*Claims CAID*

27.    Claims CAID is a duly organized and existing Delaware series limited liability company with its principal place of business located in Coral Gables, Florida. Claims CAID's limited liability company operating agreement provides for the establishment of one or more designated series as permitted by Delaware law. Del. Code Ann. Tit. 6, § 18-215(a). Accordingly, Claims CAID established various designated series to serve as units of the company for the purpose of maintaining various assignments separate from other company assets, and in order to account for and associate certain assets with certain particular series.

28.    Claims CAID has enumerated rights relating to its designated series pursuant to its limited liability agreement and consistent with Delaware law. Del. Code Ann. Tit. 6, §§ 18-215(a)-(c). Specifically, all rights and benefits arising from assignments to its series shall belong to Claims CAID. Claims CAID may receive assignments in the name of Claims CAID and further associate such assignments with a particular series or may have claims assigned directly to a particular series. In either event, Claims CAID and the designated series are authorized to pursue or assert any claim

or suit capable of being asserted by any designated series arising from, or by virtue of, an assignment to a designated series. Claims CAID retains the legal right to sue on behalf of each designated series and pursue all rights, benefits, and causes of action arising from assignments to a series in its own name or in the name of the designated series. One or more Health Plan irrevocably assigned to certain series of Claims CAID the right to assert the causes of action alleged in this Complaint. As a result of said assignments, Claims CAID, through its operating agreement, is authorized and empowered to obtain the relief sought herein. Claims CAID's assignments, samples of which are alleged in detail in the Appendix to this Complaint, are valid and binding contracts.

29.    RICO Defendants' Co-Payment Circumvention Enterprise triggered payment obligations of the Assignors and Class Members. These actions caused the Assignors and Class Members to pay artificially inflated prices and purchase artificially inflated quantities of dispensed Xenazine. This illegal conduct directly harmed Assignors and the Class Members.

### Defendants

#### Lundbeck

30.    Lundbeck is a Delaware corporation with principal executive offices located at 6 Parkway North 60015, Deerfield, Illinois. Lundbeck manufactures and markets pharmaceutical products, including Xenazine. At all relevant times, Lundbeck advertised, marketed, and sold pharmaceutical products, including Xenazine, throughout all states and territories of the United States, including the Commonwealth of Virginia. Lundbeck derived substantial revenue related to the sale of Xenazine from its business throughout each of the states and territories of the United States, including the Commonwealth of Virginia.

31.    This Court has personal jurisdiction over Lundbeck because Lundbeck's conduct

as a member of the Co-Payment Circumvention Enterprise constitutes "[t]he transaction of any business within this Commonwealth," "[t]he causing of tortious injury by an act or omission in this Commonwealth," and "[t]he contracting to supply services or things in this Commonwealth." Va. Code Ann. § 8.01-328.1. In addition, 18 U.S.C. § 1965(d) provides personal jurisdiction over "any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs." Lundbeck engaged in substantial and not isolated activity throughout the Commonwealth of Virginia relating to the Co-Payment Circumvention Enterprise, resulting in Assignors and the Class Members sustaining financial injuries.

*CVC*

32.    CVC is an Idaho corporation claiming 501(c)(3) status for tax purposes. CVC's principal place of business during the duration of the Scheme was located at 6606 West Broad Street, Suite 403, Richmond, Virginia 23230, however, pursuant to a filing with the Commonwealth of Virginia, on July 31, 2019, CVC, changed their principal place of business to P.O. Box 28955, Henrico, VA 23228. CVC was established in 2003 and operates disease funds, including the HD Fund and General Fund, to pay the co-payments of certain patients, including Medicare patients.

33.    This Court has personal jurisdiction over CVC because CVC's conduct as a member of the Co-Payment Circumvention Enterprise constitutes "[t]he transaction of any business within this Commonwealth," "[t]he causing of tortious injury by an act or omission in this Commonwealth," and "[t]he contracting to supply services or things in this Commonwealth." Va. Code Ann. § 8.01-328.1. In addition, 18 U.S.C. § 1965(d) provides personal jurisdiction over "any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs." CVC transacts its affairs in the Commonwealth of Virginia. CVC further engaged in

the substantial and not isolated activity throughout the Commonwealth of Virginia. As a result of the Co-Payment Circumvention Enterprise, the Assignors and Class Members sustained financial and economic injuries in the state of Virginia. CVC maintains systematic and continuous contacts in the Commonwealth of Virginia, and regularly transacts business in the Commonwealth of Virginia. CVC purposefully availed itself of the privilege of conducting activities in the state of Virginia, thus benefiting from the protections and benefits of the law and conducting its affairs in the Commonwealth of Virginia.

*Adira*

34.     Adira is a Virginia corporation claiming 501(c)(3) status for tax purposes. Adira's principal office is located at 7330 Staples Mill Road #288, Henrico, VA, 23228-4122. Adira, originally incorporated under the name Facilitating Patient Health, was established in 2019 and operates disease funds, including a Huntington's Disease Fund, to pay the co-payments of certain patients, including Medicare patients.

35.     This Court has jurisdiction over Adira because Adira is incorporated in and operates its principal place of business in the Commonwealth of Virginia.

*Theracom*

36.     Theracom is an Ohio corporation with their principal office located at 345 International Blvd, Suite 200 Brooks, KY 40109-6202. Theracom offers reimbursement, clinical and data collection and provides growth, pre-launch, launch, maturity, hub, and patient assistance support. At all relevant times, Theracom supported pharmaceutical manufacturers, including Lundbeck, for drugs marketed, sold, and distributed throughout all states and territories of the United States, including the Commonwealth of Virginia. Theracom derived substantial revenue related to the sale of Xenazine from its business throughout each of the states and territories of the

United States, including the Commonwealth of Virginia.

37.     This Court has personal jurisdiction over Theracom because Theracom's conduct as a member of the Co-Payment Circumvention Enterprise constitutes "[t]he transaction of any business within this Commonwealth," "[t]he causing of tortious injury by an act or omission in this Commonwealth," and "[t]he contracting to supply services or things in this Commonwealth." Va. Code Ann. § 8.01-328.1. In addition, 18 U.S.C. § 1965(d) provides personal jurisdiction over "any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs." Theracom transacts its affairs in the Commonwealth of Virginia. Theracom further engaged in the substantial and not isolated activity throughout the Commonwealth of Virginia. As a result of the Co-Payment Circumvention Enterprise, the Assignors and Class Members sustained financial and economic injuries in the state of Virginia. Theracom maintains systematic and continuous contacts in the Commonwealth of Virginia, and regularly transacts business in the Commonwealth of Virginia. Theracom purposefully availed itself of the privilege of conducting activities in the Commonwealth of Virginia, thus benefiting from the protections and benefits of the law and conducting its affairs in the Commonwealth of Virginia.

38.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331. The causes of action alleged in this Complaint arise under federal law.

39.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a), because Plaintiffs are completely diverse from RICO Defendants and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

40.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d), because at least one member of the Class is a citizen of a state different from the RICO Defendants and the amount in controversy exceeds $5,000,000.00, exclusive of interest and costs.

41.    This Court also has supplemental jurisdiction under to 28 U.S.C. § 1367, as the state law claims are so related to the federal claims as to form part of the same case or controversy.

42.    Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events that gave rise to this lawsuit occurred in Virginia. Venue is also proper in this district under 18 U.S.C. § 1965(a) because Defendants transact their affairs in Virginia.

## II.    STANDING

43.    The Assignors provide health care benefits to their Enrollees under either (i) contractual agreements, such as participation and network agreements with capitation and risk sharing arrangements; or (ii) state and federal laws that provide for the reimbursement of payments made by the assignor health plans.

44.    The assignment agreements between Assignors and Plaintiffs are valid and binding contracts, empowering Plaintiffs to bring and recover on the claims asserted in this lawsuit.

45.    Plaintiffs seek recovery on behalf of each of their Assignors who paid for or reimbursed the cost of Xenazine at supra-competitive prices and paid for inflated quantities of Xenazine. An explanation of the representative assignment for each named Plaintiff is provided in the Appendix.

46.    At all material times hereto, one or more Assignor(s) provided Medicare benefits to MA Plan beneficiaries and one or more Assignor(s) provided Medicaid benefits to Medicaid Plan beneficiaries. The Assignors paid supra-competitive prices for Xenazine and paid for artificially inflated dispensed quantities of Xenazine as a result of RICO Defendants' Scheme.

47.    RICO Defendants' Scheme triggered payment obligations for Xenazine at inflated prices and induced the dispensing of Xenazine over cheaper and therapeutically equivalent generic or alternative treatments.

48.    Assignors paid at least $5.1 million in claims on behalf of covered patients

receiving the Xenazine from at least October 1, 2011, through present.

49.    Assignors provided payment for Xenazine throughout the United States.

## III.    REGULATORY BACKGROUND

50.    In 1965, Congress amended the Social Security Act to create the Medicare Act under Title XVIII of the U.S. Code. The Medicare Act created a federally funded health insurance program for the nation's elderly and disabled.  The Medicare Act consists of five parts—Parts A, B, C, D and E.  Part A and Part B create, describe, and regulate traditional fee-for-service, government-administered Medicare. Part C outlines the Medicare Advantage program and provides that Medicare beneficiaries may elect for private insurers to deliver their Medicare benefits. Part D provides for prescription drug coverage to Medicare beneficiaries. Part E includes "Miscellaneous Provisions." Plaintiffs' Assignors provide Medicare benefits under Parts C and D.

51.    Medicare Part D coverage is a voluntary prescription drug benefit program for Medicare beneficiaries established in 2003. Medicare Part D took full effect in 2006. A beneficiary may enroll in Part D if he or she lives in the service area of a Part D plan and is entitled to Medicare benefits under Part A or enrolled under Part B.

52.    Unlike Parts A and B, yet much like Medicare Part C, Medicare Part D is based on a private-market model, where Medicare contracts with private entities, known as Part D "sponsors." These sponsors administer prescription drug plans, and plan sponsors must provide qualified prescription drug coverage.

53.    A Part D sponsor submits a bid the year before it is to deliver Part D benefits. The bid contains a per member, per month cost estimate for providing Part D benefits to an average Medicare beneficiary in the geographic area.

54.    If the Part D plan sponsor's bid exceeds the benchmark, the enrolled beneficiary may have to pay the difference as part of a monthly premium. Centers for Medicare and Medicaid

15

Services ("CMS") then provides each Part D plan sponsor with advance monthly payments equal to the Part D plan sponsor's standardized bid. Part D plans are required to include some cost sharing obligations that the beneficiary must satisfy.

55.    MA Plans and other Part C entities play an important role in the American healthcare landscape. They provide thousands of Americans with not only health insurance, but with the freedom to go into the marketplace and select the health insurance that best meets their needs. Indeed, "Congress's goal in creating the Medicare Advantage program was to harness the power of private sector competition to stimulate experimentation and innovation."[6] In 2017, 33% of Medicare-eligible individuals got their health insurance from MA Plans.

56.    Similarly, while Medicaid is jointly funded by state and federal governments, it is largely administered by private MCOs. When administered directly by the state, Medicaid operates as a fee-for-service plan—similar to Medicare Parts A & B. As of 2016, over two-thirds of all Medicaid beneficiaries receive their care in risk-bearing MCO plans. A co-pay assistance grant can easily influence these beneficiaries—even if their cost sharing obligation is already low— because Medicaid is specifically designed for individuals and families near or below the poverty line.

## IV.    FACTUAL ALLEGATIONS

57.    "Part D enrollees with high drug costs can have difficulty affording their medications when they are in the deductible phase [and] when they reach the coverage gap—the period in which they are required to pay a larger share of total drug costs."[7] Patient assistance programs ("PAP") aim to help financially needy patients afford necessary medications during this

---

[6] *In re Avandia Mktg. Sales Practices & Prods. Liab. Litig.*, 685 F.3d 353, 363 (3rd Cir. 2012).
[7] Congressional Research Service, *Prescription Drug Discount Coupons and Patient Assistance Programs (PAPs)*, June 15, 2017.

difficult period.

58.     There are two ways that pharmaceutical companies giveto PAPs. First, manufacturers can establish their own PAPs. "Under this option, pharmaceutical companies give drugs directly to patients who cannot afford them or donate the drugs to a foundation that then gives them to patients. The second option is through independent charity PAPs (herein referred to as "co-payment charities")." Austin Frerick, A., *The Cloak of Social Responsibility: Pharmaceutical Corporate Charity*, TAX NOTES, Vol. 153, No. 9, Nov. 28, 2016. [hereinafter *Cloak of Social Responsibility*]. CVC is a purportedly independent charity PAP, or co-payment charity.

59.     Pharmaceutical companies donate money to the co-payment charities, purportedly to help patients who cannot afford their drugs. These patients often have health insurance (usually Medicare or Medicaid) but apply to these charities to help cover all, or a portion of, their co-payment obligations.

60.     There are two key differences between these two giving options. "First, companies donate drugs in option 1 and money in option 2.  Second, pharmaceutical companiesreceive no money besides a [tax] deduction in option 1, *but under option 2 they receive a [tax] deduction and money from the insurer paying the other portion of the drug costs*.  Thus, assistance provided by option 2 reduces out-of-pocket costs to insured patients but do[es] not reduce the price of prescription drugs to the healthcare payer. These are one-sided discounts." *Id*. (emphasis added).

61.     Small donations to a co-payment charity may substantially increase revenue received by a given pharmaceutical company from MA Plans and Medicaid Plans, such as the

Assignors.[8]

62.    As pharmaceutical drug company "giving" to co-payment charities rises, the co-payment charity benefits as well. In fact, executives at co-payment charities are among some of the *highest paid executives* in the United States.

63.    Thus, in this context, pharmaceutical companies and co-payment charities have a mutually beneficial purpose—to receive donations, establish additional disease funds to cover co-payments of the pharmaceutical company's expensive specialty drugs, and ensure federal healthcare programs bear the cost of these drugs. Together, the co-payment charity can show "results" for the pharmaceutical company and justify increased donations.

64.    Given these shared economic incentives, it is no surprise that charitable assistance from co-payment charities increased from $11 million in 2004 to nearly $868 million in 2014. See *Cloak of Social Responsibility* (noting that from 2007 to 2009, during the Great Recession, pharmaceutical giving increased by nearly $1.5 billion, while overall corporate giving decreased by $1.2 billion). The chart below details total giving for certain co-payment charities, including CVC, from 2001 to 2014.

