**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | |
|---|---|
| MSP RECOVERY CLAIMS, SERIES LLC, a Delaware series limited liability company; MSPA CLAIMS I, LLC, a Florida limited liability company; MSP Recovery Claims Series 44, LLC, a Delaware series limited liability company; MSP Recovery Claims PROV, Series LLC, a Delaware series limited liability company; and MSP Recovery Claims CAID, Series LLC, a Delaware series limited liability company; on behalf of themselves and all others similarly situated, | |
| *Plaintiffs*, | Civil Action No. 3:22-cv-422-HEH |
| v. | **PLAINTIFFS' MEMORANDUM TO SUPPORT MOTION FOR TRO AND PRELIMINARY INJUNCTION** |
| LUNDBECK LLC, a Delaware corporation; CARING VOICE COALITION, INC., an Idaho non-profit corporation; THERACOM, LLC, an Ohio corporation; and ADIRA FOUNDATION, a Virginia non-profit corporation, | |
| *Defendants*. | |

## <u>MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND FOR PRELIMINARY INJUNCTION AGAINST ADIRA</u>

## INTRODUCTION

On December 3, 2022, Adira's board of directors voted to dissolve the company and filed Articles of Dissolution with the Virginia State Corporation Commission ten days later. **Exhibit A** – Adira Articles of Dissolution. Adira's counsel admits that the decision to dissolve the company was in direct response to Plaintiffs' claims against Adira. [D.E. 66, p. 2, *Motion to Withdraw as Counsel for Defendant Adira Foundation* ("*Motion to Withdraw*")]. Before filing for termination of the corporate entity, Adira is required under Virginia law to dispose of all assets by first satisfying all "liabilities and obligations." Va. Code Ann. § 13.1-907. However, despite no effort[1] yet to satisfy—or even secure—Adira's liabilities to Plaintiffs, Adira's counsel has informed Plaintiffs that Adira's termination is imminent. **Exhibit B** – Dec. 16 Email from John Buford. If Adira is allowed to continue its march towards extinction, Plaintiffs will suffer irreparable harm, the public interest in addressing nation-wide fraud will be hindered, and this Court's jurisdiction over Adira will be put into jeopardy.

Plaintiffs' fear of harm is not speculative or remote. Prior to the commencement of this action, Adira's directors and officers used the exact same tactic of dissolving Adira's predecessor, CVC, to avoid accountability by illegally transferring all assets, hiding critical documents, and evading all attempts to resolve Plaintiffs' claims. *See* Compl. ¶¶ 138-41. The fact that Adira is moving quickly towards termination (*i.e.*, full divestiture of all assets) is itself enough to cause irreparable harm. *See Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 694 (4th Cir. 1994) ("[I]rreparable harm may still exist where . . . damages may be unobtainable from the defendant because he may become insolvent before a final judgment can be entered and collected.") (cleaned up). However, the harm goes further than that. Adira's termination will

---

[1] Virginia law provides a specific procedure for dissolved corporations to dispose of "known claims against it." *See* Va. Code Ann. § 13.1-908.

impair Plaintiffs' ability to pursue this action against all Defendants. Adira (and its predecessor) played a critical role in carrying out Defendants' RICO scheme. Adira has indispensable evidence—from its own involvement and as the custodian for all of CVC's records—that will be lost if Adira is not enjoined from winding up and terminating.

## LEGAL STANDARD

"Federal Rule of Civil Procedure 65 authorizes federal courts to issue preliminary injunctions. The standard for granting a temporary restraining order or a preliminary injunction is the same." *Columbia Gas Transmission, LLC v. Kline Dev. Grp., LLC*, 2022 WL 985881, at *1 (E.D. Va. Mar. 18, 2022), *aff'd*, 2022 WL 17103700 (4th Cir. Nov. 22, 2022) (citing *Sarsour v. Trump*, 245 F. Supp. 3d 719, 728 (E.D. Va. March 24, 2017). "[N]otice to the adverse party" is necessary for preliminary injunctions, but Rule 65(b) allows a temporary restraining order to be issued without full notice and *ex parte* under certain circumstances. *See Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 422 (4th Cir. 1999). While "mandatory injunctions alter the status quo, prohibitory injunctions [] maintain the status quo and prevent irreparable harm while a lawsuit remains pending." *League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (cleaned up). "To be sure, it is sometimes necessary to require a party who has recently disturbed the status quo to reverse its actions, but . . . [s]uch an injunction restores, rather than disturbs, the status quo ante." *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 378 (4th Cir.2012) (cleaned up). The Forth Circuit defines that status quo as "the last uncontested status between the parties which preceded the controversy." *League of Women Voters*, 769 F.3d at 236 (cleaned up).

