## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

MSP RECOVERY CLAIMS, SERIES    )
LLC, *et al.*,    )
         Plaintiffs,    )
    )
v.    )    Civil Action No. 3:22-cv-422–HEH
    )
LUNDBECK LLC, *et al.*,    )
    )
         Defendants.    )

### MEMORANDUM OPINION
### (Resolving Motions and Closing the Case)

This case is brought by purported purchasers of third-party healthcare payors' claims.[1]  At issue is whether a pharmaceutical manufacturer, Lundbeck LLC ("Lundbeck"); a data analysis company, Theracom LLC ("Theracom"); and a now-defunct patient assistance nonprofit charity, Caring Voice Coalition, Inc. ("CVC")[2]

---

[1] Plaintiffs are MSP Recovery Claims, Series LLC; MSPA Claims 1, LLC; MSP Recovery Claims Series 44, LLC; MSP Recovery Claims PROV, Series LLC; MSP Recovery Claims CAID, Series LLC; on behalf of themselves and all others similarly situated (collectively, "Plaintiffs"). Named Plaintiffs allegedly hold assigned rights through assignments from several entities including: Medicare Advantage Organizations ("MAOs"), Medicaid Managed Care Organizations ("MCOs"), full-risk organizations such as Management Service Organizations ("MSOs"), Independent Practice Associations ("IPAs"), and "other Medicare and Medicaid first-tier, downstream, and related entities, all of which act as third-party payors, providing prescription drug benefits" to enrolled patients ("Assignors"). (Compl. ¶ 1 n.4, ECF No. 1.)

[2] CVC failed to appear, plead, or otherwise defend this action. Thus, on September 16, 2022, the Clerk entered default against CVC. (ECF. No. 44.) Adira Foundation ("Adira") is the alleged de facto successor of CVC and a named Defendant. After Adira filed its Motion to Dismiss (ECF No. 36) and Answer (ECF No. 50), Adira's counsel motioned to withdraw because Adira had ceased operations, filed its articles of dissolution, and intended to terminate the company. (Adira's Mem. in Supp. at 1, ECF No. 66.) Adira no longer wished to employ counsel in this matter and lacked resources to fund ongoing defense. (*Id.*) On January 4, 2023, this Court concluded good cause was shown and accordingly granted Adira's motion to withdraw. (Order, ECF No. 73.) Nevertheless, the Court will address and resolve Adira's Motion to Dismiss.

(collectively, "Defendants") worked in concert to artificially inflate the unit price and quantity dispensed of Xenazine—a specialty drug used to treat symptoms associated with Huntington's Disease. (Compl. ¶¶ 4–5.) Plaintiffs maintain that Defendants' conduct injured their Assignors because the Assignors were forced to reimburse patients for "artificially inflated quantities" of Xenazine at supra-competitive prices. (*Id.*) Their theory is that Lundbeck donated money to CVC to provide "kickbacks" to patients and pay for Xenazine co-payments. (*Id.*) Lundbeck would then use Theracom to unlawfully facilitate the transmission of patient information between Lundbeck and CVC to facilitate return on investment calculations. (*Id.*) Plaintiffs seek to leverage a no-fault settlement between Lundbeck and the Department of Justice ("DOJ") into a treble-damages civil class action suit under the Racketeer Influenced and Corrupt Organizations Act ("RICO") and various state laws. (*Id.* ¶¶ 10, 16–17, 169–393.)

The case is presently before the Court on Lundbeck, Theracom, and Adira's separate Motions to Dismiss (ECF Nos. 32, 33, 36), filed on September 14, 2022; Plaintiffs' Motion for Temporary Restraining Order ("TRO") and Preliminary Injunction (ECF No. 74), filed on January 4, 2023; and Plaintiffs' Motion to Supplement the Complaint (ECF No. 87), filed on February 8, 2023. The parties have filed memoranda on all pending Motions supporting their respective positions. On January 17, 2023, the Court heard oral argument on all pending motions except for Plaintiffs' Motion to Supplement Complaint, which was filed after the hearing took place. The Court will dispense with oral argument as to that motion because the facts and legal contentions

2

have been adequately presented to the Court, and oral argument would not aid in the decisional process. *See* E.D. Va. Loc. R. 7(J).

While many of the principles governing the legal theories underlying this lawsuit have been developed in federal courts in the United States, no court within the Fourth Circuit has grappled with the issues this case presents. This case is a venture into a new frontier. For the reasons discussed below, the Court will grant Defendants' Motions to Dismiss, deny Plaintiffs' Motion for a TRO and Preliminary Injunction, and grant Plaintiffs' Motion to Supplement the Complaint.

## I. BACKGROUND

Lundbeck manufactures specialty neuroscience medications including Xenazine, a medication used to treat chorea (involuntary muscle movement) associated with Huntington's Disease. (Compl. ¶ 94.) Xenazine was the only drug specifically "indicated" to treat that disease until 2015, when generic competitors entered the market. (Ex. A to Compl. at 1, ECF No. 1-2.)

CVC was a nonprofit charity created to assist qualifying patients afford the prescription co-pay obligations imposed by the patients' third-party insurance companies. (Compl. ¶ 32.) CVC is now defunct. (*Id.* ¶ 135.) However, Plaintiffs recently settled their parallel lawsuit asserting fundamentally identical claims against CVC in the District of Massachusetts. *See* Notice of Settlement and Agreed Mot. for a Stay of Proceedings, *MSP Recovery Claims, Series LLC v. Caring Voice Coal., Inc.*, No. 20-cv-11418 (D. Mass. Jan. 10, 2022) (ECF No. 64). Adira was established in 2018 and is essentially a replica of CVC. (Compl. ¶¶ 390–93.) While Plaintiffs do not allege that Adira played a

3

role in the alleged RICO enterprise, they assert that Adira is the successor corporation of CVC and thus jointly and severally liable to Plaintiffs. (*Id.* ¶¶ 138, 142, 388–393.)

Lundbeck contracted with Theracom, which led the Xenazine Information Center ("XIC"). (*Id.* ¶ 106.) The XIC helped facilitate patient access to Lundbeck's patient assistance programs ("PAPs")[3] and referrals to independent charitable co-pay foundations like CVC. (*Id.*) Plaintiffs allege Theracom unlawfully transferred information between Lundbeck and CVC. (*Id.* ¶ 5.)

Plaintiffs are a collection of Delaware businesses that have not interacted or conducted business with any of the Defendants in the case at hand. (*Id.* ¶¶ 18–29.) They seek to bring this suit on behalf of third-party payors that provide prescription drug benefits to patients. (*Id.* ¶¶ 1 n.4, 9, 52; *see also supra* note 1.) Plaintiffs maintain that Assignors had Medicare contracts with the federal government and that when patients paid their co-pays and received Xenazine from pharmacies, it "triggered" reimbursement payment obligations of the Assignors. (Compl. ¶¶ 18, 29, 47, 111, 183.) While the Complaint fails to identify any Assignors by name, an Appendix to the Complaint includes five "representative" assignors: SummaCare, Inc.; Interamerican Medical Center Group, LLC; Health First Health Plans, Inc.; Centro de Pediatria y Medicina de Familia

---

[3] PAPs help people with no health insurance and those who are underinsured afford medications. (Ex. D to Compl. at 2–3, ECF No. 1-5.) These programs are managed by nonprofit organizations, pharmaceutical companies, and government agencies. (*Id.*) PAPs may cover the full cost of medications, provide a discount, or provide drugs directly to patients. (*Id.*)

de Villalba, C.S.P; and Sal Health Group, LLC d/b/a "Salubris." (App. at 83–87, ECF No. 1.[4])

Medicare is a "federally funded health insurance program for the nation's elderly and disabled." (Compl. ¶ 50.) The Medicare Act consists of Parts A–E. (*Id.*) Assignors provide Medicare benefits under Parts C and D. (*Id.*) Part C "outlines the Medicare Advantage program and provides that Medicare beneficiaries may elect for private insurers to deliver their Medicare benefits." (*Id.*) Part D "provides for prescription drug coverage to Medicare beneficiaries." (*Id.*) Patients who use Medicaid Part D for their medications have co-pay obligations, which can cause them to "abandon" their medications if they cannot afford them. (*Id.* ¶¶ 55, 116 & n.14.) As a result, companies like Lundbeck have developed PAPs to help patients afford necessary medications like Xenazine. (*Id.* ¶ 57; *see also supra* note 3.)

According to Plaintiffs, pharmaceutical companies donate to PAPs by either (1) creating their own PAP and directly providing drugs to patients who cannot afford them or donating the drugs to a foundation that gives them to patients; or (2) donating money to independent charity PAPs to help patients who cannot afford their drugs. (Compl. ¶ 58.) In the first giving option, companies donate *drugs* and receive a tax deduction for such donations. (*Id.* ¶ 60.) Whereas, in the second option, companies donate *money* and receive a tax deduction *and money from the insurer paying the other portion of the drug costs* for such donations. (*Id.* ¶ 60.) Donations made under the second option reduce out-

---

[4] The Appendix is part of the Complaint (ECF No. 1) and begins on page 83. Because the Appendix's paragraphs are not continually numbered, this Memorandum Opinion refers to the Appendix by page number, for ease of reference.

of-pocket costs to patients but do not reduce the price of drugs to the healthcare payer. (*Id.*) Plaintiffs assert that "pharmaceutical companies and co-payment charities have a mutually beneficial purpose—to receive donations, establish additional disease funds to cover co-payments of the pharmaceutical company's expensive specialty drugs, and ensure federal healthcare programs bear the cost of these drugs." (*Id.* ¶ 63.) In other words, Plaintiffs argue that drug manufacturers set specialty drug prices "with an intimate knowledge of the drug market" and that "[t]his knowledge enables manufacturers to set supra-competitive drug prices by using PAPs to circumvent beneficiary co-payment obligations, thus eliminating price sensitivity." (*Id.* ¶ 67.)