---

[8] *See* Michael Banigan, *A Guide to Patient Assistance Programs: What You Need to Know to Promote Patient Advocacy and Maximize Charitable Contributions*." Chronic Disease Fund Inc. (2016) (providing that pharmaceutical companies can calculate their profitability, or "charitable margin," as a result of their donations to co-payment charities and can stand to earn 220 percent charitable margins). *See also Cloak of Social Responsibility* (explaining that example of "charitable margin" can yield a "charitable margin of 220 percent"); *see also* Citi Research, *The Straw that Could Break the Camel's Back*: *DOJ/OIG Action on Foundation Funding Could Severely Impede Industry Returns*, May 16, 2017 [hereinafter *Citi Research*] (explaining that "[e]ach $1m industry donation to a charitable foundation to enable Medicare patients Xtandi access or similar high priced drugs has the potential to generate up to $21m for the sponsor company, **funded by the US Government.**") (emphasis added).

| Table A-1. Total Giving in Dollars for Independent Charity Patient Assistance Programs (PAPs), 2001-2014 | | | | | |
|---|---|---|---|---|---|
| | Patient Access Network Foundation[a] | Chronic Disease Fund/ Good Days[b] | Caring Voice Coalition[c] | Healthwell Foundation[d] | Patient Services | Subtotal: Independent Charity PAPs |
| 2001 | — | | | | $2,328,611 | $2,328,611 |
| 2002 | — | — | — | — | $3,296,181 | $3,296,181 |
| 2003 | — | — | — | — | $5,118,345 | $5,118,345 |
| 2004 | — | — | $80,383 | — | $6,982,842 | $11,301,748 |
| 2005 | $7,557,312 | $5,597,689 | $5,257,803 | $115,856,793 | $15,719,269 | $49,988,866 |
| 2006 | $18,652,884 | $66,279,917 | $9,850,206 | $47,289,619 | $15,333,700 | $157,406,276 |
| 2007 | $24,880,629 | $63,551,700 | $15,816,549 | $59,391,157 | $21,467,030 | $185,107,065 |
| 2008 | $32,825,596 | $82,133,885 | $27,943,050 | $57,521,456 | $35,269,942 | $235,693,929 |
| 2009 | $37,323,252 | $136,713,152 | $37,530,533 | $71,425,660 | $29,594,995 | $312,587,592 |
| 2010 | $37,562,665 | $172,488,043 | $38,166,963 | $84,233,714 | $37,440,434 | $369,891,819 |
| 2011 | $28,379,485 | $195,647,202 | $46,827,156 | $49,521,777 | $39,983,874 | $360,359,494 |
| 2012 | $108,460,641 | $182,365,638 | $58,221,721 | $36,995,288 | $50,332,148 | $436,375,436 |
| 2013 | $174,340,174 | $194,448,004 | $67,435,466 | $31,135,498 | $60,897,475 | $528,256,617 |
| 2014 | $496,427,781 | $170,628,203 | $98,027,589 | $29,089,150 | $73,735,080 | $867,857,753 |

*Source:* ProPublica's Nonprofit Explorer Database.
*Notes:* These totals come from line 13 titled "Total Grants" on Form 990, although for some entities before 2008, the totals were from line 23, part II.
[a]Excluded 2004 return because it was an initial return.
[b]Excluded 2004 return because it was an initial return.
[c]Excluded 2002 return because it was an initial return and their reporting years run July to June.
[d]Excluded 2004 return because it was an initial return.

65.    The rise of co-payment charities and pharmaceutical corporate giving to such charities (with the economic incentives detailed above) is tied to the enactment of public insurance programs expanding the number of Americans with prescription drug coverage, the growth of specialty drugs, and the federal anti-kickback law.

66.    First, this increased giving to co-payment charities occurred during a period in which there was a surge in the number of Americans with prescription drug coverage as a result of the enactment of Medicare Part D and, subsequently, the passing of the Affordable Care Act in 2010 ("ACA"), which expanded prescription drug benefits. "Before these public insurance expansions, federal government spending on prescription drugs was 25 percent of total spending in 2005. In 2014 it was 41 percent." *See Cloak of Social Responsibility*.

67.    Specialty drug prices are set by drug manufacturers with an intimate knowledge of the drug market. This knowledge enables manufacturers to set supra-competitive drug prices by using PAPs to circumvent beneficiary co-payment obligations, thus eliminating price sensitivity.

68.    Second, along with these public insurance programs, specialty drugs (*i.e.*, generally defined as expensive prescriptions requiring extra handling or administration in treating complex

diseases) have contributed to the growth of co-payment charities. "In recent years, spending for specialty drugs has grown faster than spending for other pharmaceuticals. Although specialty medications account for only one percent of prescriptions, they account for almost a third of U.S. prescription spending.  For Medicare Part D, specialty drugs accounted for a quarter of a percent of prescriptions in 2013 but eleven percent of total drug cost." *Id*.

69.    Co-payment charities allow pharmaceutical companies to manage price sensitivity for these more expensive specialty drugs. The OIG noted that PAPs "may steer patients toward and lock them into a particular manufacturer's product, even when other equally effective and less costly alternatives are available. *Id*.

70.    Moreover, the rise of co-payment charities stemmed from federal anti-kickback law. The AKS made the receipt of kickbacks, bribes, or rebates in connection with items or services covered by the Medicare and Medicaid programs a crime. The AKS makes it a crime to knowingly and willfully offer, pay, solicit, or receive any payment to induce a person to purchase or recommend any good, service, or item covered under a federal health care program. *See* 42 U.S.C. § 1320a-7b(b).

71.    As it relates to PAPs, the OIG has stated that the AKS could be violated "if a donation is made to a PAP to induce the PAP to recommend or arrange for the purchase of the donor's federally reimbursable items," as well as if a PAP's grant of financial assistance to a patient is made "to influence the patient to purchase (or induce the patient's physician to prescribe) certain items." *Supplemental Special Advisory Bulletin: Independent Charity Patient Assistance Programs*, 79 Fed. Reg. 31120, 31121 (May 30, 2014), attached as **Exhibit C**.

72.    Congress has determined that any Medicare or Medicaid claim "that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim" for

purposes of the FCA. *See* 42 U.S.C. § 1320a-7b(g).

## A. OIG Guidance for Co-Payment Charities

73.     The OIG has provided guidance to co-payment charities regarding compliance with

applicable laws and regulations, including the AKS and FCA. In this guidance, the OIG made clear

that such charities will violate those laws and regulations if they do not follow specified rules.

Those rules ensure that a pharmaceutical manufacturer cannot control a co-payment charity, or

receive information from such a charity, that would allow the manufacturer to link the amount it

donates to additional profits from the sale of a particular drug.

74.     In 2005, the OIG issued a special advisory bulletin on PAPs ("2005 Bulletin"). The

2005 Bulletin provided that certain cost-sharing subsidies provided by bona fide, independent

PAPs unaffiliated with drug manufacturers do not raise AKS concerns, even if the PAPs receive

manufacturer contributions. *See OIG Special Advisory Bulletin on Patient Assistance Programs*

*for Medicare Part D Enrollees*, 70 Fed. Reg. 70623 (Nov. 22, 2005), attached as **Exhibit D**. The

2005 Bulletin also set forth factors that the OIG considers to be "fundamental" to a properly

structured, independent, bona fide PAP, including the following:

> a.   No drug manufacturer or donor exerts any direct or indirect influence or control over the PAP;
>
> b.   The PAP awards assistance in a truly independent manner that severs any link between the drug manufacturer donors funding and the beneficiary;
>
> c.   The PAP awards assistance without regard to the drug manufacturer's interests, or the beneficiary's choice of product, provider, practitioner, supplier, or Part D drug plan;
>
> d.   The PAP provides assistance based upon a reasonable verifiable, and uniform measure of financial need applied in a consistent manner; and
>
> e.   the drug manufacturer does not solicit or receive data from the PAP that would allow the manufacturer to substantiate the amount of its donations with the number of subsidized prescriptions for its products. Id. at 70626-27 ("Simply put, the independent charity PAP must not function as a conduit for payments by the pharmaceutical manufacturer

to patients and must not impermissibly influence beneficiaries drug choices.")

75.      In 2014, the OIG issued an updated bulletin raising concerns about the conduct of co-payment charities and intensifying its scrutiny of arrangements between pharmaceutical companies and co-payment charities ("2014 Bulletin"). *See Supplemental Special Advisory Bulletin: Independent Charity Patient Assistance Programs*, 79 Fed. Reg. 31120 (May 30, 2014), attached as **Exhibit C**.  In the 2014 Bulletin, the OIG stated that although PAPs can provide an important safety net to financially needy patients, these programs also present a risk of fraud, waste, and abuse with respect to federal health care programs if they are not independent from donors. *Id.*

76.      The OIG noted three more areas of concern related to disease funds, eligible recipients, and the conduct of donors, and required co-payment charities to certify to the OIG that:

   a.  The co-payment charity will not define its disease funds by reference to specific symptoms, severity of symptoms, method of administration of drugs, stages of a particular disease, type of drug treatment, or any other way of narrowing the definition of widely recognized disease states;

   b.  The co-payment charity will not maintain any disease fund that provides co-payment assistance for only one drug, or only the drugs made or marketed by one manufacturer or its affiliates; and

   *c.*  The co-payment charity will not limit its assistance to high-cost or specialty drugs. Instead, the co-payment charity will make assistance available for all products, including generic or bioequivalent drugs covered by Medicare or other insurers, when prescribed for the treatment of the disease state(s) covered by the fund. *Id.*

77.      As for the "conduct of donors," the 2014 Bulletin reiterated its prior focus (from the 2005 Special Advisory Bulletin) on co-payment charities not giving a "donor any information that would enable a donor to correlate the amount or frequency of its donations with the number of aid recipients who use its products or services or the volume of those products supported by the PAP." *Id.*  Notably, the OIG warned that:

[t]he procedures described in these certifications are a critical safeguard and a

material fact upon which we have relied in issuing favorable advisory opinions regarding Independent Charity PAPs. These opinions do not address actions by donors to correlate their funding of PAPs with support for their own products. Such actions may be indicative of a donor's intent to channel its financial support to co-payments of its own products, which would implicate the antikickback statute.

## B. CVC's Growth and OIG's Communications

78.    CVC was founded in 2003 as a national 501(c)(3) nonprofit, charitable organization aimed at providing monetary support for financially needy patients with certain chronic or life-threatening diseases. CVC established certain disease funds, including the HD Fund and General Fund, which were funded by donors, including Lundbeck. As detailed above, CVC grew from receiving $80,383 from donors in 2004 to receiving over $131 million from donors in 2015.

79.    With the increase in CVC donations, came an increase in CVC executive salaries. CVC's President was Pamela R. Harris during the period RICO Defendants carried out the Co-Payment Circumvention Enterprise. Ms. Harris, along with her daughter, Samantha Harris (Ms. Samantha Harris later changed her name to Samantha Green), who served as CVC's Vice-President, were among a handful of executives whose compensation is set forth in Part VII of CVC's annual Form 990 Tax Filings.[9] Pamela R. Harris received a salary of $234,886 in 2010. By comparison, in 2015, she received a salary of $421,672. The rest of the executive staff at CVC saw similar pay increases. *See* **Exhibit E** – CVC's Form 990 Filings. Samantha Harris received a salary of $38,083 in 2010. In 2015, Samantha Harris was paid $219,591. The same pattern is present for CVC's director of finance, Rebecca App: her salary was $97,786 in 2010, and rose to $181,054 by 2015. In addition, CVC managed to add at least four more employees—none of whom were on the payroll in 2011—who were paid six-figure salaries by 2015: Taylor Scott ($156,192), Ron Pisarz

---

[9] For the years discussed here, CVC reported based on a fiscal year of July 1 to June 30. For example, a reference to CVC's 2011 990 (or salary paid in 2011) covers a period from July 1, 2011, to June 30, 2012.

($140,690), Jennifer Previtera ($124,989), and Robert Mayfield ($115,701). These salary increases have a direct correlation to the amounts of donations CVC received from pharmaceutical manufacturers, including Lundbeck.

80.     CVC violated one of the most basic rules that separates legitimate co-payment charities from illegal ones—it explicitly coordinated with Lundbeck to steer patients towards Xenazine and provided information to Lundbeck so that Lundbeck could correlate its donations with its increased profits on the sale of Xenazine—CVC then lied about this conduct to the OIG.

81.     In 2006, CVC certified to the OIG that it would comply with the requirements outlined above in the OIG's 2005 Special Advisory Bulletin. CVC subsequently requested an advisory opinion from the OIG asking whether its "Proposed Arrangement" as a nonprofit, tax-exempt, charitable corporation's proposal to provide financially needy Medicare beneficiaries with assistance and cost-sharing obligations under Medicare Part B, Medicare PartD, Medigap, _**and Medicare Advantage**_ would constitute grounds for sanctions under certain federal laws, including the AKS.  In response, on April 20, 2006, the OIG issued an Advisory Opinion to CVC.  *See* OIG, Adv. Op. 06-04 (April 20, 2006), attached as **Exhibit F**. The 2006 CVC Advisory Opinion noted CVC's certification that, among other requirements, no donor had exerted or will exert "any direct or indirect influence or control" over CVC. *Id.* ("[CVC] has certified that no donor or affiliate of any donor (including, without limitation, any employee, agent, officer shareholder, or contractor (including, without limitation, any wholesaler, distributor, or pharmacy benefits manager)) has exerted or will exert any direct or indirect influence or control over [CVC] or any of [CVC]'s programs.").

82.     The 2006 CVC Advisory Opinion provided that upon request and as a courtesy, donors will be informed monthly of the aggregate number of patients who qualify for assistance

in a category, but highlighted CVC's certification that "the monthly data will not contain any information that enable a donor to correlate the amount or frequency of its donation with the number of subsidized prescriptions or orders for its products or the volume or medical condition of patients choosing its services." *Id.* ("No individual patient information will be conveyed to donor, nor will any data related to the identity, amount, or nature of products or services subsidized under the Proposed Arrangement.").

83.    The OIG concluded, in part, that "[b]ased on the facts certified in [CVC's] request for an advisory opinion and supplemental submissions . . . [and subject to various limitations set forth by the OIG] while the Proposed Arrangement could potentially generate prohibited remuneration under the anti-kickback statute, if the requisite intent to induce or reward referrals of Federal health care program business were present, the OIG would not impose administrative sanctions on [CVC] under [federal laws regarding civil monetary penalties] in connection with the Proposed Arrangement." *Id.* In December 2015, the OIG published a Modified Advisory Opinion to CVC following the OIG's request that CVC certify compliance with the other factors outlined in the 2014 Bulletin ("2015 CVC Modified Advisory Opinion"), attached as **Exhibit G**. *See* OIG, Adv. Op. 06-04 (Dec. 23, 2015). The 2015 CVC Modified Advisory Opinion stated that CVC had certified compliance to each additional factor, and further that CVC had proposed additional modifications to its current operations. *Id*. The OIG concluded in the 2015 CVC Modified Advisory Opinion that CVC's PAP was sufficiently low risk, and the OIG would not impose civil monetary penalties or sanctions on CVC under the AKS. *Id*.

84.    CVC was admittedly on notice of the OIG's guidance, cautionary language, and the certification requirements set forth in the 2005 and 2014 Bulletins, as well as the Advisory Opinions OIG provided specifically to CVC. In fact, CVC even designed a "Compliance Program"

"to assist CVC in preventing, detecting and responding to illegal, improper and unethical conduct . . . [and to] serve as a procedural framework for enhancing andmonitoring compliance with applicable law, regulation, the CVC Code of Conduct and organizational policies and procedures. ***The Compliance Program is based on . . . applicable [OIG] guidance.***"  (*See* Summary of the CVC Compliance Program, attached at **Exhibit H** (emphasis added). In turn, CVC's "Code of Conduct" purports to "describe[] the commitment that [CVC] expects of itself . . . to maintain the highest ethical standards of honesty and integrity as well as to comply with all laws and legal requirements applicable to [CVC], including [OIG] guidance for charitable patient assistance programs and CVC's OIG Advisory Opinion 06-04, as modified, and industry guidance, including the Independent Charitable Patient Assistance Program Code of Ethics ('IPAP Code of Ethics')." (*See* CVC's Code of Conduct, attached at **Exhibit I**).

85.     According to CVC's Code of Conduct, based on its "core values," CVC represented that it was "dedicated to the following values/ethical principles . . . [among others]":

    a.  Act with honesty, integrity and objectivity, and in a manner that will merit the continued trust and confidence of patients and stakeholders.

    b.  Operate independently free from the influence of CVC donors.

    c.  Comply with all federal, state, and local laws, regulations, and legal requirements applicable to CVC, including OIG guidance for charitable patient assistance programs and CVC's OIG Advisory Opinion 06-04, as modified.

    d.  Be vigilant in the detection and prevention of potential fraud, waste, or abuse.

    e.  Promptly investigate and address potential violations of applicable law, regulation, OIG guidance, CVC's Advisory Opinion, IPAP Code of Ethics, this Code, or Company policies and procedures.