The Supreme Court has explained that "[a] plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that

an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). A plaintiff need not establish a "certainty of success," but must make a clear showing that it is likely to succeed at trial. *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (cleaned up). Similarly, a plaintiff must demonstrate more than just a "possibility" of irreparable harm. *Id.*

Additionally, federal courts are authorized under the All Writs Act, 28 U.S.C. § 1651, to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." The Supreme Court has stated that federal courts possess "judicial power to preserve . . . jurisdiction or maintain the status quo by injunction. . . ." *F.T.C. v. Dean Foods Co.*, 384 U.S. 597, 604 (1966); *see also Garcia v. Texas*, 564 U.S. 940, 947 (2011) ([A] Court, under the All Writs Act, 28 U.S.C. §1651, can take appropriate action to preserve its potential jurisdiction.") (cleaned up); *Zenith Radio Corp. v. United States*, 518 F. Supp. 1347, 1348 (U.S. Ct. Int'l Trade 1981) (Courts may invoke the All Writs Act to "issue injunctions needed to prevent a controversy from becoming moot.").

However, "an injunction issued pursuant to the All Writs Act to preserve a court's jurisdiction 'is not subject to the four-factor balancing test ordinarily applicable to preliminary injunctions.'" *S.C. Coastal Conservation League v. Ross*, 2019 WL 259116, at *3 (D.S.C. Jan. 18, 2019) (quoting *Bryan v. BellSouth Telecomm., Inc.*, 2006 WL 1540644, at *3 (M.D.N.C. May 31, 2006), *aff'd sub nom. Bryan v. BellSouth Commc'ns, Inc.*, 492 F.3d 231 (4th Cir. 2007)); *see also In re Am. Honda Motor Co., Inc.*, 315 F.3d at 442 (4th Cir. 2003) (finding no abuse of discretion where district court did not consider traditional four-prong analysis before issuing injunction under All Writs Act); *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1100 (11th Cir. 2004) (stating that to obtain an All Writs Act injunction, a party "must simply point to some ongoing proceeding,

or some past order or judgment, the integrity of which is being threatened by someone else's action or behavior.").

## **ARGUMENT**

The Court must grant this motion for injunctive relief because all four of the *Winter* factors weigh in favor of granting an injunction to prevent Adira from dissolving and terminating during the pendency of this action. Further, an injunction is necessary to preserve the Court's own jurisdiction.

Plaintiffs have demonstrated "that they are likely to succeed on the merits" by dispelling each of the arguments presented by Defendants' in their motions to dismiss. *League of Women Voters*, 769 F.3d at 247 (4th Cir. 2014) (Plaintiffs "need not show a certainty of success."). Plaintiffs will be irreparably harmed if the court does not step in "to protect the status quo" and block Adira's "efforts to spoliate evidence, manipulate corporate ownership structures, tip off accomplices, disrupt business relationships, and dissipate assets." *Amazon.com, Inc. v. WDC Holdings LLC*, 2021 WL 3878403, at *8 & *3 (4th Cir. Aug. 31, 2021). By contrast, Adira will not suffer any harm by preserving the status quo and delaying dissolution while this action is pending. Plaintiffs are not seeking to disrupt or dictate Adira's ordinary course of business and Adira could suspend operations while in compliance with the relief requested here. Lastly, three strong public interests would be served by an injunction: protecting the policy underlying civil RICO actions, holding parties responsible for abusing the trust relationship with Medicare providers, and protecting Congress' efforts to combat rising drug prices.

Additionally, an injunction is needed to preserve this Court's jurisdiction. Federal courts possess "judicial power to preserve . . . jurisdiction or maintain the status quo by injunction. . . ." *F.T.C. v. Dean Foods Co.*, 384 U.S. 597, 604 (1966) (referring to the All Writs Act, 28 U.S.C. §1651). If Adira is allowed to "complete its dissolution[,] this court's jurisdiction . . . would be in

imminent peril. . . ." *United States v. W. Pa. Sand & Gravel Ass'n*, 114 F. Supp. 158, 159–60 (W.D. Pa. 1953). This power is appropriately used if the Court's power "to enter any effective relief" is at threat of being "rendered meaningless" by a defendant's efforts to dissolve or transfer assets. *In re Uranium Antitrust Litig.*, 617 F.2d 1248, 1260 (7th Cir. 1980). Under Virginia law, Adira is required to fully divest and transfer all assets before seeking termination. Va. Code Ann. § 13.1-907. In other words, to protect the court's power to order "any effective relief," Adira should be enjoined from terminating its existence and transferring its assets beyond the reach of this Court.

I.    **Plaintiffs Are Entitled to Preliminary Injunctive Relief Under Rule 65**

       a)   Plaintiffs Are Likely to Succeed on The Merits Against Adira

       Plaintiffs have adequately alleged several causes of action against Adira and thoroughly responded to each of the arguments raised by Adira in its motion to dismiss. [D.E 37, *Adira Motion to Dismiss*; D.E. 51, *Plaintiffs' Response to Adira Motion to Dismiss*].[2] Adira's conduct was blatantly illegal and directly caused Plaintiffs' Assignors to unknowingly pay AKS-tainted claims. In addition to Adira's direct involvement in Defendants' RICO scheme,[3] Adira is subject to liability for violating Va. Code Ann. § 55.1-400 *et seq*. and as the successor to Defendant CVC, under Counts VI and VII respectfully. Adira has not contested that it is CVC's successor.