The federal government, through the Department of Health and Human Services Office of the Inspector General ("OIG"), permits PAPs, explaining that they "have long provided important safety net assistance to patients of limited means who do not have insurance coverage for drugs, typically serving patients with chronic illnesses and high drug costs." 70 Fed. Reg. 70623, 70623–25 (Nov. 22, 2005) (the "2005 OIG Guidance"). The OIG provides guidance to co-payment charities regarding compliance with applicable laws and regulations, such as the Anti-Kickback Statute ("AKS") and False Claims Act ("FCA"). *See id.*; *see also* 79 Fed. Reg. 31120, 31121 (May 30, 2014) (the "2014 OIG Guidance") (Compl. ¶¶ 73–74.) In the 2005 OIG Guidance, the OIG stated that certain cost-sharing subsidies provided by bona fide, independent PAPs unaffiliated with drug manufacturers do not raise AKS concerns, even if the PAPs receive

6

manufacturer contributions. (Compl. ¶ 74.) The 2005 OIG Guidance established factors that the OIG considered "fundamental" to a proper PAP.[5]

Defendants concede that while PAPs serve a purpose in the healthcare industry, they have "sometimes" been the subject of public "criticism." (*See, e.g.*, Lundbeck's Mem. in Supp. at 15, ECF No. 32-1.) Specifically, Lundbeck acknowledges that in the early 2010s, prestigious medical journals opined that "[PAPs] may lead to higher drug prices." (*Id.* (quoting David H. Howard, Ph.D., *Drug Companies' Patient-Assistant Programs—Helping Patients or Profits?*, N.E. J. Med. (July 10, 2014), https://bit.ly./3R5hWmB).)

Against the backdrop of public disapproval, in 2014, the OIG issued the updated 2014 OIG Guidance, which raised concerns about PAPs and "intensif[ied] its scrutiny of arrangements between pharmaceutical companies and co-payment charities." (Compl. ¶ 75.) The OIG stated that while PAPs can provide essential safety nets for patients, "these programs also present a risk of fraud, waste, and abuse with respect to federal health care programs if they are not independent from donors." (*Id.*) The 2014 OIG Guidance reiterated its prior focus on PAPs not giving a "donor any information that

---

[5] The factors include, in pertinent part:

   a. No drug manufacturer or donor exerts any direct or indirect influence or control over the PAP;

   b. The PAP awards assistance in a truly independent manner that severs any link between the drug manufacturer donors' funding and the beneficiary;

   c. The PAP awards assistance without regard to the drug manufacturer's interests . . . ;

   d. The drug manufacturer does not solicit or receive data from the PAP that would allow the manufacture to substantiate the amount of its donations with the number of subsidized prescriptions for its products . . . .

would enable a donor to correlate the amount or frequency of its donations with the number of aid recipients who use its products or services or the volume of those products supported by the PAP." (*Id.* ¶ 77 (quoting the 2014 OIG Guidance).)

CVC certified to the OIG in 2006 that it would comply with the 2005 OIG Guidance. (*Id.* ¶¶ 78, 81.) Specifically, CVC ensured that "no donor . . . has exerted or will exert any direct or indirect influence or control over [CVC]" and that it would not share with donors any "individual patient information" or "data related to the identity, amount, or nature of products or services subsidized under the Proposed Arrangement." (*Id.* ¶¶ 81–82.) CVC subsequently requested an advisory opinion from the OIG and asked whether its "Proposed Arrangement" would constitute grounds for sanctions under federal law. (*Id.*) In response, the OIG published an Advisory Opinion to CVC (the "2006 CVC Advisory Opinion") and concluded that it would not impose sanctions or civil monetary penalties on CVC but noted that "the Proposed Arrangement could potentially generate prohibited remuneration under the [AKS], if the requisite intent to induce or reward referrals of Federal health care program business were present." (*Id.*; *see also* Ex. F to Compl., ECF No. 1-7.)

CVC later certified compliance with the additional requirements set forth in the 2014 OIG Guidance. (Compl. ¶ 83.) The OIG then published a Modified Advisory Opinion to CVC (the "2015 CVC Modified Advisory Opinion"), where it again concluded that it would not impose penalties or sanctions on CVC. (*Id.*; Ex. G to Compl., ECF No. 1-8.) The OIG also stated that CVC was "sufficiently low risk." (*Id.*; Ex. G to Compl.)

In 2016, the DOJ opened investigations into pharmaceutical companies and charities, including Lundbeck and CVC. As a result of the DOJ's investigation, the DOJ alleged that:

> Lundbeck made donations to CVC and knowingly and willfully used CVC as a conduit to pay the [co-pay] obligations of Medicare and ChampVA patients taking Xenazine for unapproved uses. Lundbeck was the sole donor contributing millions of dollars to a "Huntington's Disease" fund at CVC. Although this fund ostensibly provided financial support only for patients with Huntington's Disease, Lundbeck, through its hub, the [XIC], referred Xenazine patients with many other conditions to CVC . . . CVC used money from Lundbeck to pay the Xenazine copays of these other patients through the Huntington's Disease fund, which did not pay the copays of any drug other than Xenazine.

(Compl. ¶ 104 (quoting DOJ Settlement Agreement Press Release, Ex. B to Compl., ECF No. 1-3 (the "DOJ Settlement")).) The DOJ asserted that Lundbeck and CVC dissolved the Huntington's Disease Fund but agreed that CVC would continue to cover Xenazine patient co-pays from a "general fund" to circumvent OIG's mandates.[6] (Compl. ¶ 104 (quoting DOJ Settlement).) DOJ further maintained that Lundbeck had a policy that prevented patients insured through government programs from participating in free drug programs and used XIC to direct those patients to CVC. (*Id.*) The DOJ concluded that "[a]s a result of [this] conduct . . . Lundbeck caused false claims to be submitted to Medicare and ChampVA," and asserted claims against Lundbeck under the AKS, FCA,

---

[6] Simultaneous to the DOJ investigation, in 2017, the OIG rescinded its prior 2015 CVC Modified Advisory Opinion (the "2017 CVC Recission Letter"). (Compl. ¶ 87; Ex. K to Compl., ECF No. 1-12.) The 2017 CVC Recission Letter concluded CVC "fail[ed] to fully, completely, and accurately disclose all material facts to [the] OIG," and CVC failed to comply with certain certifications made to the OIG. (*Id.*) CVC announced that it would not open financial assistance for any disease fund in 2018. (*Id.* ¶ 88.) Instead, in February 2018, CVC's President incorporated a new 501(c)(3) charity, Adira, where CVC allegedly "began fraudulently conveying CVC's assets and records to the new charity." (*Id.* ¶ 90.)

and other theories. (*Id.* (quoting the DOJ Settlement).) Lundbeck entered into a no-fault settlement with the DOJ for $52.6 million but did not admit to any of the facts identified in the settlement, nor did it admit to any legal wrongdoing. (Compl. ¶ 101; Lundbeck's Mem. in Supp. at 16.)

Plaintiffs, by bolstering their Complaint with the DOJ Settlement, allege that Defendants engaged in the following "scheme." Lundbeck donated money to CVC, which CVC used to pay patients' co-pays. (Compl. ¶¶ 106–110.) In exchange, CVC improperly provided Lundbeck with information about how its donations were being used. Meanwhile, Theracom acted as an intermediary to facilitate the information exchange and refer financially needy patients to CVC. (*Id.*) Plaintiffs maintain that this "scheme" injured Assignors by "artificially inflat[ing] the quantity of dispensed Xenazine and allow[ing] Lundbeck to raise the prices of Xenazine to supra-competitive levels." (*Id.* ¶¶ 7–8, 113.) Plaintiffs argue that even though Lundbeck paid $52.6 million to the United States, the DOJ Settlement "does not redress the harm" that the "scheme caused to Assignors." (*Id.* ¶ 105.)

Plaintiffs' Complaint includes a graph displaying the volume of Xenazine dispensed and reimbursed by Assignors to illustrate that Defendants' "scheme" caused Assignors to pay "supra-competitive prices" for Xenazine. (Compl. ¶ 92.) The graph depicts the volumes and prices of Xenazine from 2010 to 2020 in a linear fashion, with a dramatic peak in 2014, followed by a sharp decline in what appears to be 2014 or 2015. (*Id.*) Plaintiffs allege the plummet in Xenazine prices "confirms that the volume (or

quantity) of Xenazine dispensed and paid for by Assignors plummeted after [Defendants'] Scheme was uncovered[.]" (*Id.*)

Additionally, Plaintiffs point to CMS's Medicare Part D data, which "shows that for Xenazine, Medicare spending rose from $113 million in 2012, to more than $227 million by 2015" and "[t]he average spending per dosage unit in 2012 was $66.22" and "[i]n only four years, the average spending per dosage unit jumped to $142.28[.]" (*Id.* ¶¶ 95, 97.) Plaintiffs maintain that "Assignors' data for their covered beneficiaries yields similar findings. Assignors paid at least $5.1 million for Xenazine prescriptions on behalf of covered beneficiaries." (*Id.* ¶ 98.) This increase in prices "would not have been possible but for the illegal [scheme]." (*Id.* ¶ 99.)