    *Id.*

86.     The referenced IPAP Code of Ethics that CVC committed to comply with similarly provides that co-payment charities "[o]perate under the auspices of an ongoing compliance with

an organization-specific [OIG] Advisory Opinion," and "[o]perate independently, free from the influence of donors," which included "[r]efrain[ing] from providing donors or other entities with information that could permit the correlation of the amount or frequency of donations with the number of patients assisted by the [co-payment charity] who use a donor's products or services or the volume of those products supported by the [co-payment charity]." (*See* IPAP Code of Ethics, attached as **Exhibit J**). Nonetheless, CVC shared with Lundbeck the very information it promised it wouldn't share and steered patients toward Xenazine in violation of the OIG's general guidance, the OIG's specific guidance to CVC, CVC's certifications to the OIG, CVC's internal "compliance" policies the FCA, and the AKS.

87.     In November 2017, the OIG rescinded its prior advisory opinions issued to CVC ("2017 CVC Rescission Letter"). *See* OIG, Adv. Op. 06-04 (Nov. 28, 2017), attached as **Exhibit K**. The 2017 CVC Rescission Letter was based on CVC's "failure to fully, completely, and accurately disclose all material facts to OIG," and CVC's failure to comply with certain factual certifications made to the OIG. *Id.*

> Specifically, we have determined that, in contravention of the certifications [CVC] made, [CVC]: (i) provided patient-specific datato one or more donors that would enable the donor(s) to correlate the amount and frequency of their donations with the number of subsidized prescriptions or orders for their products, and (ii) allowed donors to directly or indirectly influence the identification or delineation of [CVC's] disease categories."

*Id.*

88.     The 2017 CVC Rescission Letter concluded that:

> [CVC]'s failure to comply with these certifications materially increased the risk that CVC served as a conduit for financial assistance from a drug manufacturer donor to a patient, and thus increased the risk that the patients who sought assistance from [CVC] would be steered to federally reimbursable drugs that the manufacturer donor sold. This type of steering can harm patients and the Federal health care programs, because, for example, patientsmay be urged to seek, and physicians may be more likely to prescribe, a more expensive drug if co-payment assistance is available for that drug but not for less expensive but therapeuticallyequivalent

alternatives. ***In these circumstances, manufacturers may have greater ability to raise the prices of their drugs while insulating patients from the immediate out-of-pocket effects of price increases, leaving Federal healthcare programs like Medicare (and the taxpayers who fund those programs) to bear the cost.***

*Id.* (emphasis added).[10]

89.     Shortly thereafter, CVC announced that in light of the 2017 CVC Rescission Letter it would not open financial assistance for any disease fund in 2018.

90.     Instead, in February of 2018, the President of CVC, Smiley, incorporated a new 501(c)(3) charity (Defendant Adira) where CVC began fraudulently conveying CVC's assets and records to the new charity, as further discussed below.

## C. The Scheme Permitted Lundbeck to Charge Supra-Competitive Prices For and Artificially Inflate the Quantity of Xenazine

91.     As part of the Scheme, RICO Defendants artificially increased the quantity of claims the Assignors and Class Members paid for Xenazine by pushing patients away from Lundbeck's free drug program "which was open to other financially needy patients, even if those Medicare or ChampVA patients could not afford their copays for Xenazine. Instead, in order to generate revenue from Medicare and ChampVA and to induce purchases of Xenazine, Lundbeck, via XIC, referred financially needy non-Huntington's Disease Xenazine patients to CVC, which resulted in claims to Medicare and ChampVA to cover the cost of the drug." *See* **Exhibit A** Lundbeck Settlement. These claims, and all claims for Xenazine during the Scheme, forced the Assignors and Class Members to pay for Xenazine at artificially supra-competitive prices.

92.     Analysis of the Assignors' data confirms that the volume (or quantity) of Xenazine dispensed and paid for by Assignors plummeted after RICO Defendants' Scheme was uncovered.

---

[10]   CVC subsequently announced that in light of the 2017 CVC Rescission Letter, it would not open financial assistance for any disease fund in 2018. See http://www.caringvoice.org/decision-2018-financial-assistance.

This provides direct evidence of the causal link between RICO Defendants' Scheme and allegations contained here.



93.    As seen in the chart above, the Scheme allowed RICO Defendants to artificially increase the quantity of Xenazine prescriptions dispensed, for which the Assignors were responsible for payment.

**Xenazine**

94.    Xenazine is a monoamine depletory used to treat involuntary and uncontrollable muscle movements. Xenazine has one FDA approved indication, which is to treat chorea associated with Huntington's disease. Xenazine has shown effectiveness and received compendial support to treat other hyperkinetic movement disorders such as Tardive dyskinesia in adults,

Tourette's syndrome.

95.    CMS's Medicare Part D data shows that for Xenazine, Medicare spending rose from $113 million in 2012, to more than $227 million by 2015—or about $71,317.29 per patient.

96.    Xenazine cost Medicare Part D around $227 million in 2015 or about $71,317.29 per patient.

97.    The change in average spending by Medicaid per dosage unit of Xenazine increased by 32.93% from 2015 to 2016 with an average annual growth rate in per-dose spending of 21.07% from 2012 to 2016. The average spending per dosage unit in 2012 was $66.22, with an average spending per claim totaling $5,983.45. In only four years, the average spending per dosage unit jumped to $142.28, with an average spending per claim totaling $12,726.30 in 2016.

98.    Assignors' data for their covered beneficiaries yields similar findings. Assignors paid at least $5.1 million for Xenazine prescriptions on behalf of covered beneficiaries.

99.    Lundbeck's ability to exponentially increase the prices and quantity dispensed of Xenazine year over year would not have been possible but for the illegal Co-Payment Circumvention Enterprise.

**D.  The DOJ Settlement**

100.    The DOJ prosecuted Lundbeck and CVC for their roles in the Scheme, which also defrauded the federal government.

101.    This resulted in a settlement in which Lundbeck agreed to pay $52.6 million to the United States after the DOJ alleged that Lundbeck's use of CVC as a conduit violated the AKS and FCA.

102.    The DOJ investigation into the Scheme represents one part of a much larger ongoing investigation by the DOJ and OIG, along with the U.S. Attorney's Office for the District of Massachusetts, into schemes by various drug manufacturers and co-payment charities that

violated the AKS and FCA.[11] As recognized by pharmaceutical-industry financial analysts, these investigations "impede industry returns."[12]

103.    The Lundbeck Settlement with the United States was based on the DOJ's claims that Lundbeck's conduct violated the AKS and FCA, thereby leaving Federal healthcare programs (in that case, Medicare and ChampVA) "bear[ing] the cost."

104.    The DOJ alleged that from October 1, 2011, through December 31, 2016,

> Lundbeck made donations to CVC and knowingly and willfully used CVC as a conduit to pay the copay obligations of Medicare and ChampVA patients taking Xenazine for unapproved uses. Lundbeck was the sole donor contributing millions of dollars to a "Huntington's Disease" fund at CVC. Although this fund ostensibly provided financial support only for patients with Huntington's Disease, Lundbeck, through its hub, the Xenazine Information Center ("XIC"), referred Xenazine patients with many other conditions to CVC. Until June 2014, CVC used money from Lundbeck to pay the Xenazine copays of these other patients through the Huntington's Disease fund, which did not pay the copays of any drug other than Xenazine. In May 2014, HHS-OIG published a document entitled "Supplemental Special Advisory Bulletin: Independent Charity Assistance Programs." After June 2014, and in response to HHS-OIG's May 2014 bulletin, CVC determined that its Huntington's Disease fund no longer would pay the copays of patients taking Xenazine for treatment of diseases other than chorea associated with Huntington's Disease. At the same time, however, Lundbeck and CVC agreed that CVC would continue to pay the Xenazine copays for non-Huntington's Disease patients out of a "general fund" that CVC could use for this purpose. In response to Lundbeck asking CVC whether there was a "risk" that HHS-OIG would not view this practice

---

[11] Other recent results involving the resolution of AKS and FCA claims brought by the United States against drug manufacturers participating in improper schemes with co-payment charities include: (i) Jazz Pharmaceuticals PLC ("Jazz") agreeing in May 2018 to pay the United States $57 million related to claims involving Jazz's relationship with CVC to fund co-payment for Jazz's narcolepsy drug Xyrem; (ii) United Therapeutics agreed to pay the United States $210 million to resolve the United States' AKS and FCA claims on behalf of Medicare based on United Therapeutics' relationship with CVC; and (iii) Actelion Pharmaceuticals U.S., Inc. ("Actelion") agreeing in December 2018 to pay the United States $360 million related to claims involving Actelion's relationship with CVC to fund co- payment for Actelion's Hypertension drugs Tracleer, Ventavis, Veletri, and Opsumit.

[12] *See Citi Research* ("[t]he ongoing multiple DOJ/OIG investigations into financial donations by pharmaceutical companies to independent foundations has the potential to severely limit future revenues for several high-priced blockbuster Medicare Part D drugs through (i) lowered overall funding for patient out-of-pocket assistance (ii) lesser ability for individual pharmaceutical donors to guide their funding towards specific drugs.").

as compliant with CVC's Advisory Opinion or the AKS, CVC replied "[t]hey don't know what we use the general fund for." Lundbeck agreed that some funds it had already donated to the Huntington's Disease fund could be transitioned to this "general fund" for the purposes of paying Xenazine patients' copays. Lundbeck also made subsequent "unrestricted" donations to CVC with the understanding that CVC would use those funds to pay for non-Huntington's Disease Xenazine patients copays.

Meanwhile, Lundbeck had a policy of not permitting Medicare or ChampVA patients to participate in its free drug program for Xenazine, which was open to other financially needy patients, even if those Medicare or ChampVA patients could not afford their copays for Xenazine. Instead, in order to generate revenue from Medicare and ChampVA and to induce purchases of Xenazine, Lundbeck, via XIC, referred financially needy non-Huntington's Disease Xenazine patients to CVC, which resulted in claims to Medicare and ChampVA to cover the cost of the drug.

As a result of the foregoing conduct, the United States contends that Lundbeck caused false claims to be submitted to Medicare and ChampVA.

(*See* **Exhibit B** – DOJ Settlement Agreement Press Release)

105.    The Lundbeck Settlement does not redress the harm that RICO Defendants' Scheme caused to the Assignors and Class Members or settle any claims that the Assignors and Class Members may have against RICO Defendants.

106.    On information and belief, Theracom acted as, managed, and operated Lundbeck's hub, the XIC.[13] Theracom, acting as the XIC, used patient information to (1) establish patient eligibility for the Xenazine patient support program; (2) communicate with healthcare providers and health plans about benefit and coverage status and patient medical care; (3) provide support services, including facilitating the provision of Xenazine to patients, as well as any information or materials related to such services or Lundbeck products; (4) evaluate the effectiveness of the Xenazine support program; (5) report safety information, including in communications with the

---

[13] Several Xenazine branded treatment forms contain the following prescriber certification: "I authorize Theracom LLC, acting as the Xenazine Information Center, to be my designated agent." *See* **Exhibit L** – Xenazine Treatment Forms.

U.S. Food and Drug Administration and other government authorities; (6) contact patients about signed prescription forms or patients' use or potential use of Xenazine and provide patients with related patient support communications; and (7) allow Lundbeck to analyze the usage patterns and the effectiveness of Lundbeck products, services, and programs and help develop new products, services, and programs, and for other Lundbeck general business and administrative purposes. *See* **Exhibit L** – Xenazine Treatment Forms.

107. Despite knowing that Xenazine is only approved by the FDA to treat Chorea associated with Huntington's disease and that CVC's disease fund was specifically created to assist Huntington's patients, Theracom was instrumental in aiding Lundbeck and CVC with the enrollment of non-Huntington's patients taking Xenazine into CVC's PAP. *See* **Exhibit B** – DOJ Settlement Agreement Press Release

108. RICO Defendants' misconduct caused economic injury to Assignors and the Class Members.

109. Lundbeck bribed CVC to act as a conduit to pay the co-payment obligations of MA Plan and Medicaid patients taking Xenazine.

110. RICO Defendants' conduct eliminated price sensitivity of patients allowing pharmacies to dispense Xenazine, which in turn enabled Lundbeck to raise the price of Xenazine to supra-competitive levels, quickly and outside of ordinary market conditions. MA Plans and Medicaid Plans were left to bear the cost, while CVC was able to show "results" to Lundbeck—if Lundbeck "donated" money to CVC, it would make money, not only off the new "customers" but also by its ability to raise prices, and ensure that the drugs were still dispensed, and reimbursed.

111. RICO Defendants' conduct caused MA Plan and Medicaid Plan patients to purchase the Xenazine;

a. Lundbeck routinely obtained data from CVC detailing how many patients, including MA Plan and Medicaid Plan patients, CVC had assisted and how much CVC had spent on those patients for Xenazine;

b. In deciding whether and how much to donate to CVC, Lundbeck considered the revenue it would receive from prescriptions for MA Plan patients who received assistance from CVC to cover their co-payments for Xenazine;

c. Lundbeck used data from CVC to confirm that Lundbeck's revenue exceeded the amount of Lundbeck's "donations" to CVC;

d. Lundbeck ensured that MA Plans and Medicaid Plans bore the cost of Xenazine by employing a policy of not permitting MA Plan and Medicaid Plan patients to participate in Lundbeck's free drug program (*i.e.*, where government funds are not implicated), which was open to other financially needy patients, even if those MA Plan and Medicaid Plan patients could not afford their co-payments for Xenazine;

e. Lundbeck and Theracom funneled MA Plan and Medicaid Plan patients prescribed Xenazine to CVC, which upon CVC providing coverage of patients' co-payments, triggered Assignors' obligations reimburse for Xenazine; and

f. Theracom, acting as the XIC, was Lundbeck's hub for Xenazine patient assistance and facilitated and managed the exchange of information and referrals between Lundbeck and CVC.

112. Because of RICO Defendants' Scheme, Assignors and Class Members paid for prescriptions they would not have otherwise paid and there was a direct relationship between the misconduct at issue here and the payments Assignors and Class Members made for Enrollees. Such payments involved reimbursement of artificially increased quantity of dispensed Xenazine and supra-competitive prices on all Xenazine prescriptions.

113. RICO Defendants knew and intended that their Scheme would artificially inflate the quantity of dispensed Xenazine and allow Lundbeck to raise the prices of Xenazine to supra-competitive levels.

114. Assignors and Class Members were the primary and intended victims of RICO Defendants' Scheme. The injury to them was a foreseeable and natural consequence of the Scheme because Lundbeck knew that third-party payers such as the MA Plans and the Medicaid Plans

would pay for or reimburse the cost of Xenazine.

115.    Assignors and Class Members suffered direct economic injury as a direct and proximate cause of RICO Defendants' Scheme and are therefore best suited to advance and pursue the recovery of the claims asserted in this Complaint.