       Plaintiffs have shown that they have standing to bring this action against Adira because "the assignee of a claim has standing to assert the injury in fact suffered by the assignor." *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 286 (2008) (internal quotation marks and citation omitted). To establish standing, a plaintiff must have "(1) suffered an injury in fact, (2)

---

[2] Plaintiffs' responses to the Defendants' motions and Plaintiffs' proposed surreplies further explain why all three of Defendants' motions should be denied. [D.E. 52, 53, and 67-70]. Adira failed to file any reply brief in support of its motion.

[3] Which carries liability under the Federal RICO statute, the Florida RICO statute, and various state law claims for unjust enrichment and consumer protection. *See* Complaint, D.E 1, Counts I through V.

that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Plaintiffs were injured by paying for unpayable AKS-tainted claims of Xenazine and at supra-competitive prices. *See* D.E. 51, at 22; & D.E. 52, at 12. Adira—and its predecessor, CVC—was critical in carrying out Defendants' scheme. Lundbeck and TheraCom were explicitly prohibited from using a conduit to provide co-payment assistance directly to the Assignors' beneficiaries. The HHS OIG had issued detailed advisory opinions explaining the requirements for a patient assistance program to be considered lawful—e.g., charities cannot share assistance details with donors, assistance funds cannot be funded by a single donor, charities cannot operate single-drug funds, etc. CVC certified compliance with each of these requirements, but in fact violated all of them. Instead of attempting to legitimately provide assistance, Lundbeck and TheraCom bribed this sham charity to funnel this assistance to Xenazine patients insured by Plaintiffs' Assignors. These bribes constitute AKS violations, thereby rending each claim submitted illegal and unpayable.

Plaintiffs have sufficiently alleged all elements of their RICO counts and related state law claims. A RICO claim under 18 U.S.C. § 1962(c) must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985). Racketeering activity is defined to include any act violative of several specific federal statutes, including 18 U.S.C. §§ 1341 (Mail Fraud), 1343 (Wire Fraud), and § 1952 (Travel Act). 18 U.S.C. § 1961(1). Assignors were directly harmed by being deceived into paying claims tainted by the AKS. [Compl. ¶¶ 128, 187, 189, 195]. As a member of the RICO enterprise, CVC—and by extension, Adira—is liable for the harm caused by Defendants' pattern of racketeering. [D.E. 51, p. 25; D.E. 53, p. 23-25].

Additionally, Defendants' conduct was unfair, illegal, and deceptive. Their conducted harmed Plaintiffs thereby entitling Plaintiffs to relief under at least twelve state consumer protection and unjust enrichment claims. Plaintiffs' full briefing[4] shows that they are likely to succeed on the merits and dispels any doubt raised by Defendants' arguments. *League of Women Voters*, 769 F.3d at 247 (4th Cir. 2014) ("While plaintiffs seeking preliminary injunctions must demonstrate that they are likely to succeed on the merits, they need not show a certainty of success.") (cleaned up).

Moreover, Plaintiffs' success on Counts VI and VII is all but certain. Plaintiffs sufficiently allege that Adira is CVC's successor for purposes of successor liability. Both entities share a common identity of directors, made numerous acquisitions of property lacking adequate consideration; the two engage in the same business, the transfers were executed prior to and during litigation, and the millions of dollars transferred to Adira allowed CVC to claim defunct status.[5] [Compl. ¶¶ 133-151, 389-392]. Adira even acknowledges its successor status by arguing liability is contingent on CVC's actions. [D.E. 51, p. 13]. Adira is liable for conduct perpetrated by CVC. Adira also does not deny the alleged transfers were fraudulent.[6] Instead, Adira simply argues that Plaintiffs cannot be a bona fide creditor absent viable claims against CVC. [D.E. 51, p. 12-13]. However, CVC is liable for its wrongdoings. Virginia courts rely upon presumptions of fraud,

---

[4] To avoid unnecessary repetition, Plaintiffs rely on and incorporate herein the clear showing of likely success from their briefs filed with this Court.

[5] *See Kaiser Found. Health Plan of Mid-Atl. States v. Clary & Moore, P.C.*, 123 F.3d 201, 205-06 (4th Cir. 1997) (discussing the factors considered under successor liability).

[6] As admitted in its untimely Answer to the Complaint, "Adira received cash, investments, and personal property from CVC. It is admitted that Greg Smiley was president of Adira and that James Rock and Bruce Padgett were board members[.]" [ECF 50, Pg. 1291, 1308-10, 1347, 49].

known as "badges of fraud."[7] *Fox Rest Assocs., L.P. v. Little*, 282 Va. 277, 284-85 (Va. 2011). A "plaintiff need only allege one 'badge of fraud' to raise a prima facie case for fraudulent conveyance." *A.G. Dillard, Inc. v. Stonehaus Construction, LLC*, 2016 WL 3213630, at *4 (Va. June 2, 2016) (citing *Fox*, 282 Va. at 285-86).