While Plaintiffs acknowledge Xenazine may be dispensed only with a physician's prescription (*see* Compl. ¶ 204), Plaintiffs cite the OIG's 2017 CVC Recission Letter as evidence to support its allegations that Defendants caused the artificial inflation of the quantity of dispensed Xenazine (*id.* ¶ 88). The 2017 CVC Recission Letter states that CVC's failure to comply with its certifications to the OIG, "can harm patients and the Federal health care programs because, for example, patients may be urged to seek, and physicians may be more likely to prescribe, a more expensive drug if co-payment assistance is available for that drug but not for less expensive but therapeutically equivalent alternatives." (*Id.* ¶ 88 (quoting Ex. K to Compl.).)

As previously mentioned, Adira was established in 2018, and Plaintiffs do not allege that it played a role in the "scheme." (*Id.* ¶¶ 90, 138, 175.) Plaintiffs argue, instead, that "CVC's President and Chairman together incorporated a new 501(c)(3)

charity—Facilitating Patient Health, which was later renamed to Adira—to continue operating some of the same disease funds[.]" (*Id.* ¶ 133.) Plaintiffs assert that Adira is liable as a successor to CVC because Adira and CVC shared the same president, board members, data, monies, equipment, employees, and accounting firm. (*Id.* ¶¶ 389–393.)

Plaintiffs allege several counts in total—five against all Defendants and two against only CVC and Adira. The five counts against all Defendants are: a substantive RICO claim under 18 U.S.C. § 1962(c) (Count I); a RICO conspiracy claim under 18 U.S.C. § 1962(d) (Count II); consumer protection claims under the laws of twelve states: California, Connecticut, Florida, Illinois, Massachusetts, Michigan, New York, Ohio, Pennsylvania, Puerto Rico, South Carolina, and Wisconsin (Count III); an unjust enrichment claim "under state law" (Count IV); and a claim under Florida's state RICO law, the Civil Remedies for Criminal Practices Act, Fla. Stat. 7701, *et seq.* (Count V). The two counts against CVC and Adira are: a violation of Va. Stat. § 55.1-400, *et seq.* (Count VI); and successor liability as to Adira (Count VII).

Defendants move to dismiss Plaintiffs' claims on lack of standing, pursuant to Federal Rule of Civil Procedure 12(b)(1), and failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6).

Plaintiffs filed a Motion for TRO and Preliminary Injunction to enjoin Adira from dissolving, divesting, and terminating, pursuant to Federal Rule of Civil Procedure 56 and the All Writs Act, 28 U.S.C. § 1651. Plaintiffs also seek leave of Court to supplement the Complaint, pursuant to Federal Rule of Civil Procedure 15(d). The Court will address each motion in turn.

## II. ANALYSIS

Defendants present several arguments supporting their Motions to Dismiss. First, they claim that Plaintiffs lack standing to sue because Plaintiffs did not plead sufficient information about their alleged Assignors' purported injuries and failed to show whether valid assignments exist. As to the state-law consumer protection claims, Defendants maintain that Plaintiffs lack standing to sue because Plaintiffs do not reside and did not make purchases in the respective states. Second, Defendants argue that Plaintiffs have not identified an injury in fact traceable to Defendants that the Assignors have suffered. Third, Defendants assert that Plaintiffs' claims are barred by the statute of limitations. Fourth, Defendants contend that Plaintiffs' RICO claims should be dismissed because (1) Plaintiffs' Assignors were indirect purchasers; (2) Plaintiffs failed to allege a qualifying predicate act and requisite pattern of racketeering; (3) Plaintiffs failed to comply with Federal Rule of Civil Procedure 9(b); (4) Plaintiffs failed to allege a RICO enterprise; and, lastly, (5) Plaintiffs failed to demonstrate a proximate, economic injury. Fifth, Defendants claim that Plaintiffs' tag-along state law claims should be dismissed for independent reasons. Finally, Adira argues Counts 6 and 7 should be dismissed because Plaintiffs' RICO claims fail to state a claim upon which relief can be granted.

### A. Plaintiffs Adequately Pled Their Assignors Conveyed a General Assignment Agreement and Suffered an Injury in Fact

Federal district courts exercise limited jurisdiction. *Exxon Mobil Corp. v. Allapattah Servs. Inc.*, 545 U.S. 546, 552 (2005). The standing doctrine reflects the mandate from Article III of the Constitution that courts may only hear cases and

controversies. U.S. Const. art. III; *Summers v. Earth Island Inst.*, 555 U.S. 488, 492–93 (2009). For a case or controversy to be justiciable in federal court, a plaintiff must allege "such a personal stake in the outcome of the controversy as to warrant his invocation of federal court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Planned Parenthood of S.C. v. Rose*, 361 F.3d 786, 789 (4th Cir. 2004). The burden of proof for establishing standing is on the party claiming subject matter jurisdiction. *Mirant Potomac River, LLC v. EPA*, 577 F.3d 223, 226 (4th Cir. 2009).

Article III standing requires a litigant to establish that he or she has "(1) an injury in fact that is (2) fairly traceable to the challenged conduct and (3) likely to be redressed if the court rules in [the plaintiff's] favor." *DiCocco v. Garland*, 52 F.4th 588, 591 (4th Cir. 2022) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). During the pleading stage, "general factual allegations" showing these elements suffice. *Id.* at 561. Defendants' Motions to Dismiss relying on standing are tested under Federal Rule of Civil Procedure 12(b)(1). *See Taubman Realty Grp. Ltd. P'ship v. Mineta*, 320 F.3d 475, 480–81 (4th Cir. 2003). "A defendant may challenge [standing at the motion-to-dismiss stage] in one of two ways: facially or factually." *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017). In a facial challenge, the defendant argues that the complaint "fails to allege facts upon which [standing] can be based," and in a factual challenge, the defendant contends "that the jurisdictional allegations of the complaint [are] not true." *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). Defendants facially attack Plaintiffs' standing, so the Court need only address whether Plaintiffs' general factual allegations meet the pleading requirements. Where, like here, defendants make a facial

14

attack, the court assumes all allegations are true. *DiCocco*, 52 F.4th at 591 (citing *Beck*, 848 F.3d at 270).

Where an assignment provides assignees with a property right, the assignees are thereby conferred constitutional standing. *See Sprint Commc'ns Co., L.P. v. APCC Servs. Inc.*, 554 U.S. 269, 286 (2008). "[T]he assignee of a claim has standing to assert the injury in fact suffered by the assignor." *Id.* However, "[i]f a valid assignment confers standing, an invalid assignment defeats standing." *US Fax Law Ctr., Inc. v. iHire, Inc.*, 476 F.3d 1112, 1120 (10th Cir. 2007).

Defendants argue that even considering the information in the Complaint regarding Plaintiffs' representative Assignors, the assignments do not confer standing and Plaintiffs fail to allege that its Assignors suffered an injury in fact. (Lundbeck's Mem. in Supp. at 19–22; Theracom's Mem in Supp. at 13–18, ECF No. 34; Adira's Mem. in Supp. at 2–8.) The crux of Defendants' arguments turns on Plaintiffs' failure to plead that any representative assignor paid "even one payment to the alleged scheme or for that matter even allege facts showing payment of even one claim." (Adira's Mem. in Supp. at 6; *see also* Lundbeck's Mem. in Supp. at 21 ("It does not allege when Assignors reimbursed claims for Xenazine; at what price they reimbursed for Xenazine; which doctors prescribed Xenazine for the claims they reimbursed; or whether the patients whose claims they reimbursed received co-pay assistance from CVC.").) Defendants maintain that Plaintiffs' allegation that "Assignors provided payment for Xenazine throughout the United States" is devoid of factual detail. (Compl. ¶ 49.)

In light of the fact that "general factual allegations" suffice at the pleadings stage to establish standing, the Court concludes that Plaintiffs sufficiently plead that their representative Assignors conferred Article III standing with valid assignments and suffered economic injuries fairly traceable to Defendants' actions. *See Lujan*, 504 U.S. at 561. While Plaintiffs do not name each "representative" Assignor in the Complaint, Plaintiffs describe and provide five "representative" assignments in the Appendix. (App. at 83–88.) Those assignments include similar language stating:

> [Assignor] hereby irrevocably assigns, transfers, conveys, sets over and delivers to MSP Recovery, and any of its successors and assigns, any and all of [Assignor's] right, title, ownership, and interest in and to all Claims existing on the date hereof, whether based in contract, tort, statutory right, and any and all rights . . . to pursue and/or recover monies for [Assignor.]

(*Id.* at 85 ¶ 2.) The "Claims" refer to unpaid monies arising from Medicare coverage for Xenazine. (*Id.*) Plaintiffs allege that these representative contract assignments were valid and provide tangible evidence supporting this allegation. The Court concludes that Plaintiffs plead with enough specificity to establish that their "representative" Assignors conferred standing with valid assignments.

Because the Court must view the facts in the light most favorable to Plaintiffs at this stage, the Court further concludes that Plaintiffs sufficiently plead that these "representative" Assignors, and others similarly situated, suffered an economic injury fairly traceable to Defendants' actions. Assignors were responsible for reimbursing or directly paying for Xenazine. (*Id.* ¶ 43.) Plaintiffs plead that Assignors paid over $5 million in claims on behalf of covered patients receiving Xenazine from 2011 to present and provide facts showing a lack of price sensitivity as to Xenazine. (*Id.* ¶ 48.) For

16

example, Plaintiffs state that the dosage unit for Xenazine increased from $66.22 in 2012 to $142.28 in 2016, and provide a graph that indicates that the volume dispensed and paid for by Assignors increased until after Defendants' "scheme" was "uncovered." (*Id.* ¶¶ 92, 97.)