116.    In fact, Assignors and Class Members are likely the only entities harmed by the RICO Defendants' Scheme. This is principally because there are no violations of law among the chain of distribution until the unlawful co-payment is provided through the conduit (i.e., CVC) and a bill is submitted to the third-party payer. Additionally, wholesale distributors, specialty distributors, and/or pharmacies actually benefit from the scheme as their sales increase *because the rate of abandonment decreases*, as well as revenue from service fees which are based on a percentage of the Wholesale Acquisition Cost ("WAC").[14] [15]

117.    RICO Defendants had the shared goal of growing Lundbeck's co-payment assistance fund and thereby enabling CVC's directors and officers to use the non-profit charities increased funds to justify a surge in their own compensation. The Co-payment Circumvention Enterprise increased the number of MA Plan and Medicaid Plan patients (among all healthcare programs) who were receiving co-payment assistance for Xenazine from Lundbeck's co-payment

---

[14] Prescription abandonment—when a prescription is transmitted to the pharmacy but never filled—is a major concern for both providers and drug manufacturers. Prescription abandonment is multi-faceted, but it is widely understood that high co-payments are a leading cause and lowering co-payments significantly reduces abandonment for highly effective chronic treatments. Dana P. Goldman et al., *Prescription Drug Cost Sharing: Associations with Medication and Medical Utilization and Spending and Health*. 298.1 Jama 61, 61-69 (2007). Available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6375697/

[15] Prescription abandonment causes an estimated 125,000 avoidable deaths in the U.S. annually. Regardless of whether patients and doctors are induced by PAP funds at the prescription stage, the data is clear that patients are induced by co-payment assistance at the dispensing stage. Hayden B. Bosworth et al., *Medication Adherence: A Call for Action*. 162.3 Am Heart J. 412 (2011). Available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3947508/

fund, triggering the Assignors' and Class Members' coverage obligations for these Enrollees, eliminating price sensitivity to Xenazine, and allowing Lundbeck to increase its revenues and profits related to Xenazine sales.

118.    For RICO Defendants, this collusive bribery Scheme was a "win-win" arrangement. Lundbeck systematically blocked MA Plan and Medicaid Plan beneficiaries from accessing Lundbeck's free drug program. Instead, Theracom referred those beneficiaries to CVC. Lundbeck directed its bribes to CVC with the intent to increase MA Plan and Medicaid Plain reimbursements. As CVC illegally provided data and information to Lundbeck, both directly and through Theracom (i.e., Lundbeck's hub), related to the profitability of Lundbeck's "donations" to CVC, Lundbeck would couple their use of CVC with price increases of Xenazine. Lundbeck's bribes to CVC resulted in more MA Plan and Medicaid Plan patients receiving co-payment assistance. This in turn eliminated price sensitivity for Xenazine, resulting in supra-competitive pricing and artificially inflated quantities of dispensed Xenazine, which together increased profits for Lundbeck. And all along the way, as Lundbeck's drug prices increased and utilization of CVC increased to mask the effects of the price increases, donations to CVC continued to rise, and CVC's executives increased their own compensation and benefits.

119.    Data from CMS and Assignors show how RICO Defendants' Scheme eliminated price sensitivity of patients purchasing, physicians prescribing, and pharmacies dispensing Xenazine and resulted in federal healthcare programs bearing the increased costs. This data reflects that Lundbeck charged supra-competitive prices and increased the quantity of Xenazine paid for by federal programs while the Co-Payment Circumvention Enterprise pursued such goals through unlawful means, as described herein.

120.    Assignors paid at least $5.1 million in claims for Xenazine from at least October 1,

2011, until present. Information in the exclusive control of RICO Defendants will show that a significant portion of the co-payments paid on behalf of the beneficiaries of the Assignors were made by CVC in connection with RICO Defendants' Co-payment Circumvention Enterprise.

121.    Assignors were not privy to which financially needy patients' co-payments were being provided by Lundbeck's bribes to CVC. Assignors' obligations to cover claims for Xenazine only arose when covered patients satisfied their co-payment obligations and Assignors did not and could not have known that their reimbursement obligations were caused by RICO Defendants' misconduct.

122.    RICO Defendants' documents and disclosures clearly show that they possess information to show exactly which patients received co-payment assistance. For example:

123.    CVC's Form 990 Tax Filings state in Supplemental Information to Schedule I, Part I, Line 2:

> Financial grants are given when an individual specifies he/she has a disease supported by Caring Voice and he/she meets stated income guidelines. Individuals fill out an application for financial assistance which must be accompanied by a medical certification from their physician documenting their diagnosis. Grant funds are paid to third party pharmacies or insurance companies after proof is received that the patient has incurred therapy costs associated with the specific diagnosis. ***Caring Voice monitors the use of grant funds for individuals using proprietary database software. The database maintains all records to substantiate the amount of an individual's grant, the grantee's eligibility and payments made on the grant***.[16]

124.    CVC's Code of Conduct (adopted by CVC's Board of Directors on July 22, 2017) states that CVC will:

> Maintain accurate and complete books and records, including accounting and financial data, and retain such books and records in accordance with applicable federal, state and local laws and regulations, Company's record retention policies and procedures and Company

---

[16] *See* CVC's Form 990 Tax Filings, attached as **Exhibit E**.

instructions.[17]

125.    As noted above, RICO Defendants' Scheme benefited CVC and its executives.

126.    The information alleged in this section was not, and could not have been, reasonably known or discovered by Plaintiffs until at least April 2019, when such facts were first publicly reported.

127.    In addition, Lundbeck intentionally concealed the Scheme, covering up the true nature of its payments and relationship with charities. The payments were in fact bribes and for the purpose of using the foundations as conduits to effectuate its goals of artificially and deceptively inflating the drug prices and increasing the use of the drugs to increase profits at the expense of healthcare payors like the Assignors and Class Members. Lundbeck's concealment prevented Plaintiffs from reasonably discovering the facts underlying RICO Defendants' Scheme which caused Assignors' and the Class Members' injuries.

128.    RICO Defendants' Scheme caused pharmacies to seek reimbursement from federal health care programs for their purchases of Xenazine. The act of submitting claims for reimbursement carries with it an implied certification of compliance with governing federal rules that are a precondition of or material to payment. Pharmacies submitting claims for reimbursement therefore implied that the claims complied with federal law, including the AKS. RICO Defendants thus caused pharmacies to provide false certifications.

129.    As Lundbeck used CVC as a conduit, CVC did not act as an independent charity. Instead, CVC's conduct violated the AKS. Therefore, those certifications were false.

130.    As a result of Lundbeck's collusion with Theracom and their use CVC as a conduit, the Assignors and Class Members were harmed by paying for an increased number of Xenazine

---

[17] *See* CVC's Code of Conduct, attached as **Exhibit H**.

prescriptions throughout the United States as a direct result of the Co-payment Circumvention Enterprise. The Assignors and Class Members paid increased prices for Xenazine prescriptions as a result of the Scheme, due to Lundbeck recouping its "donations" to CVC, for all Xenazine prescriptions.

**E.  CVC's Fraudulent Transfers to Adira**

131.    As stated above, in or around November of 2017, the OIG issued the 2017 CVC Rescission Letter.

132.    Shortly thereafter, CVC announced that it was no longer opening any new disease funds.

133.    Instead, on February 20, 2018 (just months after the 2017 CVC Rescission Letter), CVC's President and Chairman together incorporated a new 501(c)(3) charity—Facilitating Patient Health, which was later renamed to Adira—to continue operating some of the same disease funds, including an HD Fund.

134.    During this time, CVC was aware of, and involved in, several DOJ investigations and settlements for fraudulent and illegal acts at issue in this Complaint.

135.    Also at this same time, CVC began winding up its operations and now claims to be defunct. CVC's Articles of Dissolution were accepted on June 3, 2019. *See* **Exhibit M** – CVC Articles of Dissolution.

136.    Between at least 2011 and 2017 Greg Smiley served as treasurer of CVC. Starting sometime in 2016 or 2017, Greg Smiley became the President and CEO of CVC and held that position until the end of CVC's disillusionment. *See* **Exhibit E** - CVC Form 990s

137.    In 2014, James Rock became a director and member of the executive team at CVC. Starting in 2016, James Rock was elevated to Chairman of CVC and held that position until the

end of CVC's disillusionment.

138.    On February 23, 2018, (just months after the 2017 CVC Rescission Letter), CVC's President (Greg Smiley) and Chairman (James Rock) together incorporated a new purported 501(c)(3) charity—Facilitating Patient Health ("FPH"), which was later renamed to Adira—to continue operating some of the same disease funds that CVC was forced to close, including an HD Fund. James Rock and Greg Smiley were named as two of the three founding directors. *See* **Exhibit N** - FPH Articles of Incorporation.

139.    FPH's 2019 Annual Report (submitted February 9, 2019) names James Rock as Director and Greg Smiley as Director and Chief Executive Officer.

140.    On March 15, 2019, CVC entered into a Grant Agreement with FPH. ("CVC-FPH Agreement"). Greg Smiley—who was President of both CVC and FPH at the time—signed on behalf of CVC, while James Rock—who was Chairman of both CVC and FPH at the time—signed on behalf of FPH.

141.    The CVC-FPH Agreement provided that CVC would provide $3,000,000 to FPH.

142.     On May 6, 2019, FPH amended its articles of incorporation (signed by Greg Smiley) to change the organization's name to "Adira Foundation."

143.    On May 31, 2019, CVC entered into a "Records Transfer Agreement" with Adira, where CVC would "transfer title and custody of all electronic patient records . . . as well as certain other records" to CVC. The Records Transfer Agreement contains an attached "Bill of Sale" which purports that, in consideration of the agreement, Adira paid CVC $10.

144.    Greg Smiley signed the Records Transfer Agreement on behalf of ***both*** CVC ***and*** Adira. No other signatures appear on the Records Transfer Agreement. In addition to Greg Smiley and James Rock, several CVC employees—including other senior management personal—began

working for Adira at the same time as the transfers. For example, Lauren Ruiz was Director of Patient Services at CVC from November 2011, until joining Adira in April 2019 as a Programs Manager. Additionally, Bruce Packett, who served as a director at CVC for several years, including from 2017-2020, has now also served on Adira's Board of Directors since 2018.

145.    CVC and Adira even used the same accounting firm, Meadows Urquhart Acree & Cook LLP, to file their respective 2019 990 forms.

146.    Further, an email to Greg Smiley's Adira email address on August 18, 2020, noted that: "Any [CVC] billings after 6/9/2020 will need to be paid with assistance/refund from Adira to cover the costs."

147.    An email to Greg Smiley further shows that Adira and CVC were different only in name, with the sender directing Greg to have "the entire contents of CVC's AP 05897 [transferred] to Bank of America in cash." The email concluded by noting that the CVC and Adira funds were intermingled until the CVC assets were transferred: "This will leave only the Adira assets at UBS."

148.    An internal CVC document titled "CVC Board Slides 202004" reveals that CVC transferred all non-restricted and unobligated funds to Adira, noting that "$4.0 million Total Will be transferred to Adira on or before 6/30/2020." In addition, this same document instructs that CVC will transfer to Adira both cash and "safe assets earning 5+%."

149.    Further, several additional internal CVC documents instruct that an extensive list of personal property was (or would be) given to Adira, including laptops, computer servers, software licensees, office equipment, etc., totaling tens of thousands of dollars in value—even after accounting for depreciation.

150.    An October 2, 2020, email from an accounting firm to Greg Smiley reads, in part, "regarding salary on CVC's final return, you wont' [sic] have any for CVC itself but we will have

to show your salary for Adira as it is a related party. CVC's final return will look similar to the 6.30.20 return as we showed no income actually coming from CVC but did show your Adira income (as required)."

151.    Greg Smiley's salary from CVC in 2018 was $190,309. In 2019, Greg Smiley's 2019 CVC salary was $256,066 and $192,865 in 2020. *See* **Exhibit E** - CVC Form 990. In addition to his CVC salary, Greg Smiley was paid, by Adira, $192,865 in 2019 and $234,248 in 2020. *See* **Exhibit O** – Adira Form 990s.

## V.    CLASS ACTION ALLEGATIONS

152.    At all material times, Xenazine—manufactured and sold by Lundbeck—was shipped across state lines and sold to customers located both within and outside its state of manufacture.

153.    During the relevant time period, in connection with the purchase and sale of Xenazine, monies as well as contracts, bills, and other forms of business communication and transactions, were transmitted in continuous and uninterrupted flow across state lines.

154.    During the relevant time period, various methods of communication were used to effectuate the illegal acts alleged here, including the United States mail, interstate and foreign travel, and interstate and foreign telephone commerce. The activities of RICO Defendants, as alleged in this Complaint, were within the flow of, and have substantially affected, interstate commerce.

155.    Plaintiffs bring this action on behalf of themselves and the following Class Members:

> All Medicare Advantage Organizations, Medicaid Managed Care Organizations, and at-risk, first-tier, and downstream entities in the United States and its territories that from at least October 1, 2011 through present, pursuant to Medicare and/or Medicaid contracts offering Medicare and Medicaid benefits, provided services, purchased Xenazine, provided reimbursement, or possess the recovery rights to

reimbursement for some or all of the purchase price of Xenazine resulting from CVC's co-payment assistance.  This class excludes: (a) RICO Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) the federal government; and (c) any judges or justices involved in this action and any members of their immediate families.

156.    Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23 both individually and on behalf of a national damages class.

157.    As discussed in this Complaint, RICO Defendants' Scheme resulted in increased sales of the Xenazine, the cost of which were borne by Assignors and Class Members. The damages suffered by Plaintiffs apply to all individual Class Members (and Plaintiffs as the rightful assignees of those organizations that assigned their rights to Plaintiffs). Class action law has long recognized that, when companies engage in conduct that has uniformly harmed a large number of claimants such as Plaintiffs and other third-party payers, class resolution is an effective tool to redress the harm.

158.    Assignors and Class Members have been deprived of money as a result of their obligation to pay for prescribed Xenazine at artificially inflated quantities and supra-competitive prices, and because of RICO Defendants' improper shifting of patients from Lundbeck's free drug program to the co-payment charity. But for the Scheme, Assignors and Class Members would have paid less for Xenazine.

159.    The Classes, defined above, are properly brought and should be maintained as a nationwide class action under Rule 23(a), satisfying the class action prerequisites of numerosity, commonality, typicality, and adequacy:

> Numerosity: The Class Members are so numerous that joinder is impracticable. Plaintiffs believe the Class includes thousands of third-party payors that paid for hundreds of thousands, if not millions, of prescriptions. There are thousands of entities (including the organizations that assigned their rights to Plaintiffs) throughout the United States that sustained damages as a result of their payment for Xenazine caused by

RICO Defendants' Scheme. Thus, the numerosity element for class certification is met.

<u>Commonality</u>: RICO Defendants' misconduct was directed at all Class Members. Questions of law or fact are common to all Class Members. RICO Defendants' co- payment assistance conspiracy Scheme and racketeering activity carried out by their enterprise have a common, adverse effect on all Class Members. Thus, common questions of law or fact are prevalent throughout the class, such as whether RICO Defendants engaged in a pattern of racketeering activity and conspired to induce Class Members' payment for Xenazine prescriptions. Each Class Member shares the same needed remedy—namely reimbursement for unlawfully paid bills and lost money or disgorgement of RICO Defendants' profits as a result of RICO Defendants' co-payment assistance conspiracy Scheme and racketeering activity that caused Assignors and Class Members to pay supra-competitive prices for artificially inflated quantities of Xenazine.

<u>Typicality</u>: Plaintiffs' claims are typical of the claims of the Class Members because their claims arise from the same course of conduct by RICO Defendants, namely RICO Defendants' formation of their co-payment Scheme and racketeering activity unlawfully causing Class Members to reimburse innocent, non-party pharmacies for the over-prescription and over-dispensing of Xenazine at supra- competitive prices and actual payment that would otherwise not have been made but for RICO Defendants' conduct. Plaintiffs' claims are, therefore, typical of the Class Members.

<u>Adequacy</u>: Plaintiffs will fairly and adequately represent and protect the interests of the Class Members. Plaintiffs' interests in vindicating these claims are shared with all of the Class Members. Plaintiffs are represented by counsel who are experienced and competent in the prosecution of class action litigation and have particular experience with class action consumer protection and RICO litigation in the pharmaceutical industry.

160.    The Class is properly brought and should be maintained as a class action under Rule 23(b) because a class action is the superior method for resolving these claims. Pursuant to Rule 23(b)(3), common issues of law and fact predominate over any questions affecting only individual members of the Classes. RICO Defendants deliberately conspired to cause Assignors to pay for Xenazine through the formation of the Scheme that subsequently resulted in the submission and payment of supra-competitive prices for Xenazine by Assignors and the Class Members that

otherwise would not have been paid.