However, CVC has not defended against the allegations brought here. Defendant CVC was required to answer Plaintiffs' complaint on or before August 16, 2022 but failed to appear or file an answer or other responsive pleading. On September 14, 2022, Plaintiffs submitted a Request for Clerk's Entry of Default against Defendant CVC. D.E. 38. On September 16, 2022, the Clerk of the Court entered the Entry of Default against CVC for CVC's failure to timely plead or otherwise defend this action. D.E. 44. Concurrent with the filing of this motion, Plaintiffs are filing a motion for entry of default judgement against CVC. As CVC's successor, Adira is liable to satisfy such a judgment; therefore, success on Plaintiffs' Count VII is more than likely.

b) <u>Plaintiffs Are Likely to Suffer Irreparable Harm Without Preliminary Relief</u>

If Adira is allowed to move forward with its dissolution and termination, Plaintiffs will lose access to critical evidence and any future money judgement would be rendered ineffectual. This is not a remote or paranoid fear. The individuals controlling Adira have followed this same playbook to avoid accountability before. This exact strategy was employed in the dissolution of CVC and Plaintiffs have suffered the consequences of CVC's/Adira's previous attempts to hide assets and documents.

As explained in Plaintiffs' response to Adira's motion to dismiss, Plaintiffs have other

---

[7] *Fox*, 282 Va. at 284-85 (badges of fraud include: "(1) Retention of an interest transferred property by the transferor; (2) transfer between family members for allegedly antecedent debt; (3) pursuit of the transferor or threat of litigation by his creditors at the time of the transfer; (4) lack of gross inadequacy of consideration for the conveyance; (5) retention or possession of the property by transferor; and (6) fraudulent incurrence of indebtedness after the conveyance.")

pending claims against CVC and Adira for similar illegal co-payment schemes with other drug manufacturers. One such case was filed on July 27, 2020 against CVC and United Therapeutics Corporation. *See MSP Recovery Claims, Series LLC et al. v. Caring Voice Coalition, et al.*, 20-cv-11418-WGY, ECF No. 1 (July 27, 2020, D. Mass.) ("*MSP v. CVC*"). On December 23, 2021, Plaintiffs entered into a confidential settlement agreement ("Settlement") with CVC. To date, Plaintiffs have received only a fraction of the documents contemplated by the Settlement. CVC produced numerous folders that were completely empty—in many cases containing several layers of subfolders that were all empty. Many of the documents and records that CVC attested to maintaining—such as records of grant recipients—are nowhere to be found. However, the documents that were produced reveal that CVC misrepresented material facts which Plaintiffs relied on in agreeing to the Settlement and that CVC intentionally divested itself of the assets and records being sought.

On November 28, 2017, the OIG officially rescinded the prior advisory opinions that had been used for over a decade as a shield behind which Defendants conducted their fraudulent Scheme. [Compl. ¶¶ 87-88]. CVC then announced that, because of the 2017 CVC Rescission Letter, it would not open financial assistance for any disease fund in 2018. [Compl. ¶ 89]. In February 2018, CVC's CEO, Greg Smiley, submitted Articles of Incorporation on behalf of a new 501(c)(3) corporation called Facilitation Patient Health ("FPH"), later renamed Adira. [ECF 1-15, Pg. 384-389; Compl. ¶¶ 90, 133]. The same individuals responsible for the fraudulent operation of CVC were the same individuals that founded FPH in order "to continue operating some of the same disease funds that CVC was forced to close, including a [Huntington's Disease] Fund." [Compl. ¶138]. "On March 15, 2019, CVC entered into a Grant Agreement with FPH. ("CVC-FPH Agreement"). Greg Smiley—who was President of both CVC and FPH at the time—signed

on behalf of CVC, while James Rock—who was Chairman of both CVC and FPH at the time—signed on behalf of FPH." [Compl. ¶ 140]. "The CVC-FPH Agreement provided that CVC would provide $3,000,000 to FPH." [Compl. ¶ 141]; *see also* **Exhibit C** attached here – CVC-FHP Grant Agreement. "On April 2, 2019, Lundbeck paid $52.6 million to settle the United States' claims that Lundbeck violated the Anti-Kickback Statute ("AKS") and False Claims Act ("FCA") . . . related to the general conduct at issue in this lawsuit." [Compl. ¶ 110; Exhibit A and B of Complaint; **Exhibit L**, p. 54, 2019 Annual Report]. "The Lundbeck Settlement did not address or settle damages sustained by the Assignors and Class Members. The terms of the Lundbeck Settlement did not address the claims Plaintiffs set forth in the action." [Comp. ¶ 11].

On May 2, 2019, Smiley signed and dated documents to change the name of FPH to Adira. [Compl. ¶ 142; **Exhibit A**]. The following day, Smiley filed for dissolution of CVC. [ECF No. 1-14, Pg. 381]. "On May 31, 2019, CVC entered into a 'Records Transfer Agreement' with Adira, where CVC would 'transfer title and custody of all electronic patient records . . . as well as certain other records' to CVC. The Records Transfer Agreement contains an attached 'Bill of Sale' which purports that, in consideration of the agreement, Adira paid CVC $10." [Compl ¶ 143]; *see also* **Exhibit D** attached here – Records Transfer Agreement.