However, as Defendants point out, the Complaint lacks evidence that shows precisely which patients received co-payment assistance from Plaintiffs' Assignors. (Lundbeck's Mem. in Supp. at 11 (citing *MSP Recovery Claims, Series LLC v. Caring Voice Coal., Inc.*, No. 21-21317-civ-Gayles/Torres, 2022 WL 3155035, at *5 (S.D. Fla. July 21, 2022), *Report and Recommendation adopted*, 2022 4448256, at *1 (S.D. Fla. Sept. 23, 2022) (concluding Plaintiffs had Article III standing in a nearly identical claim by the same Plaintiffs, represented by the same law firm, and bringing nearly identical claims against the same charity but a different pharmaceutical manufacturer but dismissing the Complaint on other grounds). Nonetheless, the Court is not convinced that Plaintiffs must include specific documents or bills of this type at this stage in the proceeding because the alleged facts lead to the conclusion that patients did receive co-payment assistance from Assignors. *See U.S. ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 777–78 (7th Cir. 2016) ("[A] plaintiff does not need to present, or even include allegations about, a specific document or bill that defendants submitted to the Government" to establish standing).

Assuming all the allegations are true as the Court must at this stage, *DiCocco*, 52 F.4th at 591, and recognizing that Article III only requires "general factual allegations" of the standing elements, *Lujan*, 504 U.S. at 560–61, it is plausible to infer that Assignors

suffered economic injury from the increase in Xenazine prices and that the price increment is fairly traceable to Defendants' conduct. Plaintiffs allege that Defendants' scheme to eliminate price sensitivity and allow Lundbeck to raise their prices to supra-competitive levels caused these injuries. For Article III standing purposes, Plaintiffs adequately plead that based on Defendants' alleged actions, Plaintiffs' Assignors reimbursed for Xenazine at higher prices and with increased frequency because Lundbeck unlawfully accessed information and used an illegal "conduit" disguised as an independent charity to sell Xenazine at higher prices and volumes than it would have been able to do legally. (Compl. ¶¶ 1–8.) Plaintiffs have adequately pleaded that Plaintiffs' Assignors suffered a concrete, economic injury, traceable to Defendants' allegedly fraudulent conduct.

Defendants' arguments challenging Plaintiffs' Article III standing fail because Plaintiffs have successfully alleged that their Assignors and those similarly situated have suffered an injury in fact and were conveyed valid assignments. Plaintiffs plead their claim with sufficient specificity to allege a fairly traceable injury to Defendants' purported "scheme." As Defendants do not challenge the redressability of Plaintiffs' claims, this Court concludes that Plaintiffs have Article III standing.

While Defendants' Motions to Dismiss Plaintiffs' RICO claims will ultimately be granted because such claims fail to state a claim upon which relief can be granted, as elaborated below, *see supra* Section C1, the Court is persuaded by Defendants' arguments concerning the Indirect Purchase Rule (IPR). The United States Supreme Court held in *Illinois Brick v. Illinois*, 431 U.S. 720 (1977), that indirect purchasers do

not have standing to sue for damages under federal antitrust laws. RICO statutory law was heavily influenced by statutory antitrust law. *See Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 454 (1991) ("Congress modeled § 1964(c) on the civil-action provision of the federal antitrust laws"). Accordingly, several federal courts have established a bright-line rule that bars RICO suits by indirect purchasers. For example, the United States Circuit Court for the Third Circuit recently held, in a case like the one at hand, that insurers that merely reimbursed prescriptions for a drug were indirect purchasers and therefore lacked RICO standing under the IDR. *Humana, Inc. v. Indivior, Inc.*, Nos. 21-2573 & 21-2574, 2022 WL 17718342, at *1 (3d Cir. Dec. 15, 2022).

In *Humana*, as in this case, the plaintiffs alleged that "defendants fraudulently induced them to include [a particular prescription drug] on their formularies, and thus defendants' scheme directly injured them." *Id.* at *3. The Third Circuit rejected RICO standing under the IDR because, as in antitrust cases, "pecuniary recoveries by indirect purchasers would 'transform treble-damage actions into massive multiparty litigations involving many levels of distribution and including large classes of ultimate consumers remote from the defendant.'" *Id.* (quoting *Illinois Brick*, 431 U.S. at 737).

The United States Court of Appeals for the Fourth Circuit has stated that the IPR principle "applies to RICO cases." *NCNB Nat. Bank of North Carolina v. Tiller*, 814 F.2d 931, 937 (4th Cir. 1987), *overruled on other grounds by Busby v. Crown Supply, Inc.*, 896 F.2d 833 (4th Cir. 1990). The parties disagree about *Tiller*'s applicability to this case. Defendants claim *Tiller*'s precedent clearly establishes that Plaintiffs, as indirect purchasers, lack standing. (*See, e.g.*, Lundbeck's Mem. in Supp. at 27.) Plaintiffs,

however, argue that the Fourth Circuit has not adopted a bright-line rule that the IPR applies to RICO cases. (Pls.' Resp. in Opp'n at 20, ECF No. 52.) Instead, Plaintiffs contend "the Fourth Circuit has consistently held RICO standing focuses on 'whether the conduct has been so significant and important a cause that the defendant should be held responsible.'" (*Id.* (quoting *Chisolm v. TranSouth Fin. Corp.*, 95 F.3d 331, 337 (4th Cir. 1996).) This Court believes that because RICO jurisprudence prioritizes directness, as in the antitrust context, the IPR should bar RICO claims by indirect purchasers, like Plaintiffs in this case. Nevertheless, to the extent that the Fourth Circuit's statement in *Tiller* is dicta or otherwise not applicable to the case at hand, this Court will address the merits of Plaintiffs' claims, and, as elaborated in Section C, Plaintiffs' claims will ultimately be dismissed for failure to state a claim upon which relief can be granted.

## B. Plaintiffs' Claims are Not Time-Barred for 12(b)(6) Purposes

"A defendant may properly raise—and the Court may properly consider—a statute of limitations defense at the motion to dismiss stage 'if the time bar is apparent on the face of the complaint.'" *Plumbers and Steamfitters Union Loc. No. 10 v. Waters*, 451 F. Supp. 3d 543, 553 (E.D. Va. 2020) (quoting *Dean v. Pilgrim's Pride Corp.*, 395 F.3d 471, 474 (4th Cir. 2005)). In deciding a motion to dismiss based on the statute of limitations, the Court should only grant the motion if it clearly appears on the face of the Complaint that Plaintiffs' claims are time-barred. *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007). A cause of action accrues when the plaintiff "has actual or constructive knowledge of his or her claim." *Parkway 1046, LLC v. U.S. Home Corp.*, 961 F.3d 301, 307 (4th Cir. 2020). Accrual cannot occur until the plaintiff has, or should

have, "possession of the critical facts that he has been hurt and who has inflicted the injury." *United States v. Kubrick*, 444 U.S. 111, 122 (1979); *see also Rotella v. Wood*, 528 U.S. 549, 553 (2000) (holding RICO claims accrue upon a plaintiff's discovery of their injury, not discovery of Defendants' actions). The application of the injury discovery rule is generally fact-sensitive and more appropriate for a trier of fact, but nonetheless, the test is objective, and dismissal is appropriate when the facts from which knowledge may be imputed are clear from the pleadings. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 150 (2d Cir. 2012).

The Complaint was filed on June 6, 2022. As Defendants' accurately point out, the longest applicable statute of limitations is six years. *See, e.g.*, Mich. Comp. Laws Ann. § 445.911(9) (six-year statute of limitations for Michigan consumer protection claim); *see also Wood*, 528 U.S. at 553 (four-year statute of limitations for RICO claims); *CVLR Performance Horses, Inc. v. Wynne*, 792 F.3d 469, 476 (4th Cir. 2015) ("The statute of limitations on private civil RICO claims is four years, beginning on the date the plaintiff discovered, or should have discovered, the injury."). Accordingly, for Plaintiffs' claims to be timely, the accrual date must have been on or after June 6, 2018, for their RICO claims. As for claims with a six-year statute of limitations, the accrual date must have taken place on or after June 6, 2016.

Defendants argue that Plaintiffs' claims are time-barred under two theories. First, Defendants contend that two of the "representative" assignments occurred before the accrual date. Second, Defendants maintain that "the Complaint makes clear that

[Plaintiffs] knew or should have known about their alleged injuries long before [the accrual date]." (Lundbeck's Mem. in Supp. at 24.)

As to the first argument, two of the "representative" Assignors—InterAmerican Medical Group and Health First—assigned its claims to Plaintiffs on December 16, 2014, and April 28, 2016, respectively. (App. at 83–85.) Defendants assert that because the language of the assignments states that they assign "Claims existing on the date hereof" (*id.*), "Plaintiffs have thus pled themselves out of a timely claim with respect to these two 'representatives'" because the assignments occurred *before* the accrual date (Lundbeck's Mem. in Supp. at 24). Plaintiffs argue that assignments must not be interpreted so narrowly, pointing to the assignments' language which states that the Assignors assign "*any and all of* [Assignor's] right title, ownership and interest in all rights and entitlements that Assignor *has, may have had,* or has asserted against third parties from or relating to the Claims." (Pls.' Opp'n Mem. at 15, ECF No. 52 (emphasis in original).) The Court agrees with Plaintiffs that Defendants' narrow interpretation of the language is inappropriate. Moreover, Plaintiffs' Complaint includes at least two "representative" assignments with effective dates in 2021 (Centro de Pediatria and Salubris (App. at 89–90)), which is clearly *after* the accrual date. Thus, because the accrual date took place before at least two of Plaintiffs' "representative" assignments, Defendants argument fails.