161.    Assignors and Class Members paid for prescriptions of Xenazine that they otherwise would not have paid but for RICO Defendants' Co-payment Circumvention Enterprise and racketeering activity.

162.    Additional questions of law and fact common to some or all the Classes include, but are not limited to:

      a.    Whether RICO Defendants engaged in a bribery scheme and thereby violated the AKS, the Travel Act, and/or mail and wire fraud statutes;

      b.    The effect of such bribery scheme on the quantities dispensed and prices of Xenazine; and

      c.    The quantum of overcharges paid by the Assignors and Class Members in the aggregate.

163.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

164.    Plaintiffs know of no difficulty to be encountered in this action that would preclude its maintenance as a class action.

## TOLLING OF THE STATUTE OF LIMITATIONS

### *Fraudulent Concealment Tolling*

165.    The claims asserted in this Complaint have been tolled as a matter of law as RICO Defendants took affirmative steps to conceal the wrongful conduct alleged herein including, *inter*

*alia*, Lundbeck utilizing CVC as a conduit and concealing such use under the guise of "donations" to an "independent" co-payment assistance charity.

166.    The claims asserted in this Complaint have been tolled as a matter of law as CVC and Adira took affirmative steps to conceal the wrongful conduct alleged herein including, *inter alia*, CVC's fraudulent transfers to Adira and concealing such transfers as bona fide transactions.

*Discovery Rule Tolling*

167.    Assignors did not know, and had no reasonable way of discovering, RICO Defendants' alleged Scheme. Within the applicable statutes of limitation, Assignors could not have discovered through the exercise of reasonable diligence that RICO Defendants were concealing the conduct alleged herein. Assignors did not discover, and did not know of, facts that would have caused a reasonable person to suspect that RICO Defendants were engaged in the alleged Scheme, nor would a reasonable diligent investigation have disclosed the true facts.

168.    Assignors did not know, and had no reasonable way of discovering, CVC's and Adira's fraudulent and/or voidable transfers. Within the applicable statutes of limitation, Assignors could not have discovered through the exercise of reasonable diligence that CVC and Adira were concealing their conduct alleged herein. The Assignors did not discover, and did not know of, facts that would have caused a reasonable person to suspect that CVC and Adira were fraudulently transferring assets, nor would a reasonable diligent investigation have disclosed the true facts.

## VI.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violations of Racketeering Influenced Corrupt Organization Act ("RICO") 18 U.S.C. § 1962(c) Through the Use of Co-Payment Charity Scheme
*Against RICO Defendants*

169.    Plaintiffs re-allege and incorporate by reference paragraphs 1-168 of this Complaint as if fully set forth herein.

170.    At all relevant times, RICO Defendants have been "persons" under 18 U.S.C. § 1961(3) who conducted the affairs of the enterprise through the pattern of racketeering activity detailed throughout this Complaint in violation of 18 U.S.C. § 1962(c).

171.    Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

172.    Section 1964(c) provides that "any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." The elements of a RICO claim under § 1964(c) pursuant to a violation of§ 1962(c) are: (i) conduct; (ii) of an enterprise; (iii) through a pattern of; (iv) racketeering activity.

### Description of the Co-payment Circumvention Enterprise

173.    RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

174.    Under 18 U.S.C. § 1961(4), a RICO "enterprise" may be an association-in-fact that, although it has no formal structure, has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprises' purpose.

175.    The Co-payment Circumvention Enterprise is an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4), consisting of RICO Defendants Lundbeck, Theracom, and CVC, including their employees and agents.

176.    The Co-payment Circumvention Enterprise functioned as an ongoing and continuing unit. The Co-payment Circumvention Enterprise was created and/or used as a tool to effectuate a pattern of racketeering activity. Each of the Enterprise participants is a "person" distinct from the Enterprise.

177.    The Co-Payment Circumvention Enterprise had a common purpose that united its members. This purpose was to profit from the illegal kickbacks and referrals. The common purpose was accomplished by: (1) growing CVC's fund and CVC's executive compensation and (2) by increasing the number of patients who had their drugs purchased by Assignors and Class Members, thereby increasing the amount of money Lundbeck made from Xenazine. By funneling and steering people into CVC's fund, the Co-payment Circumvention Enterprise increased Lundbeck's number of covered "customers," thereby triggering the Assignors' and Class Members' coverage obligations for their Enrollees and eliminating price sensitivity to Xenazine. These two prongs of the plan worked hand-in-hand and resulted in a cycle that expanded profits for Lundbeck, Theracom, and CVC, at the expense of, among others, the Assignors and Class Members.

178.    Each of the RICO Defendants received substantial revenue from participating in the Co- Payment Circumvention Enterprise. Such revenue was exponentially greater than it would have been in the absence of such Enterprise. Each portion of the Enterprise benefitted from the existence of the other parts.

179.    The Co-payment Circumvention Enterprise has a systemic linkage because there are contractual relationships, financial ties, and continuing coordination of activities between each Defendant.

180.    There were interpersonal relationships between those associated with the Co-payment Circumvention Enterprise. This includes relationships: (1) among CVC's officers and

directors and relationships among Lundbeck's officers, directors, principals, and agents, and Theracom's officers, directors, principals, and agents; and (2) relationships between CVC, Theracom, and Lundbeck. This is evidenced by routine communications (through the U.S. Mail and Wire) between Lundbeck and CVC to ensure that its "donations" were sufficient to drive increased profits. Theracom would facilitate this process by acting as Lundbeck's hub and facilitating the sharing of CVC data with Lundbeck to ensure that Lundbeck's "donations" achieved their proper purpose of paying co-pays only for patients receiving Xenazine, thereby increasing profits for Lundbeck. Lundbeck and CVC knew and intended for Theracom to act as the hub for carrying out the Co-Payment Circumvention Enterprise. The OIG explicitly warned CVC not to send pharmaceutical manufacturers this information because doing so would violate the AKS and FCA, and CVC certified its understanding and compliance with the OIG's warnings. But RICO Defendants participated in this conduct anyway. Lundbeck settled the DOJ's AKS and FCA claims for $52.6 million for this illegal conduct. This conduct shows that CVC and Lundbeck were communicating—directly and through Lundbeck's hub, Theracom—information important to their Scheme through the mail and wires to profit illegally and that they had a relationship.

181.    The Co-payment Circumvention Enterprise had the longevity sufficient to permit its associates to pursue the enterprise's purpose. It lasted for years, during which time its purposes were pursued. CVC grew its fund for Xenazine as Lundbeck increased its annual "donations" to CVC. And CVC's officers and directors increased their annual compensation, as detailed in CVC's Form 990 Tax Filings. Moreover, Lundbeck insulated the price sensitivity of Xenazine, as demonstrated by the 21.07% annual increase in the price of Xenazine. Lundbeck also increased the number of "customers" buying Xenazine, which allowed Lundbeck to increase its profits.

182.    Lundbeck carried out its business activities both with and without CVC and

Theracom. Similarly, CVC operated other funds without Lundbeck. Theracom also conducted other business apart from CVC and Lundbeck. The Scheme thus did not involve parallel conduct because the RICO Defendants participate in transactions with co-payment charities that do not result violations of the AKS or the FCA.

### Conduct of the Enterprise's Affairs

183.    Each Defendant conducted or participated in, either directly or indirectly, the conduct of the Co-payment Circumvention Enterprise's affairs. Each Defendant was part of the Co-payment Circumvention Enterprise and each operated and managed the Co-payment Circumvention Enterprise. Such participation included, but is not limited to: (1) CVC managing, collecting, and sharing data (through the U.S. mail and wire facilities) with Lundbeck—both directly and through Theracom—so that Lundbeck could effectively conduct ROI analyses on the amounts of "donations" to CVC's HD Fund and General Fund; (2) Lundbeck provided necessary bribes, disguise as donations, to CVC so the payment obligations of the Assignors and Class Members would be triggered; and (3) CVC, Lundbeck, and Theracom all steered and funneled Xenazine patients to CVC's disease funds.

184.    At all relevant times, each Defendant was aware of the Co-Payment Circumvention Enterprise's conduct and was a knowing and willing participant in the racketeering conduct of the Enterprise.

### RICO Defendants' Pattern of Racketeering Activity

185.    To carry out their illegal and collusive bribery Scheme, RICO Defendants knowingly conducted or participated, directly or indirectly, in the affairs of the Co-payment Circumvention Enterprise through a pattern of racketeering activity within the meaning of 18U.S.C. §§ 1961(1), 1961(5), and 1962(c), and employed the use of the mail and wire facilities,

in interstate commerce, to promote, manage, establish, and carry out the Co-Payment Circumvention Enterprise in violation of 18 U.S.C. § 1952 (Travel Act), § 1341 (Mail Fraud), and § 1343 (Wire Fraud).

186.    RICO Defendants' pattern of racketeering likely involved thousands, if not hundreds of thousands, of separate instances of use of the U.S. mail or interstate wire facilities to further the Co-Payment Circumvention Enterprise. Each of these mailings and interstate wire transmissions constitutes an instance of "racketeering activity" under 18 U.S.C. § 1961(1)(B) by violating the underlying predicate acts of § 1952, § 1341, and § 1343. Collectively, these violations constitute a "pattern of racketeering activity," under 18 U.S.C. § 1961(5), to advance RICO Defendants' intentional and illegal Scheme.

187.    RICO Defendants engaged in a scheme to illegally profit at the direct expense of third-party payors, including the Assignors and Class Members. They funneled and steered patients into CVC's funds for Xenazine, knowing third-party payors such as Assignors and Class Members would ultimately bear the cost of the Xenazine prescriptions. RICO Defendants knew their Scheme to funnel, steer, and refer were violative of federal and state laws including, but not limited to, the AKS and the FCA and that they were transmitting false and illegal information through mail and wire communications.

188.    RICO Defendants' use of the mails and wires to perpetuate their Scheme involved thousands of communications which involved, among others, the following:

    a. Communications from Lundbeck, Theracom, and CVC to patients, steering them to Lundbeck's co-payment assistance program using CVC;

    b. Transmittal of bribes, disguised as donations, by Lundbeck to CVC, which were used, in part, to pay the co-payments of Lundbeck's "customers" in CVC's co-pay assistance program;

    c. Submission of certifications by Lundbeck and CVC in which they claimed to be in compliance with federal law, including the AKS and

FCA;

d.  Submissions of data from CVC to Lundbeck (directly and through Theracom) so that Lundbeck could determine how much money it was making from its "donations" to CVC and how much more money it could make by increasing its "donations";

e.  Certifications by CVC that it would determine the eligibility according to a "uniform measure of financial need that is applied in a consistent manner" when in fact CVC emphasized patients taking Xenazine based on Lundbeck bribes, not financial need;[18] and

f.  Causing false claims, in violation of the FCA and AKS, to be submitted by innocent, non-party pharmacies to the Assignors and Class Members.

189.    The predicate acts violating the Travel Act, as well as mail and wire fraud, had the same purpose; that is, to make money by growing CVC's funds as large as possible so that CVC's officers and directors could justify increasing their compensation and so that Lundbeck could get as many "customers" as possible for Xenazine at the expense of the Assignors and Class Members. All of the predicate acts detailed above, including the certifications made by Lundbeck, Theracom, and CVC, as well as the wire communications in furtherance of their Scheme, were for this purpose. If the certifications by Lundbeck to CMS had not been made, Assignors would not have purchased Lundbeck's products. If CVC's certifications had not been made, CVC would not have been permitted to administer its HD Fund or its General Fund and the Assignors and Class Members would not have paid for the claims resulting from the unlawful conduct. The false certifications and contracts RICO Defendants caused pharmacies to send over the mail and wires were done so Lundbeck could make larger "donations" to CVC's funds and cause damage to the Assignors and Class Members.

190.    These predicate acts allowed the continuance of the Scheme to increase the quantity of Xenazine and maintain supra-competitive prices. As a result, the Assignors and Class Members

---

[18] *See* CVC's Form 990 Filing, attached as **Exhibit E**.

paid supra-competitive prices for Xenazine at artificially inflated volumes.

191.    RICO Defendants, including officers, directors, agents, and principals of both organizations, participated in all of the predicate acts. These individuals sent or caused to be sent all of the false certifications through the mail and wire facilities. These individuals communicated with each other and others in furtherance of the Scheme.

192.    The intended and direct victims of the Scheme are the Assignors and Class Members.

193.    The violations of the Travel Act and Mail and Wire Fraud included transmission of false claims andthe unlawful transmission of data and communications to further the racketeering Scheme over a period of at least five years involving harm to multiple parties.

194.    CVC was involved in similar fraudulent schemes with other drug manufacturers. It was engaged in similar schemes with Jazz, United Therapeutics, and Actelion, each of which resulted in settlements with the United States for violations of the AKS and FCA in 2018. Specifically, Jazz settled for $57 million, United Therapeutics settled for $230 million, and Actelion settled for $360 million. CVC's multi-faceted fraud involved multiple victims and predicate actsand is the type of broad and persistent racketeering activity that RICO was intended to stop.

195.    The Co-payment Circumvention Enterprise's illegal scheme and its predicate acts proximately caused injury to the Assignors' and Class Members' business and property by triggering the Assignors' and Class Members' duty to purchase Xenazine and by driving up the cost of Xenazine.

196.    Moreover, the Co-payment Circumvention Enterprise and its predicate acts proximately caused injury to the Assignors' and Class Members' business and property by

triggering the Assignors' and Class Members' duty to purchase Xenazine and by driving up the cost of Xenazine.

197.    Accordingly, RICO Defendants' violations of 18 U.S.C. §1962(c) have directly and proximately caused injuries and damages to Assignors and Class Members, entitling Plaintiffs to bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## SECOND CLAIM FOR RELIEF
### Violations of 18 U.S.C. § 1962(d) Through the Use of the Co-Payment Charity Scheme
*Against RICO Defendants*

198.    Plaintiffs re-allege and incorporate by reference paragraphs 1-168 of this Complaint as if fully set forth herein.

199.    Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions.

200.    RICO Defendants violated § 1962(d) by conspiring to violate § 1962(c). The object of this conspiracy was to conduct or participate in, directly or indirectly, the conduct of the affairs of the Co-payment Circumvention Enterprise described previously through a pattern of racketeering activity.

201.    RICO Defendants knowingly agreed that Lundbeck would perform services that would facilitate the illicit activities of the Co-payment Circumvention Enterprise. Lundbeck, through Theracom, steered Xenazine patients away from its manufacturer-sponsored free-drug fund and into CVC's funds. Lundbeck also provided CVC with "donations" so that CVC could pay the co-payments of Lundbeck's "customers" in CVC's funds. Lundbeck also sent certifications over the interstate mails and wires claiming it was in compliance with federal law, including the AKS and FCA. Lundbeck also used the data CVC sent it, in violation of the AKS and FCA, to determine how much money it was making from its "donations" to CVC and how much *more*

money it could make by increasing its "donations." Indeed, this exchange of data shows that Lundbeck and CVC were not engaged in parallel conduct but were working together and had a meeting of the minds that they could both profit from the Co-payment Circumvention Enterprise. The shared data showed how much money Lundbeck made the prior year before from its "donations" to CVC and how much more it could make by increasing its "donations." It thus set out a roadmap of illegal activities and profits.