"Greg Smiley signed the Records Transfer Agreement on behalf of both CVC and Adira. No other signatures appear on the Records Transfer Agreement." [Compl. ¶ 144]. On June 3, 2020, CVC transferred $4 million to Adira. [Compl. ¶ 148]. In August 2020, Smiley signed the Adira 990 Form for 2019. [ECF No. 1-16, Pg. 391; Exhibit O of Complaint]. The 2019 990 Form reveals the following information:

1) Adira continued operation of CVC's funds, including its Huntington's Disease Fund [ECF No. 1-16, Pg. 391];
2) Adira only allegedly received $1,899 in grants (100% of which were from the public) [*Id.* at Pg. 405];

3) Adira held $142,611 in assets [*Id.* at Pg. 391];

4) Adira paid over $1.7 million in expenses [*Id.* at 400], of that, more than $605,000 in salaries and employee benefits [*Id.* at Pg. 391], and nearly $100,000 in "meals and entertainment", travel, occupancy, and other miscellaneous spending [*Id.* at Pg. 400];

5) Smiley paid himself $192,865 [*Id.* at Pg. 420]; and

6) CVC is a "related...organization" that transferred $1.8 million to Adira. [*Id.* at 433].

In 2021, Adira filed its 990 Form for 2020, which was also signed by Smiley. [ECF No. 1-16, Pg. 436]. According to the 2020 990 Form, Adira 1) increased assets from $142,611 to $2.9 million [ECF No. 1-16, Pg. 436]; 2) paid its staff approximately $400,000 ($235,000 paid to Smiley) [*Id.* at Pg.442-43]; and 3) transferred more than $4.2 million from CVC to Adira. [*Id.* at Pg. 478]. Additionally, documents produced by CVC reveal that over $10 million was transferred from CVC to the Patient Access Network Foundation in a "Gift Agreement" dated August 14, 2020, ***after*** the filing of *MSP v. CVC*. **Exhibit E** – CVC-PAN Gift Agreement

An email to Greg Smiley further shows that Adira and CVC were different only in name, with the sender directing Smiley to have "the entire contents of CVC's AP 05897 [transferred] to Bank of America in cash." **Exhibit F** – Email Regarding Adira Assets. The email concluded by noting that the CVC and Adira funds were intermingled until the CVC assets were transferred: "This will leave only the Adira assets at UBS." *Id.*, *see also* [Compl. ¶ 147]. Further, several additional internal CVC documents instruct that an extensive list of personal property was (or would be) given to Adira, including laptops, computer servers, software licensees, office equipment, etc., totaling tens of thousands of dollars in value—even after accounting for depreciation. [Compl. ¶ 149]. The Records Transfer Agreement requires Adira to retain the records for 10 years and reserved a right for CVC to access said records. To date, said records have not been produced by CVC. Plaintiffs' counsel made numerous attempts to contact CVC's counsel but to date have received no response.

This same pattern of dissolution, divestiture, and dereliction has already begun again in this case. On December 16, 2022, counsel for Adira emailed to inform all parties that "[t]he board of Adira Foundation has voted to dissolve the company. . . . The company's termination will occur sometime in the next few weeks." *See* **Exhibit B -** Email from John Buford. This email included a copy of the articles of dissolution that Adira filed with the State of Virginia Corporation Commission that same week. *See* **Exhibit A -** Adira Articles of Dissolution. This filing was signed and authorized by Greg Smiley. If Adira is allowed to continue towards termination, Plaintiffs will lose access to invaluable evidence in Adira's possession and lose any prospect of recovery against Adira. In fact, in moving this Court to withdraw, Adira's counsel of record admits that "once [Adira] terminates, there will be no officer, director, or employee of Adira capable of cooperating with Movants in the defense of Adira, instructing counsel as to strategy, or otherwise permitting Movants to effectively represent the entity." [Dkt # 66, p. 4]. If Adira's termination would prevent its own attorneys from representing it, then clearly Plaintiffs would have no ability to pursue this action against Adira.

On December 12, 2022, Plaintiffs served Adira with their first set of discovery requests. *See* **Exhibit G** - MSP's First Set of RFPs to Adira, and **Exhibit H** - MSP's First Set of Rogs to Adira. Any objections to these discovery requests were due by December 27, 2022, yet none were served. Adira's full responses are due January 11, 2023, but Adira has made no indication that it intends to comply as its counsel has instead moved to withdraw from the case.