Regarding Defendants' second argument, Defendants maintain that the Complaint makes clear that the accrual date is well before June 6, 2016, because Plaintiffs knew or should have known about their alleged injuries before that date. (Lundbeck's Mem. in Supp. at 24.) Defendants quote paragraph 92 of Plaintiffs' Complaint, which states:

22

"[a]nalysis of Assignors' data confirms that the volume (or quantity) of Xenazine dispensed and paid for by Assignors plummeted after [Defendants'] RICO Scheme was uncovered" and displays a graph with a dramatic decline in Xenazine sales beginning in approximately 2014. (*Id.*) Defendants argue that Plaintiffs do not allege that they continued reimbursing for Xenazine prescriptions beyond 2015. (*Id.*) Defendants maintain that these facts alleged in the Complaint make clear that Plaintiffs were on notice of Defendants' wrongdoing in 2014 and thus Plaintiffs cannot bring these claims eight years later. In response, Plaintiffs assert that Defendants' wrongful conduct could not have been discovered until the DOJ published the DOJ Settlement in April 2019. (Pls.' Opp'n Mem. at 16.)

The Court is persuaded by Plaintiffs' argument. While Plaintiffs clearly knew that Xenazine prescriptions plummeted in 2014, the Complaint does not make obvious that Plaintiffs possessed knowledge of Defendants' alleged wrongdoing at that time. Plaintiffs' Complaint states that the "*analysis* of Assignors' data" confirms that the volume of Xenazine paid for by Assignors declined after Defendants' scheme "was uncovered" (Compl. ¶ 92 (emphasis added)), however, Defendants do not attempt to explain when this "analysis" was completed or *who* "uncovered" Defendants' "scheme." The Complaint does not identify that Plaintiffs knew any links existed between Lundbeck, Theracom, CVC, and Adira in 2014. In other words, it is not apparent that Plaintiffs discovered their alleged injury in 2014. *See Wood*, 528 U.S. at 553. Rather, Plaintiffs' heavy reliance upon Lundbeck's no-fault settlement with the DOJ supports the notion that Plaintiffs were on notice of Defendants' conduct when the DOJ Settlement

was released in 2019. Because it is not apparent, based on the face of the Complaint, that Plaintiffs' claims are time-barred, *see Dean*, 395 F.3d at 474, the Court will not grant Defendants' Motion to Dismiss based on this ground.

### C. Plaintiffs' Fail to State a Claim to Relief that is Plausible on its Face

Federal Rule of Civil Procedure 12(b)(6) permits a party to move the court to dismiss an action if the plaintiff fails to state a claim upon which relief can be granted. The function of a motion to dismiss for failure to state a claim is to test the legal sufficiency of the complaint. *Neitzke v. Williams*, 409 U.S. 319, 326–27 (1989). When considering a motion made pursuant to Rule 12(b)(6), the court is generally limited to a review of the pleadings filed in the case. *See* Fed. R. Civ. P. 12(d). Exhibits attached to the pleadings are considered a part of the complaint. Fed. R. Civ. P. 10(c). To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

While the Court must accept well-pleaded factual allegations as true, "conclusory assertions" are inadequate to create a plausible claim, and a plaintiff's "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *United States ex rel. Taylor v. Boyko*, 39 F.4th 177, 193 (4th Cir. 2022) (quoting *Iqbal*, 556 U.S. at 67). Moreover, dismissal is appropriate if it appears that the plaintiff is not "entitled to relief under any legal theory which might plausibly be suggested by the facts alleged." *Harrison v. U.S. Postal Serv.*, 840 F.2d 1149, 1152 (4th Cir. 1988) (citation omitted).

Defendants argue that Plaintiffs' Complaint should be dismissed because it fails to state a claim. Counts I and II are causes of action under 18 U.S.C. § 1962 for Defendants' alleged RICO scheme. Count III is a cause of action for Defendants' alleged violation of consumer protection laws in a dozen states. Count IV is a cause of action for unjust enrichment against Defendants. Count V is a cause of action for Defendants' alleged violation of Florida's RICO statute. Count VI is a cause of action for fraudulent transfer under Virginia law. Count VII is a successor liability claim as to Adira. The Court will address each Count in turn.

### 1. Plaintiffs' RICO Claims Fail to Plead that Defendants' Actions Proximately Caused Assignors' Economic Injuries (Counts I & II)

Plaintiffs assert RICO claims for violations of 18 U.S.C. § 1962(c) and (d). Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). At the motion to dismiss stage, § 1962(c) requires a plaintiff to adequately plead: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985) (footnote omitted).

RICO defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Plaintiffs allege that Defendants participated in an "association-in-fact enterprise" (Compl. ¶ 175), which must "have at

25

least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose," *Boyle v. United States*, 556 U.S. 938, 946 (2009). An association-in-fact enterprise need not have any particular indicia of organization, such as a "chain of command," but it does need some sort of discrete existence and structure uniting its members in a cognizable group." *Id.* at 948.

Plaintiffs assert that Defendants committed mail and wire fraud (18 U.S.C. §§ 1341 and 1343, respectively) and violations of the Travel Act (18 U.S.C. § 1952) to satisfy the "racketeering activity" element.[7] Mail and wire fraud are federal crimes expressly included in the RICO statute's list of predicate acts constituting "racketeering activity." 18 U.S.C. § 1961(1). Mail and wire fraud "have two essential elements: (1) the existence of a scheme to defraud and (2) the use of the mails or wire communication in furtherance of the scheme." *United States v. Curry*, 461 F.3d 452, 457 (4th Cir. 2006); *see also United States v. Pasquantino*, 336 F.3d 321, 332 n.5 (4th Cir. 2003) ("Because the mail and wire fraud statutes share the same language in relevant part, we apply the same analysis to both offenses."). When mail and wire fraud are asserted as predicate acts in a civil RICO claim, each must plead with particularity, pursuant to Rule 9(b). *Menasco, Inc. v. Wasserman*, 886 F.2d 681, 684 (4th Cir. 1989).

---

[7] Specifically, Plaintiffs maintain that Lundbeck's receiving "data from CVC" and CVC submitting "certifications" to the OIG, in which it "claimed to be in compliance with federal law," are predicate acts for RICO purposes. (Compl. ¶ 186.) Plaintiffs assert that Defendants' alleged transmissions of false claims to the federal government qualify as an "unlawful activity" under the Travel Act. (Compl. ¶ 193.) As elaborated below, the Court need not determine whether Defendants committed violations under these laws because Plaintiffs do not and cannot adequately plead Defendants proximately caused a RICO injury.

Rule 9(b) states, in "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Such circumstances include "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentations and what he obtained thereby." *Weidman v. Exxon Mobil Corp.*, 776 F.3d 214, 219 (4th Cir. 2015). "These facts are often 'referred to as the who, what, when, where, and how' of the alleged fraud." *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008) (quoting *United States ex rel. Willard v. Humana Health Plan of Texas Inc.*, 336 F.3d 375, 384 (5th Cir. 2003). Nevertheless, a "court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999). Mere allegations of "fraud by hindsight" will not satisfy the requirements of Rule 9(b). *Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204, 209 (4th Cir. 1994).

Pleading proximate cause of a RICO injury is also an essential requirement. *Slay's Restoration, LLC v. Wright Nat'l Flood Ins. Co.*, 884 F.3d 489, 493 (4th Cir. 2018). "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff[s'] injuries." *Anza*, 547 U.S. at 461; *see also Slay's Restoration*, 884 F.3d at 493. The analysis "turns on the directness of the resultant harm, not the foreseeability of that harm." *Slay's Restoration*, 884 F.3d at 493. "RICO causation requires a proximity of [a]

27

statutory violation and injury such that the injury is sequentially the direct result—generally at 'the first step' in the chain of causation." *Id.* at 494 (citation omitted).

In the nearly identical case from the United States District Court for the District of Southern Florida, *MSP Recovery Claims, Series LLC v. Caring Voice Coal., Inc.*, the court, citing *Ironworkers Loc. 68 v. AstraZeneca Pharms.*, dismissed Plaintiffs' RICO claims (and tag-along state law claims) on this ground. *Caring Voice Coal., Inc.*, 2022 WL 3155035, at \*9, *Report and Recommendation adopted*, 2022 4448256, at \*1; *Ironworkers Loc.*, 634 F.3d 1352, 1361–70 (11th Cir. 2011).

In *Caring Voice Coal., Inc.*, the plaintiffs were the same as those in the case at hand—assignees of Medicare health insurance providers—and represented by the same law firm. 2022 WL 3155035, at \*9. In that case, the plaintiffs brought nearly identical claims against CVC and a different pharmaceutical company, United Therapeutics ("UT"). *Id.* at \*2. The plaintiffs alleged that the defendants engaged in a scheme to monopolize the market for certain drugs and insulate price sensitivity for those drugs. *Id.* This allegedly caused plaintiffs' assignors to pay artificially inflated prices due to the defendants' agreements. *Id.* There, too, the plaintiffs provided a settlement agreement between UT and the DOJ, where UT was ordered to pay \$210 million for violating the AKS and using CVC as a conduit to eliminate the price sensitivity of patients purchasing the defendant's drugs and inducing more patients to purchase their drugs. *Id.*

In reaching its conclusion, the *Caring Voice Coal., Inc.* court analyzed the United States Court of Appeals for the Eleventh Circuit's case, *Ironworkers Loc. 68*, 634 F.3d at 1355–57. The plaintiffs in *Ironworkers Loc. 68* were health insurance companies that

claimed the defendants, manufacturers of an antipsychotic prescription drug, committed mail and wire fraud that caused plaintiffs to pay more for their enrollees' prescriptions. *Id.* The plaintiffs contended that the defendants engaged in an "illegal off-label marketing campaign" that falsely represented the safety and effectiveness of the drug. *Id.* The Eleventh Circuit affirmed the dismissal of the plaintiffs' RICO claims, holding that they failed to "adequately plead that [the drug manufacturer's] false representations proximately caused the plaintiffs' purported economic losses." *Id.* at 1358. The court reasoned that violators of RICO are not civilly liable to *all* plaintiffs who have been injured. *Id.* at 1361.