202.    Further, RICO Defendants knowingly agreed that CVC would perform services that would facilitate the activities of the Co-payment Circumvention Enterprise and those who were running it in an illegal manner. Some of the services that CVC performed were steering people into its funds. CVC also sent certifications over the interstate mails and wires claiming it was in compliance with federal law, including the AKS and FCA. CVC also sent Lundbeck data, in violation of the AKS and FCA, so Lundbeck could see how much money it was making from its "donations" to CVC and how much *more* money it could make by increasing its "donations." Indeed, this sharing of data shows that Lundbeck and CVC were not engaged in parallel conduct but were working together and had a meeting of the minds that they could both profit from the Co-payment Circumvention Enterprise. CVC knew that the more money it accepted in "donations" from Lundbeck, the more money CVC could justify paying its officers and directors in compensation.  By illegally giving Lundbeck this data, CVC was soliciting greater contributions.

203.    Further, Theracom knowingly agreed with Lundbeck and CVC that they would perform services that would facilitate the activities of the Co-Payment Circumvention Enterprise and those who were running it in an illegal manner. Some of the services that Theracom performed were steering people towards CVC's co-payment assistance funds by sharing CVC data with Lundbeck to ensure Lundbeck could verify that its "donations" provided co-pays for Xenazine.

Theracom caused false certifications to be sent over the interstate mail and wire facilities claiming they were in compliance with federal law, including the AKS and FCA. Theracom sent Lundbeck data, in violation of the AKS and FCA, so that Lundbeck could see how much money it was making from its "donations" to CVC, and how much more money it could make by increasing its "donations." Indeed, this conduct shows that RICO Defendants did not engage in parallel conduct but worked together and had a meeting of the minds that they could each profit from the Co-payment Circumvention Enterprise. Theracom knew that if Lundbeck provided more "donations," CVC would provide more co-pay assistance, thereby increasing Lundbeck's profits, which in turn creates more work and profits for Theracom. Thus, by illegally providing data to Lundbeck, Theracom managed to increase its own profits—as well as Lundbeck's and CVC's profits

204.    RICO Defendants knowingly agreed that one or all of them would commit at least two instances of Travel Act violations or mail and wire fraud (or cause an innocent third-party to send false statements over the mails and wires). RICO Defendants had actual or constructive knowledge that CVC had certified to HHS that it would not share data with manufacturers, allow manufactures to exert influence over it, or steer people to particular drugs. In short, RICO Defendants knew that CVC had certified that it would abide by the AKS and FCA. RICO Defendants knew that the Scheme they were engaged in or were going to engage in was going to make all these certifications false. They also knew that each time a pharmacy filled a prescription for someone in CVC's funds, any certifications the pharmacist made that he or she would abide by federal law would be false. Lundbeck also knew that any certifications it made to HHS or the Government about its compliance with federal law would be false.

205.    RICO Defendants knew that any communications they had over the telephone, e-mail, or text message in furtherance of the Scheme would be predicate acts.

206.    RICO Defendants agreed to pursue the same objective of profiting illegally from the Co-payment Circumvention Enterprise. They agreed to divide the work of accomplishing this objective. Lundbeck would make the "donations"; CVC would provide data; they would both steer clients and make false certifications; Theracom would act as "the hub" to coordinate between Lundbeck, CVC, and Xenazine patients. RICO Defendants intended to further this endeavor, which, as described above, when completed, amounted to a violation of 18 U.S.C. § 1962(c) that proximately and directly caused injury to the Assignors and Class Members.

207.    Plaintiffs bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

### THIRD CLAIM FOR RELIEF
### Violations of State Consumer Protection Laws
*Against RICO Defendants*

208.    Plaintiffs re-allege and incorporate by reference paragraphs 1-168 of this Complaint as if fully set forth herein.

209.    RICO Defendants engaged in unfair, false, unconscionable, or deceptive acts or practices in violation of various state consumer protection laws, as set forth below.

210.    RICO Defendants directly misrepresented to Assignors and the Class Members that they were complying with federal and state laws, including laws against bribery, kickbacks, and false claims to the government.

211.    RICO Defendants intended for 'payers such as Assignors and Class Members to rely on these certifications. The intention may be inferred by the very nature of the representation, whose sole purpose was to procure payment for Xenazine. These representations and certifications were made in an effort by RICO Defendants to have the consuming public use the CVC fund and were addressed to the market generally by having improper and unnecessary prescriptions for

Xenazine paid for by Medicare, Assignors, and the Class Members. The ultimate consequence of this conduct is a significant injury to the consuming public by, among other things, imposing additional costs on the taxpaying public for Medicare.

212.    Assignors and the Class Members relied on these misrepresentations to their detriment, which were material to their decision to pay for Xenazine.

213.    Assignors and the Class Members were directly and proximately injured by RICO Defendants' conduct suffered an injury in fact, and suffered actual, ascertainable damages.

214.    Assignors and the Class Members would not have reimbursed for nearly as much of the Xenazine as they did, had RICO Defendants refrained from engineering the false representations or otherwise disclosed its schemes. Likewise, Assignors and the Class Members would not have paid nearly as much for each prescription of Xenazine as they did, had RICO Defendants not eliminated price sensitivity through the Co-payment Circumvention Enterprise.

215.    Accordingly, Plaintiffs and the Class Members in each of the below jurisdictions, seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a jurisdiction's consumer protection law, and cost of suit, including reasonable attorneys' fees, to the extent permitted by the below state laws.

### *California Unfair Competition Law (Cal. Bus. Code §§ 17000, et seq.)*

216.    RICO Defendants' conduct occurred in "trade" or "commerce" within the meaning of Cal. Bus. Code Article 2 §§ 17020-17031.

217.    The California UCL provides that "Any person who engages, has engaged, or proposes to engage in unfair competition shall be liable for a civil penalty." Cal. Bus. Code §17206(a).

218.    RICO Defendants' conduct constitutes "unfair or deceptive" acts in violation of the

California UCL.

219.    RICO Defendants' illegal conduct substantially affected California trade and consumers.

220.    Assignors and the Class Members suffered injury-in-fact, ascertainable loss, and actual damages as a direct and proximate result of RICO Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of increased payments for Xenazine here.

221.    RICO Defendants' conduct alleged in this Complaint occurred throughout the United States, including the State of California.

222.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of Xenazine in the State of California.

223.    Plaintiffs are entitled to recover their actual damages.

224.    Plaintiffs also seek punitive damages, attorney fees, and any other just and proper relief under the California UCL.

### ***Connecticut Unfair Trade Practices Act (Conn. Gen. Stat. §§ 42-110a, et seq.)***

225.    RICO Defendants' conduct occurred in "trade" or "commerce" within the meaning of Conn. Gen. Stat. § 42-110a(4).

226.    The Connecticut UTPA provides that "no person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a).

227.    RICO Defendants' conduct constitutes "unfair or deceptive" acts in violation of the Connecticut UTPA.

228.    RICO Defendants' illegal conduct substantially affected Connecticut commerce

and consumers.

229.    Assignors and the Class Members suffered injury-in-fact, ascertainable loss, and actual damages as a direct and proximate result of RICO Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of increased payments for Xenazine herein.

230.    RICO Defendants' conduct alleged in this Complaint occurred throughout the United States, including in the State of Connecticut.

231.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of Xenazine in the State of Connecticut.

232.    Simultaneously with the filing of this Complaint, Plaintiffs served a copy on the Attorney General and Commissioner of Consumer Protection pursuant to Conn. Gen. Stat. § 42-110g.

233.    Plaintiffs are entitled to recover their actual damages, punitive damages, and attorneys' fees pursuant to Conn. Gen. Stat. § 42-110g.

### *Florida Deceptive and Unfair Trade Practices Act (Fla. Stat. Ann. §§ 501.201, et seq.)*

234.    Plaintiffs, Assignors, and the Class Members and are "interested persons" and "consumers" within the meaning of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). Fla. Stat. Ann. § 501.203(6)-(7).

235.    RICO Defendants are engaged in "trade or commerce" within the meaning of Fla. Stat. Ann. § 501.203(8).

236.    FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]" Fla. Sta. § 501.204(1).

237.    RICO Defendants' conduct constitutes "unconscionable acts or practices, and unfair or deceptive acts or practices" under FDUTPA.

238.    RICO Defendants knew or should have known that their conduct was in violation of FDUTPA.

239.    RICO Defendants' illegal conduct substantially affected Florida commerce and consumers.

240.    Assignors and the Class Members suffered injury-in-fact, ascertainable loss, and actual damages as a direct and proximate result of RICO Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of increased number and size of payments for Xenazine described herein.

241.    RICO Defendants' conduct alleged in this Complaint occurred throughout the United States, including in the State of Florida.

242.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of Xenazine in the State of Florida.

243.    Plaintiffs seek to recover against each Defendant the amount of their actual damages, attorneys' fees, and costs pursuant to Fla. Stat. Ann. §§ 501.211(2) and 501.2105(1).

### *Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS §§ 505/1, et seq.)*

244.    RICO Defendants' conduct occurred in "trade" or "commerce" within the meaning of 815 ILCS 505/1(f).

245.    RICO Defendants are "persons" within the meaning of the Illinois CFDBP Act. 815 ILCS 505/1(c).

246.    Assignors and the Class Members are "consumers" within the meaning of the Illinois CFDBP Act. 815 ILCS 505/1(e).

247.    The Illinois CFDBP Act provides that "Unfair methods of competition and unfair or deceptive acts or practices… are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

248.    RICO Defendants conduct constitutes "unfair or deceptive" acts or practices in violation of the Illinois CFDBP Act.

249.    Assignors and the Class Members suffered injury-in-fact, ascertainable loss, and actual damages as a direct and proximate result of RICO Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of increased payments for Xenazine herein.

250.    RICO Defendants' conduct alleged in this Complaint occurred throughout the United States, including the State of Illinois.

251.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of Xenazine in the State of Illinois.

252.    Simultaneously with the filing of this Complaint, Plaintiffs served a copy on the Illinois Attorney General pursuant to 815 ILCS 505/10(d).

253.    Plaintiffs are entitled to recover three (3) times the amount of actual damages resulting from RICO Defendants' violation together with costs and reasonable attorney's fees. 815 ILCS 505/2W.

### _Massachusetts Regulation of Business Practice & Consumer Protection Act (Mass. Gen. Laws Ch. 93a, §§ 1, et seq.)_

254.    Assignors, the Class Members, and RICO Defendants are "persons" within the meaning of the Massachusetts Regulation of Business Practice & Consumer Protection Act ("Massachusetts CPA"). Mass. Gen. Laws Ch. 93A, § 1(a).

255.    RICO Defendants are engaged in "trade or commerce" within the meaning of Mass.

Gen. Laws Ch. 93A, § 1(b).

256.    The Massachusetts CPA makes unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce unlawful. Mass. Gen. Laws Ann. Ch. 93A, § 2(a).

257.    RICO Defendants conduct constitutes "unfair or deceptive acts or practices" under Massachusetts CPA.

258.    RICO Defendants knew or should have known that their conduct was in violation of Massachusetts CPA.

259.    RICO Defendants' illegal conduct substantially affected Massachusetts commerce and consumers.

260.    Assignors and the Class Members suffered injury-in-fact, ascertainable loss, and actual damages as a direct and proximate result of RICO Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of increased payments for Xenazine described herein.

261.    RICO Defendants' conduct alleged in this Complaint occurred throughout the United States, including in the State of Massachusetts.

262.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of Xenazine in the State of Massachusetts.

263.    Plaintiffs seek monetary relief against RICO Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $25 for each Plaintiff. Because RICO Defendants' conduct was committed willfully and knowingly, Plaintiffs are entitled to recover up to three times actual damages, but no less than two times actual damages pursuant to Mass. Gen. Laws Ch. 93A, §§ 9 and 11.

264.    Plaintiffs also seek punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Massachusetts CPA.

### *Michigan Consumer Protection Act (§§ 445.901, et seq.)*

265.    RICO Defendants' conduct occurred in "trade" or "commerce" within the meaning of Michigan CPA §445.902(g).

266.    RICO Defendants are "persons" within the meaning of Michigan CPA §445.902(d).

267.    The Michigan CPA provides that "Unfair, unconscionable, or deceptive methods, acts, or practices in conduct of trade or commerce are unlawful." §445.903(1).

268.    RICO Defendants' conduct constitutes "unfair, unconscionable, or deceptive" methods, acts, or practices under the Michigan CPA.

269.    RICO Defendants' conduct substantially affected Michigan trade or commerce, and consumers.

270.    Assignors and the Class Members suffered injury-in-fact, ascertainable loss, and actual damages as a direct and proximate result of RICO Defendants' unfair, unconscionable, or deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of increased payments for Xenazine herein.

271.    RICO Defendants' conduct alleged in this Complaint occurred throughout the United States, including the State of Michigan.

272.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of Xenazine in the State of Michigan.

273.    Plaintiffs are entitled to recover their actual damages and reasonable attorney fees pursuant to § 445.911(2)-(3).

### *New York General Business Law (N.Y. Gen. Bus. Law §§ 349, et seq.)*

274.     The New York General Business Laws ("New York GBL") makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349.

275.     RICO Defendants' conduct constitutes "deceptive acts" in violation of the New York GBL.

276.     RICO Defendants' illegal conduct substantially affected New York commerce and consumers.

277.     Assignors and the Class Members suffered injury-in-fact, ascertainable loss, and actual damages as a direct and proximate result of RICO Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of increased payments for Xenazine described herein.

278.     RICO Defendants' conduct alleged in this Complaint occurred throughout the United States, including in the State of New York.

279.     Plaintiffs' analysis of its Assignors' data identified one or more purchases of Xenazine in the State of New York.

280.     As a result of the foregoing willful, knowing, and wrongful conduct of RICO Defendants, Plaintiffs have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including but not limited to actual damages or $50, whichever is greater, treble damages up to $1,000, punitive damages to the extent available under the law, reasonable attorneys' fees and costs, an order enjoining RICO Defendants' deceptive and unfair conduct, and all other just and appropriate relief available pursuant to N.Y. Gen. Bus. Law § 349.

### *Ohio Consumer Protections Laws (Ohio Rev. Code Ann. §§1345, et seq; §§4165, et seq.)*

281.    RICO Defendants, Assignors, and the Class Members are "persons" within the meaning of the Ohio CPL. Ohio Rev. Code Ann. §1345.01; §4165.01.

282.    RICO Defendants are "suppliers" within the meaning of Ohio CPL. Ohio Rev. Code Ann. §1345.01

283.    RICO Defendants engaged in trade or commerce within the meaning of Ohio CPL.

284.    Ohio CPL specifies "No supplier shall commit an unfair or deceptive act or practice." Ohio Rev. Code Ann. §1345.02.

285.    Ohio CPL declares it unlawful for any person to engage in a deceptive practice in the course of the person's business, vocation, or occupation. Ohio Rev. Code Ann. §4165.02.

286.    RICO Defendants conduct constituted "unfair, deceptive acts or practices" in violation of Ohio CPL.

287.    RICO Defendants knew or should have known that their conduct was in violation of Ohio CPL.

288.    RICO Defendants' illegal conduct substantially affected Ohio commerce and consumers.

289.    Assignors and the Class Members relied upon RICO Defendants' material misrepresentations regarding the certifications, their compliance with federal and state laws, including laws against bribery, kickbacks, and false claims to the government.

290.    Assignors and the Class Members suffered injury-in-fact, ascertainable loss, and actual damages as a direct and proximate result of RICO Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of increased payments for Xenazine described herein.

291.    RICO Defendants' conduct alleged in this Complaint occurred throughout the

United States, including in the State of Ohio.

292.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of Xenazine in the State of Ohio.

293.    Plaintiffs seek actual economic losses, punitive damages, attorney's fees, and any other just and proper relief available pursuant to Ohio CPL.

### Pennsylvania Unfair Trade and Consumer Protection Law (73 Pa. Cons. Stat. §§ 201-1, et seq.)

294.    Assignors, the Class Members, and RICO Defendants are "persons" within the meaning of the Pennsylvania Unfair Trade and Consumer Protection Law ("Pennsylvania UTPA"). 73 Pa. Cons. Stat. § 201-2(2).