The Fourth Circuit in *Amazon.com, Inc. v. WDC Holdings LLC* upheld a preliminary injunction "securing assets" "to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits." 2021 WL 3878403, at *8 (4th Cir. Aug. 31, 2021) (quotes omitted); *see also*

*Deckert v. Indep. Shares Corp.*, 311 U.S. 282, 290 (1940) (affirming preliminary restraint of a certain sum when it was alleged the defendant was insolvent and its assets in danger of dissipation or depletion). Similar to here, Amazon alleged that defendants engaged in "efforts to spoliate evidence, manipulate corporate ownership structures, tip off accomplices, disrupt business relationships, and dissipate assets." *Amazon.com*, 2021 WL 3878403, at *3 (4th Cir. Aug. 31, 2021). Therefore, the district court ordered, and the Fourth Circuit affirmed, a preliminary injunction "enjoining all defendants from spoliating, concealing, or transferring relevant evidence or assets." *Id.*

The *Amazon.com* decision is consistent with long-held Fourth Circuit precedent affirming preliminary injunctions to preserve the status quo and prevent defendants from transferring assets. *See Hughes Network Sys.*, 17 F.3d at 694 (4th Cir. 1994) "[P]reliminary injunctions [may be] issued . . . to preserve the plaintiff's opportunity to receive an award of money damages at judgment.") (citing *Teradyne, Inc. v. Mostek Corp.*, 797 F.2d 43, 53 (1st Cir. 1986) (noting that a "preliminary injunction can be granted when it is necessary to protect the damages remedy"); *Productos Carnic, S.A. v. Central Am. Beef & Seafood Trading Co.*, 621 F.2d 683, 686 (5th Cir. 1980) (stating that even where a remedy is "limited to damages, an injunction may issue to protect that remedy")). Similarly, in *U.S. ex rel. Taxpayers Against Fraud v. Singer Co.*, 889 F.2d 1327 (4th Cir.1989), the Fourth Circuit allowed a preliminary injunction which required the defendant "to obtain court review and approval of non-ordinary-course-of-business transactions to prevent [the defendant], without court awareness, from further liquidating or distributing its assets." *Id.* at 1328. The court noted that such an injunction could be appropriate where the principal defendant was "'insolvent'" and its assets were "'in danger of dissolution and depletion.'" *Id.* at 1330 (quoting *Deckert v. Independence Shares Corp.*, 311 U.S. 282, 285 (1940)); *see also Buffalo Wings*

*Factory, Inc. v. Mohd*, 2008 WL 4699803, at *4 (E.D. Va. Oct. 23, 2008) ("The harm caused by a defendant's inability to pay damages, however, can be considered irreparable").

Insolvency is not merely a possibility, it is the stated and explicit goal that Adira is quickly moving towards without due consideration of the liabilities it has incurred as a result of carrying out multiple, far-reaching schemes.

c) <u>The Balance of Equities Tips in Favor of Preliminary Relief</u>

The third *Winter* factor—the balance of equities—also weighs in Plaintiffs' favor because Adira will not suffer any harm if enjoined from winding up and terminating its existence. Balancing the equities inherently involves comparing the likely harm that the moving party would suffer absent an injunction with any harm that an injunction would cause the non-moving party. *See Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 103 (4th Cir. 2022) (discussing comparative harms). In balancing the equities, courts must "'pay particular regard for the public consequences in employing the extraordinary remedy of injunction.'" *Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 603 (4th Cir. 2017), *vacated as moot and remanded sub nom. Trump v. Int'l Refugee Assistance*, 138 S. Ct. 353 (2017) (quoting *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312 (1982). The Fourth Circuit in *Int'l Refugee* held that even when the non-moving party can demonstrate harm to an important interest—national security in that case—"[a] claim of harm [by the non-moving party]. . . must still outweigh the competing claim of injury" to the moving party. *Int'l Refugee*, 857 F.3d at 603 (4th Cir. 2017).

In this case, Plaintiffs are not asking the Court to obstruct Adira's ordinary course of business or to prevent it from carrying on. Quite the opposite. Adira is trying to cease operations entirely and Plaintiffs seek only to maintain the *status quo* to protect critical evidence from spoliation and prevent Adira's impending insolvency. Plaintiffs are not asking that Adira continue providing any patient assistance service or expend time, resources, or energy. If granted, Adira

could still effectively close its doors without running afoul of an order to cease dissolution, divesture, spoliation, and termination. In short, Adira will suffer no harm if enjoined and there are no other equitable considerations weighing against granting this motion.

    d)  <u>An Injunction is in the Public Interest</u>

Lastly, the public interest weighs heavily in favor of granting a preliminary injunction. "[It is clear from the legislative history . . . that the primary purpose for allowing civil suits under RICO was to promote the public interest" by having litigants act as "private attorney generals." 101st Congress, House Rept. 101–975; *see also Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 165 (2001) (noting that one of the aims of RICO is to "protect the public from those who would run organizations in a manner detrimental to the public interest"); *Wilcox v. Ho-Wing Sit*, 586 F. Supp. 561, 567 (N.D. Cal. 1984) ("RICO casts civil litigants in the role of private attorneys general . . . and RICO claims are thus entitled to the special protection afforded by courts to securities fraud and antitrust claims."). Adira (and the other Defendants) operated "in a manner detrimental to the public interest" by accepting bribes to help Lundbeck and TheraCom illegally circumvent the congressional mandated co-payment requirements. To achieve this, Adira explicitly flouted the requirements outlined by the OIG by running single-source funds, sharing detailed information with Lundbeck and TheraCom, and steering Medicare beneficiaries away from Lundbeck's free drug program. It is in the public interest for Adira to be held accountable for its role in this scheme.