*Ironworkers Local 68* also addressed the relationship between physicians, patients, and prescription medications, and discussed how physicians are not obligated to analyze economic efficiency when prescribing medication. *Id.* at 1362–63. The court determined that even if there were a more affordable, generic alternative, a physician prescribing the more expensive drug does not engage in the type of deceptive conduct that would support a RICO claim, unless the drug is unsafe or ineffective. *Id.* Accordingly, the Eleventh Circuit affirmed the district court's dismissal because the plaintiffs failed to show a "direct relation" between the defendant's fraudulent representations and the plaintiffs' loss. *Id.* at 1360–63; *see also Anza*, 547 U.S. at 457 (stating that proximate causation requires a direct relation between the "injury asserted and the injurious conduct alleged"); *Apple, Inc. v. Pepper*, 139 S. Ct. 1514, 1521 (2019) ("[I]ncorporating principles of proximate cause into [antitrust law], we have ruled that indirect purchasers who are two or more steps removed from the violator in a distribution chain may not sue.").

In applying the Eleventh Circuit's reasoning in *Ironworkers Loc. 68*, the court in *Caring Voice Coal., Inc.* dismissed the plaintiffs' claims for failure to plead proximate causation and explained that:

> Plaintiffs resort to making conclusory allegations that UT and CVC's enterprise influenced Plaintiffs' Assignors to purchase more of UT's hypertension drugs. But that is not enough. After all, licensed physicians, pharmacies, and other healthcare actors must still prescribe and administer medications. Physicians may have increased their prescription rates for other easily inferable reasons: an uptick in [patients with the disease] or a lack of competing generic drugs on the market due to UT's patent enforceability rights.

*Caring Voice Coal., Inc.*, 2022 WL 315503, at *11.

As to Plaintiffs' conspiracy allegation, the Fourth Circuit has explained that to plead a § 1962(d) RICO conspiracy claim, a plaintiff must allege that each defendant agreed that another co-conspirator would commit two or more acts of racketeering. *United States v. Pryba*, 900 F.2d 748, 760 (4th Cir. 1990). "[A] civil conspiracy plaintiff cannot bring suit under RICO based on injury caused by any act in furtherance of a conspiracy that might have caused the plaintiff injury." *Beck v. Prupis*, 529 U.S. 494, 504–05 (2000). Instead, a civil conspiracy plaintiff must plead that her injury was caused by something "analogous to an 'act of tortious character.'" *Id.* at 501–05 (quoting 4 Restatement (Second) of Torts § 876, Comment *b*).

In the case at hand, Plaintiffs have failed to state claims under Sections 1962(c) and 1962(d) because they do not and cannot adequately plead Defendants' actions

proximately caused their injuries.[8]  Plaintiffs base their RICO claim on an allegation that CVC sent data and information about their profits to Lundbeck.  In turn, Lundbeck would "donate" funds to CVC for them to "funnel" patients to Lundbeck's drug, Xenazine. (Compl. ¶ 183.)  While Plaintiffs fail to cite specific documents or statements made by either party, they discuss the OIG's investigation and subsequent settlement regarding the "enterprise."  (*See, e.g.*, Compl. ¶ 180.)  The Complaint alleges that this fraudulent conduct influenced more Assignors and Medicare insurers to aid CVC and enrollees with co-payments or similar reimbursements tied to Xenazine.  Plaintiffs incorporated the CVC's executive salary increases and the percent of annual increase in the price of Xenazine.[9]

Even assuming Plaintiffs' allegations satisfy Rule 9(b) to sustain an "association-in-fact enterprise," "it is not enough to establish a 'direct relation' to the 'injury asserted.'"  *Caring Voice Coal., Inc.*, 2022 WL 3155035, at *11 (citing *Anza*, 547 U.S. at 458 ("The direct victim of this conduct was the State of New York, not [the plaintiffs].  It was the State that was being defrauded and the State that lost tax revenue as a result.").  Plaintiffs' Complaint provides limited specificity regarding the existence of a potential

---

[8] The Court addresses this issue first because it assumes without deciding that Plaintiffs may have sufficiently alleged the existence of an "association-in-fact" enterprise.  The Complaint alleges that Defendants were engaged in this enterprise to maximize Lundbeck's profits and CVC's executive compensation.  Plaintiffs also allege this enterprise took place beginning in at least 2011 and continuing through the present.

[9] Plaintiffs also claim to have identified "several beneficiaries that received prescriptions as a result of the Co-Payment Circumvention Scheme," in their proposed supplemental paragraph 49(a).  (Ex. 1 to Mot. to Suppl. Compl.)  The Court has reviewed and considered Plaintiffs' proposed supplement to the Complaint in conducting its analysis.  *See infra*, Section IIE.

RICO enterprise and fraud but then assumes, in blanket fashion, the existence of a proximately caused injury to Assignors.

Plaintiffs in this case are analogous to those in *Caring Voice Coal., Inc.* and *Ironworkers Loc. 68*. They are Medicare insurers who must pay directly or reimburse Medicare beneficiaries' prescription costs. As in those cases, even if Defendants committed the alleged fraudulent activity to benefit themselves, it is unclear how this activity proximately damaged Plaintiffs' Assignors or caused price inflation that directly injured them. Plaintiffs' argument hinges on conclusory allegations that Defendants' enterprise influenced Plaintiffs' Assignors to purchase more Xenazine. But as in *Caring Voice Coal., Inc.* and *Ironworkers Loc. 68*, that is not enough. Other cases stand for this same principle.[10] "After all, licensed physicians, pharmacies, and other healthcare actors must still prescribe and administer medications." *Caring Voice Coal., Inc.*, 2022 WL 3155035, at *11. Physicians may have increased their prescription rates for other easily inferable reasons: an uptick in Huntington's Disease patients or a lack of competing generic drugs on the market. Even assuming only a relatively small number of

---

[10] *See, e.g., MSP Recovery Claims, Series LLC v. Avanir Pharma, Inc.*, No. 22-cv-01026, 2022 WL 17220647, at *1 (C.D. Cal. Oct. 20, 2022) (dismissing Plaintiffs' RICO theory, noting "violations of anti-kickback statutes are not predicate acts under RICO, and Plaintiff has not identified any false statements by [the defendant] in connection with these kickbacks."); *UFCW Loc. 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 134 (2d Cir. 2010) ("Plaintiffs' 'theory of liability rests on the independent actions of third and even fourth parties,' as physicians, [pharmacy benefit managers ('PBM')], and PBM Pharmacy and Therapeutics Committees all play a role in the chain between" the drug manufacturer and third-party payors.); *Sidney Hillman Health Ctr. v. Abbott Labs.*, 873 F.3d 574, 578 (7th Cir. 2017) (surveying caselaw and holding that payors cannot recover under RICO for wrongs committed while marketing drugs because "there are so many layers, and so many independent decisions, between promotion and payment that the causal chain is too long to satisfy the Supreme Court's requirements"); *Se. Laborers Health and Welfare Fund v. Bayer Corp.*, 444 F. App'x 401, 409 & n.5 (11th Cir. 2011) (similar).

Huntington's Disease patients exist, that fact alone cannot plausibly support an inference that an uptick in Xenazine patients was proximately caused by Defendants' fraudulent activities for RICO purposes.

Plaintiffs ultimately fail to state a RICO claim. The "cost-share assistance" program likely obligated Assignors to provide reimbursements, regardless of the cost of Xenazine. As with the plaintiffs in *Caring Voice Coal., Inc.* and *Ironworkers Loc. 68*, Assignors likely "assumed the risk of price fluctuations by enrolling in these Medicare prescription drug plans." *Caring Voice Coal., Inc.*, 2022 WL 3155035, at *11. The alleged fraudulent conduct took place before generic drug competition, which can explain how Lundbeck dominated the Xenazine drug market. And, as for Assignors who were direct payers of Xenazine, their RICO claims fail for the same reasons relied upon in *Caring Voice Coal., Inc.* and *Ironworkers Loc. 68.*

The impossibility of calculating damages between Assignors who paid directly for Xenazine or simply reimbursed PAPs, like CVC, further shows that the proximate cause element has not and cannot be satisfied. Without a more plausible allegation of direct injury, this Court is left to speculate as to the portion of increased costs due to Defendants' alleged fraudulent activity and how it disproportionately affected Assignors. The Court must also confront Plaintiffs' allegation that Lundbeck's fraudulent activity with CVC caused Plaintiffs' Assignors to purchase more Xenazine. Plaintiffs mainly attribute the price changes to the OIG's 2017 CVC Recission Letter which states that "physicians may be more likely to prescribe, a more expensive drug, if copay assistance is available . . . ." (Compl. ¶ 88.)

Plaintiffs attempt to draw a causal chain by linking Defendants' actions through various independent actors (physicians, pharmacies, etc.) together with allegations of manipulated price influences and fraudulent behavior. However, they still fail to state a RICO claim because the alleged causal chain is too far attenuated. While this Court can fairly trace Plaintiffs' alleged injuries to meet Article III standing, Fourth Circuit RICO law requires Plaintiffs to plead proximate cause more specifically, and, based on the circumstances of this case, Plaintiffs cannot possibly do so. Plaintiffs did not and cannot specify how an estimated thousands of independent actors, like physicians and pharmacists, played into these injuries, or how Defendants' actions influenced these economic injuries. Moreover, Plaintiffs cannot adequately calculate damages, or articulate how Defendants' "enterprise" proximately injured Assignors. Thus, Defendants' Motions to Dismiss Count I will be granted.