295.    RICO Defendants are engaged in "trade or commerce" within the meaning of 73 Pa. Cons. Stat. § 201-2(3).

296.    The Pennsylvania UTPA prohibits "unfair or deceptive acts or practices," including "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 Pa. Cons. Stat. § 201-2(4).

297.    RICO Defendants conduct constituted "unfair or deceptive acts or practices" in violation of the Pennsylvania UTPA.

298.    RICO Defendants knew or should have known that their conduct was in violation of the Pennsylvania UTPA.

299.    RICO Defendants' illegal conduct substantially affected Pennsylvania commerce and consumers.

300.    Assignors and the Class Members relied upon RICO Defendants' material misrepresentations regarding the certifications their compliance with federal and state laws, including laws against bribery, kickbacks, and false claims to the government.

301.     Assignors and the Class Members suffered injury-in-fact, ascertainable loss, and actual damages as a direct and proximate result of RICO Defendants' unfair and deceptive practices and omissions and/or misrepresentations, at a minimum, in the form of increased payments for Xenazine described herein.

302.     RICO Defendants' conduct alleged in this Complaint occurred throughout the United States, including in the State of Pennsylvania.

303.     Plaintiffs' analysis of its Assignors' data identified one or more purchases of Xenazine in the State of Pennsylvania.

304.     Plaintiffs seek damages, punitive damages, and attorneys' fees, costs, and any other just and proper relief available pursuant to 73 Pa. Cons. Stat. § 201-9.2(a).

### *Puerto Rico Regulation of Commerce (10 L.P.R.A. §§251, et seq.)*

305.     Assignors, the Class Members, and RICO Defendants are "persons" within the meaning of 10 L.P.R.A. §§251, et seq.

306.     RICO Defendants engaged in trade or commerce within the meaning of 10 L.P.R.A. §§251, et seq.

307.     The Puerto Rico Regulation of Commerce states "[u]nfair competition, and unfair or deceptive acts or practices in trade or commerce are hereby decaled unlawful." 10 L.P.R.A. §§251, et seq.

308.     RICO Defendants' conduct constituted "unfair competition, and unfair or deceptive acts or practices" in violation of 10 L.P.R.A. §§251, et seq.

309.     RICO Defendants knew or should have known that their conduct was in violation of the Pennsylvania UTPA.

310.     RICO Defendants' illegal conduct substantially affected Puerto Rico commerce

and consumers.

311.    Assignors and the Class Members relied on RICO Defendants' material misrepresentations about their certifications of compliance with federal and state laws, including laws against bribery, kickbacks, and false claims to the government.

312.    Assignors and the Class Members suffered injury-in-fact, ascertainable loss, and actual damages as a direct and proximate result of RICO Defendants' unfair and deceptive practices and omissions and misrepresentations, at a minimum, in the form of increased payments for Xenazine.

313.    RICO Defendants' conduct alleged in this Complaint occurred throughout the United States, including in Puerto Rico.

314.    Plaintiffs' analysis of its Assignors' data identified one or more purchases Xenazine in Puerto Rico.

315.    Plaintiffs seek damages, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under 10 L.P.R.A. §§251, et seq.

### *South Carolina Unfair Trade Practices Act (S.C. Code Ann. §§ 39-10, et seq.)*

316.    Assignors, the Class Members, and RICO Defendants are "person[s]" under the South Carolina Unfair Trade Practices Act ("South Carolina UTPA"). S.C. Code Ann. § 39-5-10(a).

317.    RICO Defendants are engaged in "trade or commerce" as defined by the South Carolina UTPA. S.C. Code Ann. § 39-5-10(b).

318.    The South Carolina UTPA makes unfair or deceptive acts or practices in the conduct of any trade or commerce unlawful. S.C. Code Ann. § 39-5-20.

319.    RICO Defendants' conduct constitutes "unfair or deceptive acts or practices" in

violation of the South Carolina UTPA. RICO Defendants knew or should have known that their conduct violated the South Carolina UTPA.

320.    RICO Defendants' illegal conduct substantially affected South Carolina commerce and consumers.

321.    Assignors and the Class Members suffered injury-in-fact, ascertainable loss, and actual damages as a direct and proximate result of RICO Defendants' unfair and deceptive practices and omissions and misrepresentations, at a minimum, in the form of increased payments for Xenazine.

322.    RICO Defendants' conduct alleged in this Complaint occurred throughout the United States, including in the State of South Carolina.

323.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of Xenazine in the State of South Carolina.

324.    Because RICO Defendants' unfair and deceptive practices caused actual harm to Plaintiffs, Plaintiffs seek recovery of actual damages or $200, whichever is greater, discretionary punitive damages, reasonable attorney's fees and costs, injunctive relief, and all other proper and just relief available under the South Carolina UTPA.

### _Wisconsin Deceptive Trade Practices Act (Wis. Stat. §§ 100.18, et seq.)_

325.    Assignors and the Class Members are part of "the public" under the Wisconsin Deceptive Trade Practices Act ("Wisconsin DTPA"). Wis. Stat. § 100.18(1).

326.    Assignors and the Class Members are "persons" under Wis. Stat. § 100.18(1).

327.    Each Defendant is a "person, firm, corporation or association" underWis. Stat. § 100.18(1).

328.    The Wisconsin DTPA makes unlawful any "representation or statement of fact,

which is untrue, deceptive or misleading." Wis. Stat. § 100.18(1).

329.    RICO Defendants' conduct constitutes "representation[s] or statement[s] of fact which [were] untrue, deceptive or misleading" in violation of the Wisconsin DTPA.

330.    RICO Defendants knew or should have known that their conduct violated the Wisconsin DTPA.

331.    RICO Defendants' illegal conduct substantially affected Wisconsin commerce and consumers.

332.    Assignors and the Class Members suffered injury-in-fact, ascertainable loss, and actual damages as a direct and proximate result of RICO Defendants' unfair and deceptive practices and omissions and misrepresentations, at a minimum, in the form of increased payments for Xenazine.

333.    RICO Defendants' conduct alleged in this Complaint occurred throughout the United States, including in the State of Wisconsin.

334.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of Xenazine in the State of Wisconsin.

335.    No business relationship, contractual or otherwise, existed or exists between Assignors, the Class Members, and RICO Defendants.

336.    Plaintiffs seek damages, court costs, and attorneys' fees under Wis. Stat. §100.18(11)(b)(2), and any other just and proper relief available under the Wisconsin DTPA.

**FOURTH CLAIM FOR RELIEF**
**Unjust Enrichment Under State Law**
*Against RICO Defendants*

337.    Plaintiffs re-allege and incorporate by reference paragraphs 1-168 of this Complaint as though set forth at length above.

338.    RICO Defendants have benefitted from artificially inflated profits on the sale of Xenazine resulting from the unlawful and inequitable acts alleged in this Complaint.

339.    RICO Defendants' financial benefit resulting from its unlawful and inequitable acts is traceable to overpayments for direct and indirect purchases of Xenazine by the Assignors and Class Members.

340.    The Assignors and Class Members afforded RICO Defendants an economic benefit in the form of profits from unlawful overcharges and monopoly profits to the economic detriment of the Assignors and Class Members.

341.    Plaintiffs' analysis of its Assignors' data identified one or more purchases of Xenazine in each of these States and Territories:

    a.  California;

    a.  Connecticut;

    b.  Florida;

    c.  Illinois;

    d.  Massachusetts;

    e.  Michigan;

    f.  New York;

    g.  Ohio;

    h.  Pennsylvania;

    i.  Puerto Rico;

    j.  South Carolina; and

    k.  Wisconsin.

342.    RICO Defendants' conduct directly resulted in the unjust enrichment of the RICO Defendants through the sale of Xenazine in each of the States and Territory mentioned above.

343.    It would be futile for the Assignors and Class Members to seek a remedy from any party with whom they have privity of contract with for its direct or indirect purchases of Xenazine.

344.    It would be futile for the Assignors and Class Members to seek to exhaust any

remedy against the immediate intermediary in the chain of distribution from which the Assignors and Class Members purchased Xenazine, as they are not liable and would not compensate the Assignors and Class Members for unlawful conduct caused by RICO Defendants.

345.    The economic benefit of overcharges and artificially inflated volumes of prescriptions derived by RICO Defendants through charging supra-competitive and artificially inflated prices for Xenazine is a direct and proximate result of RICO Defendants' unlawful conduct.

346.    The economic benefits derived by RICO Defendants rightfully belong to the Assignors and Class Members, as they paid anticompetitive and monopolistic prices beginning in at least October 1, 2011, and continuing through the present, and they will continue to do so until the effects of RICO Defendants' illegal conduct cease.

347.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for RICO Defendants to be permitted to retain any of the overcharges for Xenazine derived from RICO Defendants' unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

348.    RICO Defendants are aware of and appreciates the benefits bestowed upon it by the Assignors and the Class Members.

349.    RICO Defendants should be compelled to disgorge all unlawful or inequitable proceeds received in a common fund for Plaintiffs' benefit.

350.    A constructive trust should be imposed on all unlawful or inequitable sums received by RICO Defendants traceable to the Assignors and Class Members.

**FIFTH CLAIM FOR RELIEF**
**Violations of the Civil Remedies for Criminal Practices Act, Fla. Stat. 77101, et seq.**
*Against All RICO Defendants*

351.    Plaintiffs re-allege and incorporate by references paragraphs 1-168 of this Complaint as if fully set forth herein.

352.    At all times, as set forth above, RICO Defendants' actions were unlawful under Section 772.103(3), Florida Statutes, as they were all "…employed by, or associated with, any enterprise through a pattern of criminal activity."

353.    RICO Defendants violated 772.101, *et seq.*, Florida Statutes by participating in or conducting the affairs of the Co-Payment Circumvention Enterprise (as described more fully above) through a pattern of racketeering activity.

354.    Plaintiffs, Assignors, and the Class Members are "persons" as defined in Section 1.01, Florida Statutes, injured in their business or property, through the RICO Defendants' racketeering violations.

Description of the Co-Payment Circumvention Enterprise

355.    RICO Defendants are "persons" under Section 1.01, Florida Statutes.

356.    Lundbeck and CVC are members of and constitute an "association in-fact enterprise."

357.    The Co-Payment Circumvention Enterprise is an association-in-fact of individuals and corporate entities under Section 772.101, Florida Statutes, and consists of "persons" associated for a common purpose.

358.    The purpose of the Co-Payment Circumvention Enterprise was to maximize Lundbeck's profits and CVC's executive compensation.

359.    The Co-Payment Circumvention Enterprise had an ongoing organization with an

ascertainable structure and functioned as a continuing unit with separate roles and responsibilities. Lundbeck is the source of the schemes alleged, including providing kickbacks to subsidize payments for Xenazine whose co-payments were provided by CVC.

360.    For CVC's part, CVC accepted Lundbeck's kickbacks and provided unlawful payments for Xenazine.

361.    Lundbeck and CVC, individually and collectively, fulfilled their roles in the Co-Payment Circumvention Enterprise.

362.    Lundbeck and CVC were distinct legal entities with distinct purposes. Lundbeck is the architect of the Co-Payment Circumvention Enterprise, with the sole purpose to make as much money off Xenazine as possible before generic competition entered the market. For CVC, it was to raise the amount of money in the funds to justify paying higher salaries to their executives.

363.    The Co-Payment Circumvention Enterprise had an existence that was distinct from the pattern of racketeering in which Lundbeck and CVC engaged. Lundbeck and CVC conspired with each other to minimize and/or conceal the amount of information Assignors received about the claims for payment of Xenazine, materially resulting in Assignors' reimbursement of the purchase price of Xenazine that they would not have otherwise paid for. *See* Section 817.234, Florida Statutes ("A person commits insurance fraud punishable as provided in subsection (11) if that person, with the intent to injure, defraud, or deceive any insurer: 1. Presents or causes to be presented any written or oral statement, as part of, or in support of, a claim for payment or other benefit pursuant to an insurance policy or a health maintenance organization subscriber or provider contract, knowing that such statement contains any false, incomplete, or misleading information concerning any fact or thing material to such claims(.)").

364.    At all relevant times, RICO Defendants operated, controlled, and managed the Co-

Payment Circumvention Enterprise, through a variety of actions. First, CVC falsely represented the level of control that Lundbeck had over CVC in the PAP to the OIG on numerous occasions. Second, RICO Defendants failed to disclose a material fact about the existence of the kickbacks in violation of Section 817.234, Florida Statues, (i.e., causing pharmacies to submit false submissions of payments to the Assignors and the Class Members.).

365.    RICO Defendants' participation in the Co-Payment Circumvention Enterprise was necessary for the successful operation of the schemes. The members of the Co-Payment Circumvention Enterprise all served a common purpose, which was to increase the fund to an enormous size while knowing each payment was a kickback, while minimizing the amount of information the Assignors, Class Members, and the innocent third-party pharmacies, knew about the program. These affirmative acts and strategic omissions were material to the Assignors' and Class Members' decision to issue payment for Xenazine. The Co-Payment Circumvention Enterprise's actions maximized the revenue and profitability of the Enterprises' members by knowingly causing payments for Xenazine.

366.    Section 772.102, Florida Statutes, provides that criminal activity is any activity chargeable by indictment or information by among other statutes Section 817.234, Florida Statutes. Section 817.234, Florida Statutes, criminalizes situations where health care companies, such as the Assignors and Class Members, are provided incomplete or misleading information about any fact or thing material to a claim for payment. Lundbeck and CVC violated Section 817.234, Florida Statutes, by providing incomplete or misleading information material to the Assignors' and Class Members' decision to issue payment for Xenazine.

367.    RICO Defendants committed numerous acts of racketeering by providing incomplete or misleading information related to Xenazine. Lundbeck and CVC knew or had reason

to know that they were providing incomplete or misleading information about these claims.

368.    RICO Defendants knew or had reason to know that they were not providing complete or non-misleading information under Section 817.234, Florida Statutes. Despite knowledge of these facts, they induced the Assignors and Class Members to make payment for claims that they otherwise would not have paid. Instead, RICO Defendants knowingly provide incomplete information to enrich their bottom line.

369.    Based on these omissions, the Assignors and Class Members provided payments for Xenazine throughout the United States, including Florida, based on half-truths, inaccurate information, and deliberate omissions. RICO Defendants' omissions were material to the payment of Xenazine that the Assignors and Class Members provided payment for. Had the Assignors and Class Members known of the Co-Payment Circumvention Enterprise, they would not have submitted payment for Xenazine.

370.    The Assignors and Class Members were the primary and intended victims of RICO Defendants' unlawful scheme. The Assignors paid for Xenazine throughout the United States, including Florida, based on RICO Defendants' omissions of material information under pursuant under to Section 817.234, Florida Statutes.

371.    As part of this Scheme, RICO Defendants caused pharmacies to submit false certifications and misled the Assignors and Class Members into reimbursing prescriptions of Xenazine. Lundbeck and CVC conducted or participated, directly or indirectly, in the Co-Payment Circumvention Enterprise through a pattern of unlawful activity.

372.    By reason of and as a result of RICO Defendants' conduct, the Assignors and Class Members were injured in their business or property.

373.    RICO Defendants' violations have directly and proximately caused injuries and

damages to Assignors, Plaintiffs, and the Class Members. The Assignors, Plaintiffs, and Class Members have a right to bring this action for these damages.

374.    Under Section 772.11, Florida Statues, Plaintiffs, and the Class Members seek their reasonable attorneys' fees and costs associated with prosecution of this action.

### SIXTH CLAIM FOR RELIEF
**Violation of Va. Code Ann. § 55.1-400 *et seq.* (formerly 55-80 *et seq.*)**
*Against CVC* and *Adira*

375.    Plaintiffs re-allege and incorporate by references paragraphs 1-168 of this Complaint as if fully set forth herein.