Further, as the court in *United States v. Babaria*, 775 F.3d 593, 596–97 (3d Cir. 2014) explained, protecting federal healthcare programs implicate a significant public interest.[8] The AKS

---

[8] *See also United States v. Liss*, 265 F.3d 1220, 1229 (11th Cir. 2001) (holding that kickback schemes abuse the position of trust created vis-à-vis Medicare even where "the referrals were medically necessary"); *United States v. Adam*, 70 F.3d 776, 782 (4th Cir. 1995) (similar); "Medicaid and Medicare depend upon the honesty and forthrightness of the DME provider in its claim submissions. Owners of such companies occupy a position of trust because the government

was enacted to protect the "public's confidence in the government" because the government is harmed by bribery even absent any financial harm. *See United States v. Killough*, 848 F.2d 1523, 1532 (11th Cir. 1988) (citing *United States v. Miss. Valley Generating Co.*, 364 U.S. 520, 562 (1961)). Defendants are routinely held liable for abusing this trust relationship,[9] and the federal government has emphasized the necessity of "closely scrutiniz[ing]" renumerations relating to the recommendation of medical products" because it involves "exceptional position[s] of public trust[.]" Re: OIG Advisory Opinion No. 11-08, 2011 WL 4526111, at *4. There is a strong public interest in rooting out illegal bribery schemes involving government healthcare programs. Allowing Adira to avoid accountability and potentially spoliate invaluable evidence would harm that public interest.

Finally, there is a public interest in protecting free competition, particularly in drug pricing. *See Hi-Tech Pharmacal Co. v. U.S. Food & Drug Admin.*, 587 F. Supp. 2d 1, 12 (D.D.C. 2008) ("The public interest lies in . . . competition to brand-name drugs . . . and in reduced prices.") (cleaned up); *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 481 (1974) ("The necessity of good faith and honest, fair dealing, is the very life and spirit of the commercial world."). This court in *Autopartsource, LLC v. Bruton* that, while the interest in free competition may disfavor an injunction in some cases, that is not true when the enjoined conduct "is not representative of fair competition." 2013 WL 3766524, at *13 (E.D. Va. July 16, 2013). Here, Defendants engaged in an illegal and anti-competitive scheme by intentionally circumventing the will of Congress.

---

entrusts them to provide good faith, accurate information in seeking reimbursement." *United States v. Fairley*, 880 F.3d 198, 217 (5th Cir. 2018) (cleaned up); *see also United States v. Conner*, 262 F. App'x 515, 518 (4th Cir. 2008) ("Indeed, we see it as paramount that Medicaid be able to 'trust' its service providers.").

[9] *See e.g.*, *U.S. ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 389 (4th Cir. 2015) ("[False] claims make the administration of Medicare more difficult, and widespread fraud would undermine public confidence in the system.") (cleaned up).

"Congress included copay requirements in the Medicare program, in part, to serve as a check on health care costs, including the prices that pharmaceutical manufacturers can demand for their drugs." [DOJ Settlement Agreement Press Release, attached as Exhibit B to Complaint].[10] "Pharmaceutical companies have sought to remove the powerful market force of patient price sensitivity by directly sponsoring or substantially funding 'patient assistance programs' ("PAPs") that help cover out-of-pocket costs."[11] This is not only detrimental to third-party payors, or to patients unable to afford their drugs, but it is a crime against the nation and every tax payor that funds the heavily-exploited Medicare Trust Fund.

## II.    The Court Should Enjoin Adira to Preserve Its Own Jurisdiction

In addition to preventing irreparable harm to Plaintiffs, an injunction is necessary to preserve this Court's jurisdiction over Adira. Federal courts possess "judicial power to preserve . . . jurisdiction or maintain the status quo by injunction. . . ." *F.T.C. v. Dean Foods Co.*, 384 U.S. 597, 604 (1966); *see also Garcia v. Texas*, 564 U.S. 940, 947 (2011) ([A] Court, under the All Writs Act, 28 U.S.C. §1651, can take appropriate action to preserve its potential jurisdiction.") (cleaned up). The Court's jurisdiction is threatened in two related ways. First, as part of its dissolution, Adira has fired its attorneys without any indication that it will be retaining new counsel. However, it is well settled law that a corporation may not litigate—as plaintiff or defendant—pro se. *Rowland v. California Men's Colony, Unit II Men's Advisory Council*, 506 U.S. 194, 201–02, (1993) ("It has been the law for the better part of two centuries, . . . that a corporation may appear in the federal courts only through licensed counsel.").