As for the § 1962(d) claim for conspiracy to violate § 1962(c) (Count II), this claim necessarily depends on the success of Plaintiffs' substantive RICO claim (Count I). *See GE Invest. Priv. Placements Partners II v. Parker*, 247 F.3d 543, 551 n.2 (4th Cir. 2001). Because Plaintiffs fail to adequately allege a substantive RICO claim, their conspiracy claim also fails. Thus, Defendants' Motions to Dismiss will be granted as to Count II. *See id.*

### 2. Plaintiffs' State Law Consumer Protection Claims Fail to Plead a Proximate Injury from Defendants' Actions and an Unjust Enrichment Claim is Improper (Counts III & IV)

Plaintiffs allege that Defendants violated various state consumer protection laws and that Plaintiffs' Assignors unjustly enriched Defendants through inflated

reimbursements. Plaintiffs rely on several similar state consumer protection laws that Defendants allegedly violated. *See, e.g.*, Mass. Gen. Laws Ch. 93A §§ 1, *et seq.*; Fla. Stat. Ann. § 501.203(6)–(7). As an example, Plaintiffs assert that Defendants violated the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). Fla. Stat. Ann. § 501.203. FDUTPA, like the other state consumer protection laws Plaintiffs raise, prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]" Fla. Stat. § 501.204(1). To assert a valid consumer protection claim, a plaintiff must have suffered an injury in fact, ascertainable loss, and actual damages as a direct and proximate result of the defendant's illegal behavior. *KC Leisure, Inc. v. Haber*, 972 So.2d 1069, 1074 (Fla. Dist. Ct. App. 2008).

Plaintiffs vaguely argue, citing to no specific statute, that "it would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states . . . except Ohio and Indiana, for RICO Defendants to be permitted to retain any of the overcharges for Xenazine derived from [Defendants'] unfair and unconscionable methods[.]" (Compl. ¶ 347.) Generally, to state an unjust enrichment claim, a plaintiff must show "(1) a measurable benefit was conferred on the defendant, (2) the defendant consciously accepted that benefit, and (3) the benefit was not conferred officiously or gratuitously." *Primerica Life Ins. Co. v. James Massengill & Sons Constr. Co.*, 712 S.E.2d 670, 677 (N.C. Ct. App. 2011) (citation omitted). A viable unjust enrichment claim must be analyzed independently of alleged generic wrongs. *See, e.g.*, *State, Off. of Atty. Gen., Dep't of Legal Affs. v. Tenet Healthcare Corp.*, 420 F. Supp. 2d

35

1288, 1309 (S.D. Fla. 2005). Moreover, "[i]t is well established that if there is a contract between the parties, the contract governs the claim" and recovery for unjust enrichment is improper. *Delta Envtl. Consultants, Inc. v. Wysong & Miles Co.*, 510 S.E.2d 690, 694 (N.C. Ct. App. 1999) (quotation omitted). The same is true under the law of most states, *see, e.g.*, *Hilton v. Worldwide, Inc. Glob. Benefits Admin. Comm. v. Ceasars Ent. Corp.*, 534 B.R. 259, 276 (E.D. Va. 2015) (applying New York law), including Plaintiffs' state of residence, Florida, *see Lewis v. Mercedes-Benz USA, LLC*, 530 F. Supp. 3d 1183, 1234–35 (S.D. Fla. 2021).

In this case, Plaintiffs' state consumer protection law and unjust enrichment claims should be dismissed. As discussed above, Plaintiffs' RICO claims fail because they cannot plead their injuries were proximately caused by Defendants' actions, nor can this Court trace Defendants' alleged actions to calculate Plaintiffs' damages. *See supra* Section C1; *see also Caring Voice Coal., Inc.*, 2022 WL 3155035, at *13. Plaintiffs merely restate their RICO claims, couched in consumer protection terms, to match state consumer protection laws. Because this Court cannot tie Defendants' actions to federal law and damages, the same applies to the duplicative state law claims. Therefore, the consumer protection claims must be dismissed because no direct causal chain exists between Plaintiffs' injuries and Defendants' actions.

Similarly, Plaintiffs fail to allege an independent and viable unjust enrichment claim, nor can they. Plaintiffs contend that they unjustly enriched Defendants by reimbursing for Xenazine at inflated prices due to Defendants' illegal conduct. However, they fail to allege the predicate elements of liability for the claim. "They simply seek a

remedy of repayment of alleged inflated reimbursement numbers (assuming they can be calculated) because of [Lundbeck's] alleged 'wrongs.'  Viable unjust enrichment cases do not simply focus on any 'alleged wrongs,' yet Plaintiffs only rely on 'Defendants' misconduct' as a generic basis for this claim."  *Id.*; *see also Tenet Healthcare Corp.*, 420 F. Supp. 2d at 1309.  Moreover, Plaintiffs acknowledge that their Xenazine reimbursements were all made pursuant to a contract with the patient or the government, which further demonstrates recovery for this claim would be improper. *See Wysong & Miles Co.*, 510 S.E.2d at 694.  An unjust enrichment claim is not a viable basis for recovery for these reasons, and therefore, Defendants' Motions to Dismiss Counts III and IV will be granted.

### 3. Plaintiffs' Florida State RICO Claim Fails Because It Mirrors Federal RICO Law (Count V)

Plaintiffs' claim under the Florida Civil Remedies for Criminal Practices Act, Fla. Stat. § 771.101, is the state equivalent of a federal civil RICO claim.  Accordingly, this claim should be dismissed for the same reasons this Court will dismiss Plaintiffs' federal RICO claims. *See* Section C1; *Jackson v. BellSouth Telecommc'ns*, 372 F.3d 1250, 1263–64 (stating that the Eleventh Circuit has consistently ruled that "the analysis we apply to the plaintiffs' federal RICO claims is equally applicable to [Florida's] state RICO claims."); *see also All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc.*, 135 F.3d 740, 745 (11th Cir. 1998) ("Florida's RICO statutes have consistently been interpreted using federal RICO claim cases.").  Therefore, Plaintiffs' shortcomings regarding their federal RICO claims also apply to their Florida Civil Remedies claim.

Plaintiffs must, but do not and cannot, plead with particularity how Defendants' alleged conduct proximately injured Plaintiffs' Assignors. Thus, Defendants' Motions to Dismiss Count V will be granted.

### 4. Plaintiffs' Fraudulent Transfer Claim Necessarily Fails Because Plaintiffs' RICO Claims Fail (Count VI)

Plaintiffs' Fraudulent Transfer claim, pursuant to Va. Code. Ann. § 55.1-400, *et seq.*, fails because Plaintiffs solely base this claim on CVC and Adira's alleged pattern of racketeering activity. Plaintiffs argue that they became bona fide creditors because they were victims of Defendants' RICO violations. (Compl. ¶ 377.) Plaintiffs cannot be bona fide creditors without viable underlying claims against Adira's alleged transferor, CVC. *See Grayson v. Westwood Bldgs. L.P.*, 859 S.E.2d 651, 669 (Va. 2021) ("A conveyance to a bona fide creditor presupposes that the debt is owed because of a legal or a moral duty to pay supported by consideration deemed valuable in law."). This Court has not concluded that CVC or Adira violated any laws or that they somehow owe Plaintiffs money. Plaintiffs, thus, are not bona fide creditors. Accordingly, CVC and Adira's Motions to Dismiss Count VI will be granted.

### 5. Plaintiffs' Successor Liability Claim as to Adira Fails Because Plaintiffs' Substantive Claims Fail (Count VII)

Plaintiffs' Successor Liability claim fails because Adira's predecessor, CVC, is not liable to Plaintiffs. Plaintiffs argue that "Adira is jointly and severally liable to Plaintiffs and the class members for CVC's involvement in the [RICO] Enterprise." (Compl. ¶ 393.) A successor is liable for its predecessor's debts and liabilities when the two companies are essentially the same. *See Kaiser Found. Health Plan of Mid-Atlantic*

States v. Clary & Moore, P.C., 123 F.3d 201 (4th Cir. 1997) (listing the scenarios that must take place to hold a successor liable). Even assuming Adira is CVC's successor and liable for CVC's debts and liabilities, this Court, as elaborated above, has determined that CVC is not liable to Plaintiffs. Accordingly, Adira's Motion to Dismiss Count VII will be granted.

### D. Plaintiffs' Motion for TRO and Preliminary Injunction Should be Denied Because They are Not Likely to Succeed on the Merits

Federal Rule of Civil Procedure 65 authorizes federal courts to issue temporary restraining orders and preliminary injunctions. The standard for granting either a TRO or a preliminary injunction is the same. *See MicroStrategy Inc. v. Motorola*, 245 F.3d 335, 339 (4th Cir. 2001). Both are "extraordinary remedies involving the exercise of a very far-reaching power to be granted only sparingly and in limited circumstances." *Id.* The movants bear the burden to establish that (1) they are likely to succeed on the merits of their case; (2) they are likely to suffer irreparable harm in the absence of injunctive relief; (3) the balance of equities tips in their favor; and (4) an injunction would be in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *Manning v. Hunt*, 119 F.3d 254, 263 (4th Cir. 1997).

Plaintiffs seek a TRO and preliminary injunction to enjoin Adira from dissolving, divesting, and terminating. As indicated by this Court's analysis above, Plaintiffs have failed to establish that they are likely to succeed on the merits of their case. *See Winter*, 555 U.S. at 22. Thus, the Court will deny Plaintiffs' Motion.