376.    As detailed above, during CVC's dissolution process, all (or nearly all) of CVC's unrestricted and unobligated assets were given, assigned, and/or transferred to Adira—including some transfers when Adira was still known as FPH—including millions of dollars in cash, an unknown amount of investment assets, and a long list of office equipment and other valuable personal property.

377.    During the Co-Payment Circumvention Enterprise from 2011 to 2016, Plaintiffs became bona fide creditors under Va. Code Ann. § 55.1-400 *et seq*. as victims of the Co-Payment Circumvention Enterprise.

378.    All or nearly all of CVC's gifts, transfers, conveyances, and assignments to Adira and FPH are voided as a matter of law as voluntary and/or fraudulent conveyances pursuant to Va. Code Ann. § 55.1-400 and § 55.1-400. The millions of dollars, investment assets, and set of personal property that CVC transferred to Adira and FPH was not upon consideration deemed valuable in law.

379.    When CVC completed these transfers, CVC was in the process of completing its disillusionment. As CVC's transferred all of its remaining unrestricted and unobligated assets to

78

Adira, this transfer had the effect of rendering CVC insolvent.

380.    At the time that CVC transferred its assets to Adira, Adira intended to continue CVC's business by using its assets for its gain and to the detriment of Plaintiffs and the Class Members.

381.    The aforementioned transfers were made with an actual intent to hinder, delay and defraud Plaintiffs.

382.    The aforementioned transfers were made in reckless disregard for the rights of Plaintiffs, and were made to leave CVC insolvent without the ability to pay its liabilities as they came due.

383.    If any consideration was received by Adira in exchange for the asset transfers, such consideration was a sham, nominal consideration, inadequate and less than a reasonably equivalent value for such assets.

384.    At the time the transfer was made, Adira knew or should have known that the consideration for the transfers was nonexistent, a sham, nominal consideration, inadequate, and/or less than a reasonably equivalent value for such assets.

385.    Adira's transfers were not made in good faith. Because Adira had the knowledge aforesaid, it is not a bona fide purchaser.

386.    The transfers discussed are fraudulent transfers under Va. Code Ann. § 55.1-400.

387.    Plaintiffs and Class Members request that this Honorable Court enter an Order under Va. Code Ann § 55.1-400 *et seq*. to void, as voluntary and/or fraudulent, the transfers set forth here and that it order CVC and Adira, jointly and severally, to immediately turnover such assets, or that it enter a money judgment for the value of such assets in an amount to be determined at trial of this action.

## SEVENTH CLAIM FOR RELIEF
### Successor Liability as to Adira

388.    Plaintiffs re-allege and incorporate by reference paragraphs 1-168 of this Complaint as if fully set forth herein.

389.    During CVC's wind-up in 2019, Greg Smiley was the controlling or de facto President of both CVC and Adira.

390.    CVC and Adira were both co-payment assistance charities that operated out of Virginia, Adira and CVC shared board members, transferred data, monies, and office equipment—all without any or adequate consideration, between the two charities while Smiley was acting as President of both charities and James Rock was chairman for both charities. Additionally, several CVC employees—including other senior management personal—began working for Adira at the same time as the transfers. For example, Lauren Ruiz was Director of Patient Services at CVC from November 2011, until joining Adira in April 2019 as a Programs Manager. Additionally, Bruce Packett, who served as a director at CVC for several years, including from 2017-2020, has now also served on Adira's Board of Directors since 2018.

391.    CVC and Adira even used the same accounting firm, Meadows Urquhart Acree & Cook LLP, to file their respective 2019 990 forms.

392.    Adira is the successor corporation of CVC because, through the substantial contacts between Adira and CVC alleged herein, Adira impliedly agreed to assume the liabilities of CVC; the transactions and/or transfers between Adira and CVC resulted in a de facto merger; Adira is a mere continuation of CVC; and the transactions and/or transfers were fraudulent.

393.    As a successor, Adira is jointly and severally liable to Plaintiffs and the class members for CVC's involvement in the Co-Payment Circumvention Enterprise.

## **DEMAND FOR JUDGMENT**

WHEREFORE, Plaintiffs and the Class Members demand judgment against RICO Defendants as follows:

1. Awarding Plaintiffs and the Class Members actual, consequential, compensatory, statutory, treble, punitive, and other damages, in an amount to be proven at trial, including pre- and post- judgment interest at the statutory rates;

2. Awarding Plaintiffs and the Class Members equitable relief in the nature of disgorgement, restitution, and the creation of a constructive trust to remedy RICO Defendants' unjust enrichment;

3. Declaring the alleged acts to be unlawful under the state statutes set forth above, and the common law of unjust enrichment of the states and territories set forth above;

4. Determining that this action is a proper class action, designating Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Class Counsel;

5. Awarding Plaintiffs and the Class Members their reasonable costs and expenses, including attorneys' fees; and

6. Awarding such other legal or equitable relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs and the Class Members demand a jury trial on all claims so triable under Federal

Rule of Civil Procedure Rule 38.

Respectfully submitted,

Dated: June 6, 2022

By: /s/ David Hilton Wise
David Hilton Wise (VA Bar No. 30828)
Joseph M. Langone (VA Bar No. 43543)
**WISE LAW FIRM, PLC**
10640 Page Street, Suite 320
Fairfax, Virginia 22030
(703) 934-6377; (703) 934-6379 (fax)
dwise@wiselaw.pro
jlangone@wiselaw.pro

John W. Cleary (Fla. Bar No. 118137)
Michael O. Mena (Fla. Bar No. 010664)
**MSP RECOVERY LAW FIRM**
2701 S. LeJeune Road, 10th Floor
Coral Gables, Florida 33134
(305) 614-2222
mmena@msprecoverylawfirm.com
jcleary@msprecoverylawfirm.com

Shereef H. Akeel (MI Bar No. 54345)
Adam S. Akeel (MI Bar No. 81328)
Sam R. Simkins (MI Bar No. 81210)
Daniel W. Cermak (MI Bar No. 84460)
**AKEEL & VALENTINE, PLC**
888 W. Big Beaver Road 420,
Troy, Michigan 48084
shereef@akeelvalentine.com (pro hac vice)
adam@akeelvalentine.com (pro hac vice)
sam@akeelvalentine.com (pro hac vice)
daniel@akeelvalentine.com (pro hac vice)

**APPENDIX**

**_Plaintiff MSPRC's Assignment to Demonstrate Standing_**

1.      Certain series of MSPRC executed irrevocable assignments of any and all rights to recover payments made on behalf of their Assignors' Enrollees and health plan members. These assignments authorize the designated series, and in turn MSPRC through its LLC Agreement, to pursue and enforce all legal rights of recovery and reimbursement for health care services and benefits. MSPRC alleges the below assignment to demonstrate standing.

2.      On May 12, 2017, **SummaCare, Inc. ("SMCR")** irrevocably assigned to MSP Recovery, LLC all its rights to recover against any liable third party (including RICO Defendants) for payments made on behalf of its Enrollees ("SMCR Assignment"). Specifically, the SMCR Assignment states the following:

> [SMCR] hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of [SMCR]'s right, title, ownership and interests in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for [SMCR] that [SMCR] had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to [SMCR] arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims[.]"

3.      On June 12, 2017, MSP Recovery, LLC irrevocably assigned all rights acquired under the SMCR Assignment to Series 16-11-509, a designated series of MSPRC ("Series 16-11-509 Assignment"):

> Assignor … irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to the [Assigned Claims] (and all proceeds and products thereof) as such terms are defined in the [SMCR Assignment].

4.      SummaCare, Inc. consented to, acknowledged, approved, and ratified the Series 16-11-509 Assignment, which is memorialized in a letter dated September 5, 2018.

5.      Consideration was given between each party in executing the SMCR Assignment and the Series 16-11-509 Assignment.

### *Plaintiff MSPA's Assignment Demonstrating Standing*

1.      MSPA was irrevocably assigned any and all rights to recover payments made on behalf of its Assignors' Enrollees and health plan members. These assignments authorize MSPA to pursue and enforce all legal rights of recovery and reimbursement for health care services and benefits. MSPA alleges the below assignment to demonstrate standing.

2.      On December 16, 2014, **Interamerican Medical Center Group, LLC ("IMC")** irrevocably assigned to MSP Recovery, LLC all of its rights to recover against any liable third party (including the Defendants) for payments made on behalf of its Enrollees ("IMC Assignment"). Specifically, the IMC Assignment, states the following:

> By way of this Agreement, [IMC] appoints, directs, and, otherwise, irrevocably assigns all of [IMC's] rights as it pertains to the rights pursuant to any plan, State or Federal statute(s) whatsoever directly and/or indirectly for any of its members and/or plan participants, and/or rights pursuant to any agreement[.]

3.      On February 20, 2015, MSP Recovery, LLC irrevocably assigned all rights acquired under the IMC Assignment to MSPA ("MSPA Assignment 3"):

> Assignor hereby irrevocably assigns, transfers, conveys, sets over, and delivers to Assignee or its assigns any and all of Assignor's right, title, ownership and interest in and all rights and entitlements, that Assignor has, may have had, or has asserted against third parties from or relating to the Claims [assigned pursuant to the IMC Assignment].

4.      IMC consented to, acknowledged, approved, and ratified the MSPA Assignment 3.

5.      Consideration was given between each party in executing the IMC Assignment and the MSPA Assignment.

### *Plaintiff Series 44's Assignment Demonstrating Standing*

1.      Certain series of Series 44 executed irrevocable assignments of any and all rights to recover payments made on behalf of their Assignors' Enrollees and health plan members. These assignments authorize the designated series, and in turn Series 44 through its LLC Operating Agreement, to pursue and enforce all legal rights of recovery and reimbursement for health care services and benefits. Series 44 alleges the assignments below to demonstrate standing.

2.      Effective April 28, 2016, **Health First Health Plans, Inc. ("HFAP")** irrevocably assigned to MSP Recovery, LLC all rights under the to recover against any liable third party (including the Defendants) for payments made on behalf of its Enrollees ("HFAP Assignment"). The HFAP Assignment expressly provides in pertinent part:

> Client hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of Client's right, title, ownership and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies for Client that Client had, may have had, or has asserted against any party in connection with the Claims and all rights and claims against primary payers and/or third parties that may be liable to Client arising from or relating to the Claims, including claims under consumer protection statutes and laws, and all information relating thereto, all of which shall constitute the "Assigned Claims".
> …
> The transfer, grant, right, or assignment of any and all of Client's right, title, ownership, interest and entitlements in and to the Assigned Claims shall remain the confidential and exclusive property of MSP Recovery or its assigns. This assignment is irrevocable and absolute.

3.      Effective June 12, 2017, MSP Recovery, LLC assigned all rights acquired under the HFAP Assignment to Series 16-05-456, a designated series of MSPRC ("Series 16-05-456 Assignment"). The Series 16-05-456 Assignment states:

> [T]he undersigned Assignor … irrevocably assigns, sells, transfers, conveys, sets over and delivers to Assignee and its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to the Claims and Assigned Claims, (and all proceeds and products thereof, including any related assigned assets and assigned documents) as such

terms are defined or contained in that certain (1) Assignment and (2) Addendum to the Recovery Agreement and Assignment Addendum, both given and effective April 28, 2016 and executed on June 1, 2018, by and between Health First Health Plans, Inc., a Florida corporation and Medicare Advantage Organization and party to contract number H1099 with The Centers for Medicare & Medicaid Services, as the "Client" and health plan assignor, and [MSP Recovery], a Florida limited liability company (the "Assignment"); irrespective of when the claims were vested in Client, inclusive of any and all claim(s), causes of actions, proceeds, products and distributions of any kind, and proceeds of proceeds, in respect thereof, whether based in contract, tort, statutory right, and any and all rights (including, but not limited to, subrogation) to pursue and/or recover monies that Assignor had, may have had, or has asserted against any party pursuant to the Assignment from the Client, including claims under consumer protection statutes and laws, any and all rights and claims against primary payers and/or third parties that may be liable to Client arising from or relating to the Claims and all information relating thereto.

4.      On October 22, 2020, Series 16-05-456 irrevocably assigned all the rights it acquired from MSP Recovery, LLC to Series 44-20-456, a designated series of Series 44 ("Series 44-20-456 Assignment"):

Assignor . . . hereby irrevocably assigns, transfers, conveys, sets over, and delivers to [Series 44-20-456] and its successors and assigns, (i) any and all of Assignor's right, title, ownership, and interest in and to the [claims], as well as (ii) the "Claims" and "Assigned Claims", and all proceeds and products thereof (collectively the "Assigned Claims") as such terms are defined in the Agreements.

5.      Consideration was given between each in executing the HFAP Assignment, the Series 16-05-456 Assignment, and the Series 44-20-456 Assignment.

### *Plaintiff Claims PROV's Assignment Demonstrating Standing*

1.      Certain series of Claims PROV executed irrevocable assignments of any and all rights to recover payments made on behalf of their Assignors' Enrollees and health plan members. These assignments authorize the designated series, and in turn Claims PROV through its LLC Operating Agreement, to pursue and enforce all legal rights of recovery and reimbursement for health care services and benefits. Claims PROV alleges the assignments below to demonstrate standing.

2.      On May 24, 2021, **Centro de Pediatria y Medicina de Familia de Villalba, C.S.P.** ("CPMF") irrevocably assigned all its rights and claims to recovery against any liable entity (including the RICO Defendants) for payments made on behalf of its Enrollees pursuant to its Government Healthcare Program to Series 21-04-1561, a designated series of Plaintiff Series Prov ("CPMF Assignment"). Specifically, the CPMF Assignment, states the following:

> Assignor irrevocably assigns, transfers, conveys, sets over and delivers to Assignee, and any of its successors and assigns, any and all of Assignor's right, title, ownership and interest in and to all of Assignor's Claims arising from and related to the Claims Data transferred, provided or sent to MSP Recovery, these Claims encompassing the "**Assigned Claims**."

> Such assignment of the Assigned Claims is irrevocable and absolute, and is broad with respect to recovery efforts and is not limited to any particular recovery strategy regarding reimbursement or recovery efforts.

> CPMF Assignment, at 1.1.1, 1.1.2.

3.      Consideration was given between the parties in executing this assignment.

### *Plaintiff Claims CAID's Assignment Demonstrating Standing*

1.     Certain series of Claims CAID executed irrevocable assignments of any and all rights to recover payments made on behalf of their Assignors' Enrollees and health plan members. These assignments authorize the designated series, and in turn Claims CAID through its LLC Operating Agreement, to pursue and enforce all legal rights of recovery and reimbursement for health care services and benefits. Claims CAID alleges the assignments below to demonstrate standing.

2.     On February 3, 2021, **Sal Health Group. LLC d/b/a Salubris** ("Salubris") irrevocably assigned all its rights and claims to recovery against any liable entity (including Defendants) for payments made on behalf of its Enrollees to Series 19-10-1128, a designated series of MSP Recovery Claims CAID, Series LLC ("Salubris Assignment"). Specifically, the Salubris Assignment, states the following:

> [Assignor] irrevocably assigns, transfers, conveys, sets over and delivers to Assignee, and any of its designated series, successors and assigns, any and all of Assignor's right, title, ownership, and interest in and to all of Assignor's Claims and rights arising from and related to the claims data transferred to Assignee (or its affiliates or services providers, including MSP Recovery, LLC) for the period encompassing dates of services from June 1, 2014 and continuing up to, including and through June 30, 2020, these Claims encompassing the "Assigned Claims." The assignment of the Assigned Claims set forth herein is irrevocable and absolute and is broad with respect to recovery efforts and is not limited to any particular recovery strategy regarding reimbursement or recovery efforts.

3.     Consideration was given between the parties in executing this assignment.