Second, and more alarming, is the fact that a corporation's "legal existence [is] ended upon the filing of its articles of termination" and "[o]nce terminated, [a corporation] lack[s] the capacity

---

[10] Available at: https://www.justice.gov/opa/pr/three-pharmaceutical-companies-agree-pay-total-over-122-million-resolve-allegations-they-paid

[11] Daniel O'Brien Lichtenauer, The Patient Assistance Problem, 30 J.L. & Pol'y 197, 200 (2021)

to prosecute or defend lawsuits." *Muhler Co., Inc. v. State Farm Fire & Cas. Co.*, 2022 WL 327005, at \*1 (4th Cir. Feb. 3, 2022). If Adira is allowed to "complete its dissolution[,] this court's jurisdiction . . . would be in imminent peril. . . ." *United States v. W. Pa. Sand & Gravel Ass'n*, 114 F. Supp. 158, 159–60 (W.D. Pa. 1953); *see also Loc. 1814, Int'l Longshoremen's Ass'n, AFL-CIO v. New York Shipping Ass'n, Inc.*, 965 F.2d 1224, 1236 (2d Cir. 1992) (affirming injunction to "preserve its jurisdiction" over RICO claims). Just like in *W. Pa. Sand & Gravel*, Adira is seeking to escape the reach of this Court by dissolving and terminating its existence. However, unlike in *W. Pa. Sand & Gravel*, Adira has already received a certificate of dissolution from the state and has explicitly confirmed its intentions to terminate in the imminent future. *See* **Exhibit B**. Therefore, it is even more critical for the court to preserve the status quo and grant this motion for injunctive relief.

Similarly, the Seventh Circuit in *In re Uranium Antitrust Litig.*, 617 F.2d 1248 (7th Cir. 1980) affirmed an injunction under the All Writs Act enjoining defendants from transferring assets. The court there concluded that "[w]hile the Court would not technically be robbed of subject matter jurisdiction, the Court's default judgment would be rendered meaningless and the Court would be powerless to enter any effective relief as to the defaulters." *Id*. at 1260. As part of the dissolution process, Adira is required to fully divest and transfer all assets before seeking termination. Va. Code Ann. § 13.1-907. In other words, to protect the court's power to order "any effective relief," Adira should be enjoined from transferring its assets beyond the reach of this Court.

## **CONCLUSION**

If Adira is not enjoined from dissolving, divesting, and terminating, Plaintiffs will be irreparably harmed by losing access to invaluable evidence and any hope of effective remedy against Adira. Further, this Court would be deprived of jurisdiction over Adira. Therefore, it is

appropriate under both Rule 65 and the All Writs Act for this court to grant the following injunctive relief:

a) Enjoin Adira, its officers, directors, and agents, from continuing to pursue dissolution during the pendency of this action;

b) Enjoin Adira, its officers, directors, and agents from divesting and/or transferring any assets outside of its ordinary course of business;

c) Order Adira to preserve all evidence, records, and documents, and appoint a custodian—and provide the address and phone number of such custodian to Plaintiffs and the Court—over all such records and documents until further order from the court;

d) Order Adira to timely respond to Plaintiffs first set of discovery requests and produce all responsive documents;

e) Order Adira to revoke its Articles of Dissolution by filing the appropriate papers with the Virginia State Corporation Commission pursuant Va. Code Ann. § 13.1-905; and

f) Enjoin Adira, its officers, directors, and agents from filing Articles of Termination pursuant to Va. Code Ann. § 13.1-751 and from taking any other actions towards termination of Adira's corporate existence until further order from the court. Alternatively, if Articles of Termination have already been filed by the effective date of an order enjoining Adira, order Adira to file for reinstatement pursuant to Va. Code Ann. § 13.1-754 within two weeks of the effective date of such order.

Dated: January 4, 2023

*WISE LAW FIRM, PLC*

By: /s/ *David H. Wise*
David Hilton Wise, VA Bar No. 30828
Joseph M. Langone, VA Bar No. 43543

WISE LAW FIRM, PLC
10640 Page Street, Ste 320
Fairfax, Virginia 22030
Tel: (703) 934-6377
Fax: (703) 934-6379
dwise@wiselaw.pro
jlangone@wiselaw.pro

Akeel & Valentine, PLC

By: */s/ Shereef H. Akeel* _____
Shereef H. Akeel (*pro hac vice*)
(MI Bar No. 54345)
Adam S. Akeel (*pro hac vice*)
(MI Bar No. 81328)
Samuel R. Simkins (*pro hac vice*)
(MI Bar No. 81210)
Daniel W. Cermak (*pro hac vice*)
(MI Bar No. 84460)
Hayden E. Pendergrass (*pro hac vice*)
(DC Bar No. 1645085)
888 W. Big Beaver Road 420
Troy, Michigan 48084
Shereef@akeelvalentine.com
Adam@akeelvalentine.com
Sam@akeelvalentine.com
Daniel@akeelvalentine.com
Hayden@akeelvalentine.com

Eduardo Bertran, FL Bar. No. 94087 (*pro hac vice* forthcoming)
ARMAS BERTRAN ZINCONE
4960 SW 72nd Ave., Ste 206
Miami, FL 33155
ebetran@armaslaw.com

John W. Cleary (FL Bar No. 118137) (*pro hac vice* forthcoming)
Attorneys for Plaintiffs
MSP RECOVERY LAW FIRM
2701 S. LeJeune Rd., 10th Floor Coral Gables, FL 33134
(305) 614-2222
jcleary@msprecoverylawfirm.com

*Counsel for Plaintiffs*

21

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on January 4, 2023, a copy of the foregoing was filed and served electronically through the Court's CM/ECF system to all counsel of record.

*/s/ David H. Wise*
David H. Wise (Bar No.: 30828)