## E. Plaintiffs' Motion to Supplement the Complaint Should be Granted

Plaintiffs move the Court for leave to supplement their Complaint pursuant to

Federal Rule of Civil Procedure 15(d). Rule 15(d) states:

> On motion and reasonable notice, the court may, on just terms, permit a party
> to serve a supplemental pleading setting out any transaction, occurrence, or
> event that happened after the date of the pleading to be supplemented. The
> court may permit supplementation even though the original pleading is
> defective in its stating a claim or defense. The court may order that the
> opposing party plead to the supplemental pleading within a specified time.

A supplemental pleading differs from an amended pleading because a supplemental

pleading relates to matters occurring after the filing of the initial complaint, while an

amended pleading relates to matters occurring prior to the filing of the initial complaint.

*Franks v. Ross*, 313 F.3d 184, 198 n.15 (4th Cir. 2002) (citing Fed. R. Civ. P. 15(d)).

Nonetheless, "[t]he standards used by a district court in ruling on a motion to amend or

on a motion to supplement are nearly identical." *Id.* Leave to amend is freely granted

unless "the amendment would be prejudicial to the opposing party, there has been bad

faith on the part of the moving party, or the amendment would have been futile." *Laber

v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006).

Plaintiffs seek to add a single paragraph and accompanying spreadsheet to

demonstrate "several beneficiaries that received prescriptions" because of Defendants'

alleged RICO scheme. (Ex. 1 to Mot. to Suppl. Compl. at 1.) The spreadsheet includes

the following categories in columns: "msp_mrd_id; msp_client;

msp_member_id_updated; msp_drug_name; DOS," and rows of data spanning fourteen

pages. (*Id.*) The "DOS" column includes dates (*e.g.*, "2013-02-28"). (*Id.*) The Court

presumes "DOS" stands for "dates of service," as is commonly referenced in insurance

contexts. *See, e.g.*, *Wilson v. UnitedHealthcare Ins. Co.*, 27 F.4th 228, 234 (4th Cir.

2022) (stating "DOS" means "dates of services"). The spreadsheet's entries range in date

from 2010 to 2016.

　　　Plaintiffs argue that leave to supplement the Complaint is necessary. They

maintain they were unable to access the information included in the proposed

supplemental pleading because, during the discovery process, CVC provided incomplete

documents that "made it unreasonably difficult to review" because the documents had

"missing files, atypical file types, password protected folders," etc. (Mot. to Suppl.

Compl. at 4.) Plaintiffs assert that it was only until after the motions hearing before this

Court that "Plaintiffs were able to work through those technical difficulties using a third-

party vendor." (*Id.*)

　　　Defendants contend that Plaintiffs' Motion to Supplement Complaint should be

construed as a motion to amend under Rule 15(a). This is because Rule 15(d) only

allows a party to supplement their pleadings to include any "transaction, occurrence, or

event that happened *after the date of the pleading* to be supplemented," and the data

within the spreadsheet took place *before* Plaintiffs' filed the Complaint. (Lundbeck's

Mem. in Opp'n to Mot. to Suppl. at 3, ECF No. 88; Theracom's Mem. in Opp'n to Mot.

to Suppl. at 1 n.1, ECF No. 89.) Defendants, however, do not oppose the Court

considering the contents of ECF No. 87-1 in deciding the pending Motions to Dismiss.

(Lundbeck's Mem. in Opp'n to Mot. to Suppl. at 3; Theracom's Mem. in Opp'n to Mot.

to Suppl. at 1 n.1.)

A motion to amend a pleading should only be denied as futile if a proposed amendment advances a claim or defense that is frivolous or legally deficient on its face, including failure to state a plausible claim under Rule 12(b)(6). *Kellogg Brown & Root, Inc.*, 525 F.3d at 376. While the Court is not thoroughly convinced granting leave to supplement the Complaint would not be futile, the Court will nonetheless grant Plaintiffs' Motion, as such leave should be freely granted. *See Steinburg*, 527 F.3d at 390. The Court is persuaded by Plaintiffs' argument that Rule 15(d) applies because an event *did* take place after the Complaint was filed—namely, it was only until *after* the Complaint was filed that Plaintiffs could access the information.[11] However, to be clear, even considering the information provided by Plaintiffs in ECF No. 87-1, and even if Plaintiffs could access more data of this kind, Plaintiffs nonetheless fail to state a claim upon which relief can be granted. Nothing in Plaintiffs' proposed amendment cures the Complaint's critical flaws as discussed above.

First, Plaintiffs' proposed amendment confirms that Plaintiffs' Assignors are indirect purchasers who should be precluded from recovery under RICO. *See* Section IIA; *see also Tiller*, 814 F.2d at 937; *Humana*, 2022 WL 17718342, at *1. Second, Plaintiffs' proposed amendment does not and cannot remedy the Complaint's failure to satisfy proximate causation. *See* Section IIC. Even assuming Plaintiffs can demonstrate

---

[11] The Court notes that the District Court for the Southern District of Florida recently addressed essentially the same issue brought by these Plaintiffs and denied their similar motion to supplement the complaint in *MSP Recovery Claims, Series LLC v. Caring Voice Coal., Inc.*, No. 1:21-cv-21317 (S.D. Fla. Mar. 3, 2023). While this Court agrees that Plaintiffs' justification for supplementing the Complaint is thin and lacks much detail, this Court will nonetheless grant Plaintiffs' Motion because the standard for ruling on a Rule 15(d) motion is a lenient one.

that their Assignors reimbursed for Xenazine, Plaintiffs' conclusory allegations that Defendants' unlawful conduct—based on a no-fault settlement with the DOJ—influenced Plaintiffs' Assignors to purchase *more* Xenazine and Xenazine at *supra-competitive prices* is not enough. *See Caring Voice Coal, Inc.*, 2022 WL 315503, at *11. Various independent actors—such as physicians and pharmacies—stand between Defendants' alleged unlawful conduct and Assignors' alleged injuries. *See id.*; *see also Slay's Restoration*, 884 F.3d at 493; *Anza*, 547 U.S. at 461 ("When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff[s'] injuries."). As explained above, various plausible and inferable reasons exist as to why physicians may have increased their prescription rates. *See Caring Voice Coal., Inc.*, 2022 WL 3155035, at *11. And, even assuming, *arguendo*, Defendants' conduct was unlawful, "violators of RICO are not civilly liable to *all* plaintiffs who have been injured." *Ironworkers Loc.* 68, 634 F.3d at 1361. Indeed, the direct victim of any unlawful conduct alleged was the United States government, not Plaintiffs' Assignors. *See Anza*, 547 U.S. at 458 ("The direct victim of this conduct was the State of New York, not [the plaintiffs]. It was the State that was being defrauded and the State that lost tax revenue as a result.").

Thus, the Court will grant Plaintiffs' Motion to Supplement the Complaint, however, even considering the proposed amendment, the Court will nonetheless grant Defendants' Motions to Dismiss as to all Counts for the aforementioned reasons.

## IV. CONCLUSION

The Complaint fails to adequately plead Defendants' alleged conduct proximately caused indirect-purchaser Plaintiffs' purported damages. The Court further finds that any amendment would be futile based on the facts and circumstances of this case and will dismiss Plaintiffs' Complaint with prejudice. *See Elrod v. Busch Ent. Corp.*, 479 F. App'x 550, 551 (4th Cir. 2012) (allowing trial courts to deny leave to amend a complaint if the complaint, as amended, would not withstand a motion to dismiss); *see also Harvey*, 438 F.3d at 426; *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 471 (4th Cir. 2011), *cert. denied*, 565 U.S. 825 (2011).

The parties have extensively briefed on the merits of this case. Defendants filed three separate Motions to Dismiss. (ECF Nos. 32, 33, 36.) Plaintiffs responded to each of them separately, filing a total of 88 pages in opposition, with 25 separate exhibits. (ECF Nos. 51–53.) This Court previously granted Plaintiffs' Motion for Leave to File Sur-replies to Lundbeck's Motion to Dismiss (ECF No. 67) and Theracom's Motion to Dismiss (ECF No. 69). Both Defendants responded to those motions for leave to file sur-replies, as well. (ECF Nos. 71, 76.) Before oral argument, Lundbeck filed a notice of supplemental authority (ECF No. 82) and Plaintiffs filed a Motion for a TRO and Preliminary Injunction against Adira, which addressed the likelihood of success on the merits (ECF Nos. 74–75.) Following oral argument, Plaintiffs filed their Motion to Supplement Complaint (ECF No. 87), to which Defendants Lundbeck and Theracom responded (ECF Nos. 88, 89) and Plaintiffs replied (ECF No. 90). There is no need for

further briefing for the Court to reach a final judgment on the merits of the legal issues presented in this case, and, as stated, any further amendment would be futile.[12]

An appropriate Order will accompany this Memorandum Opinion.

/s/
Henry E. Hudson
Senior United States District Judge

Date: **March 24, 2023**
Richmond, Virginia

---

[12] In determining further amendment would be futile, the Court notes that Plaintiffs' assignment theories and litigation strategies have garnished harsh criticism from courts around the country. *See MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*, 994 F.3d 869, 878–89 (7th Cir. 2021) (summarizing cases criticizing Plaintiffs' tactics and stating, "[f]ederal courts do not possess infinite patience . . . The plaintiffs' approach is not sitting well with many judges"); *MSP Recovery Claims, Series LLC v. New York Cent. Mut. Fire Ins. Co.*, 2019 WL 4222654, at *6 (N.D.N.Y. Sept. 5, 2019) ("Plaintiffs' tactics are a flagrant abuse of the legal system.").